Kenneth E. Chase (SBN 326307)
kchase@chaselaw.com
CHASE LAW & ASSOCIATES, P.A.
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431
Telephone: (561) 709-7000

*Attorneys for Plaintiff Kosher Eats LLC*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KOSHER EATS LLC, a Florida limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MESSNER REEVES LLP, a Colorado limited liability partnership, CLEARWATER PREMIERE PERPETUAL MASTER LLC, a Wyoming limited liability company, TORBEN WELCH, an individual, DANIEL CHARTRAW a/k/a Leon Chartue, an individual, and TITAN FINANCIAL, LLC, a Wyoming limited liability company,<br><br>Defendants. | **Civil Action No. 2:24-cv-05161**<br><br>**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |

## VERIFIED COMPLAINT

Plaintiff Kosher Eats LLC brings this action against Defendants Messner Reeves LLP ("Messner"), Clearwater Premiere Perpetual Master LLC ("Clearwater"), Torben Welch, Daniel Chartraw a/k/a Leon Chartue, and Titan Financial, LLC ("Titan").

Plaintiff seeks $6,000,000 in trebled damages and injunctive relief for the theft of its escrowed funds due to Defendants' violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act.

## INTRODUCTION

1.      Defendants formed an unlawful enterprise and committed five acts of wire fraud, stealing $7,670,000 from their victims, including $2,000,000 from Plaintiff. Under the false pretense of serving as an escrow pursuant to sizable business loans with no personal guarantee, which were never going to be made, Defendant Messner obtained possession of the victims' deposit money in its law firm trust account. As part of this advance fee scam, Defendant Messner failed to remit the escrowed money to the lender or borrower. Instead, Defendant Messner conspired with a convicted felon, lied about the money, presented fraudulent documents, threatened those seeking a truthful explanation, and stonewalled.

2.      Defendant Chartraw is a convicted felon, thief, fraudster, and former fugitive with an extensive criminal history. In 2012, after he was arrested, he skipped bail, adopted an alias, and absconded to Mexico. Chartraw was apprehended by the FBI, extradited, and indicted in the Eastern District of California on 18 counts of wire fraud perpetrated in a manner similar to the crimes in this case. After a guilty plea, Defendant Chartraw was sentenced to four years and nine months in federal prison. Chartraw also pled guilty to state felony theft crimes and felony domestic battery, and he was concurrently sentenced to seven years in state prison.

3.      Defendants, including Messner, Clearwater, Welch, and Chartraw, engaged in predicate acts of racketeering by defrauding new businesses with a false promise that if the business made a deposit into Defendant Messner's trust account, supposedly to be held safely by Messner, the business would receive a loan for millions of dollars within 90 days. The loan would be four times larger than the escrow deposit, and the loan would not require a personal guarantee or real estate collateral. The phony and phantom loan terms obligated a borrower to pay only interest payments at a mere

1   six per cent, which, at that time, was marginally above the prevailing inflation rate.

2   And of course, the principal did not become due until the end of the ten-year period.

3      4.      These purported loan terms are irrational, and even if the lender had the

4   money, and it didn't in this case, no sensible lender would issue a loan under such

5   conditions. Without a personal guarantee or real estate collateral, a borrower could

6   simply receive the massive loan and then dissolve the business while retaining all the

7   funds, and the lender would have no recourse. Moreover, the six per cent interest-only

8   rate for ten years rendered the loan essentially worthless on an inflation-adjusted basis,

9   providing virtually no economic benefit even in a best-case scenario where the

10  borrower made every payment without risk.

11     5.      Plaintiff, like other similarly situated victims, was a small business

12  seeking financing to expand its operations. The purported lender, manipulated by

13  Defendants, is a shell entity created in September 2022 as a Wyoming limited liability

14  company just months before Defendants fraudulently procured the victims' deposits in

15  2023. The phony lender's website is riddled with misrepresentations, including false

16  claims about the amount of money it possesses and the number of deals it has closed.

17  The fake lender entity has no capital, no lender's license, and no capacity to issue any

18  loans.

19     6.      After receiving Plaintiff's $2,000,000 deposit, Messner, acting in concert

20  with the other Defendants, made false and dilatory statements about the status of the

21  supposedly forthcoming loan, claiming that "everything is still on track" and the funds

22  would be "freed up" soon. When the deadline passed for the funding of the loans,

23  Defendants further dissembled and pretended that the delays were administrative in

24  nature and that the loans would be funded imminently.

25     7.      Welch, the managing partner of a Messner office who placed himself

26  directly in the center of the fraud scheme, falsely stated on August 24, 2023, "[t]he

27  bankers are still working through transfer protocols and clearance of the funds. I remain

28  hopeful funds are cleared and deposited tomorrow." But no "bankers" were "working

through" any "transfer protocols." Welch then dodged communications, directed others to run interference for him, and abused his position by threatening those who sought truthful and candid information about the stolen money.

8.      Plaintiff wired $2,000,000 to Messner while trusting the sanctity of an escrow in a law firm's trust account. On November 3, 2023, Welch proclaimed "[t]he funds are under the possession and control of the Firm awaiting deployment." But with the funds still unaccounted for more than two months later, on January 25, 2024, Welch changed his story and asserted that the funds were actually held by a shell Wyoming limited liability company, Titan, that was formed on November 7, 2023, under Chartraw's business partner's name, with the signature of Welch's assistant. Peddling in forged and fraudulent documents, Welch attached a bogus PDF with scrubbed out metadata supposedly reflecting an IOLTA account that did not even correspond to a bank as Welch falsely stated, "[t]he funds remain part of the escrow under our control at Titan Financial, LLC."

9.      On April 18, 2024, pursuant to a sister lawsuit against Messner by another victim, Defendant Messner's counsel contradicted Welch's assertion that Titan possessed the missing money, as Messner's counsel stated that Defendant *Clearwater* possessed the escrow money and not Defendant *Titan*. Neither of those entities should have Plaintiff's money because Plaintiff never conducted any business with Clearwater or Titan, the phony lender never received the deposit money, and Plaintiff did not consent to the transfer of its money anywhere out of Messner's trust account. Plaintiff demanded the return of its stolen money and Defendants stonewalled. For these transgressions, Plaintiff demands satisfaction.

## PARTIES

10.      Plaintiff is a Florida limited liability company with one member, Frysta Management LLC, a Florida limited liability company, whose two members, Noah Lasko and Deborah Lasko, are Florida citizens.

11.     Defendant Messner is a Colorado limited liability partnership, and none of Messner's partners are citizens of Florida. The citizenship of Messner's partners is set forth below.

1. Caleb Meyer, CEO and Partner. His listed locations of practice are Denver, Colorado, Greenwood Village, Colorado, and Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the State of Colorado.

2. Michelle L. Harden, COO and Managing Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the State of Colorado.

3. Renne M. Finch, CSO and Partner. Her listed location of practice is Las Vegas, Nevada. Upon information and belief, she is a citizen and domiciliary of the State of Nevada.

4. David A. Reeves, Managing Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

5. Benjamin Tietgen, Partner. His listed location of practice is Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Arizona.

6. Darren D. Alberti, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

7. Kate A. Bailey, Partner. Her listed location of practice is Denver, Colorado, Greenwood Village, Colorado and Salt Lake City, Utah. Upon information and belief, she is a citizen and domiciliary of either the state of Colorado or the State of Utah.

8. Brenda L. Bartels, Partner. Her listed location of practice is Colorado Springs, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

9. Alex Beltz, Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

10. Amber L. Blasingame, Partner. Her listed location of practice is Colorado Springs, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

11. Brett A. Boon, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

12. Valerie D. Bromley, Partner, whose listed location of practice is Greenwood Village, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

13. Edgar Carranza, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.

14. Kathleen Carter, Partner. Her listed location of practice is Costa Mesa, California. Upon information and belief, she is a citizen and domiciliary of the state of California.

15. Cynthia T. Carucci, Partner. Her listed location of practice is Costa Mesa, California. Upon information and belief, she is a citizen and domiciliary of the state of California.

16. Charles C. Cavanagh, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

17. Laura Chartrand, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

18. Gregory B. Cohen, Partner. His listed location of practice is San Jose, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

19. Kimberley P. Cronin, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

20. Isaac S. Crum, Partner. His listed location of practice is Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Arizona.

21. Erica M. Deatherage, Partner. Her listed location of practice is Phoenix, Arizona. Upon information and belief, she is a citizen and domiciliary of the state of Arizona.

22. Matthew J. Deenihan, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

23. Allison Dodd, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

24. Brieanna M. Dolmage, Partner, whose listed location of practice is Costa Mesa, California. Upon information and belief, she is a citizen and domiciliary of the state of California.

25. Patrick G. Drake, Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

26. R.J. Ertmer, Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

27. Rachel Farr, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

28. Mary Bryne Fletcher, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

29. Austin J. Gemmell, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

30. Matthew W. George, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

31. Deanna Gilbertson, Partner. Her listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

32. Margaret K. Gray, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

33. Scott Hawranek, Partner. His listed location of practice is Colorado Springs, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

34. Andrew S. Hollins, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

35. Amy E. Huff, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

36. Craig a. Humphrey, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

37. Matt M. Jedrzejek, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

38. Maclain Joyce, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

39. Idin Kashefipour, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

40. Dara Keller, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

41. Daniel J. Klett, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.

42. Steven G. Knauss, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.

43. Marjorie E. Kratsas, Partner. Her listed location of practice is Las Vegas and Reno, Nevada. Upon information and belief, she is a citizen and domiciliary of the state of Nevada.

44. Jason G. Martinez, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.

45. Bryant Messner, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

46. Ian R. Mitchell, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

47. Scott Monroe, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

48. Simone M. Montoya, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

49. Bruce A. Montoya, Partner. His listed location of practice is Denver and Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

50. Kathleen J. Mowry, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

51. Christina Mundy, Partner. Her listed location of practice is Las Vegas, Nevada. Upon information and belief, she is a citizen and domiciliary of the state of Nevada.

52. Ann A.P. Nguyen, Partner. Her listed location of practice is San Jose, California. Upon information and belief, she is a citizen and domiciliary of the state of California.

53. Katherine Otto, Partner. Her listed location of practice is Denver, Colorado and New York, New York. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

54. Jonathan B. Owens, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.

55. Julian Pardo de Zela, Partner. His listed location of practice is San Jose, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

56. Frank J. Perretta, Partner. His listed location of practice is San Jose, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

57. Peter W. Pierce, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

58. William D. Randall, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

59. Richard Reice, Partner. His listed location of practice is New York, New York. Upon information and belief, he is a citizen and domiciliary of the state of New York.

60. Adam M. Royval, Partner. His listed location of practice is Denver, Colorado and Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

61. Heather A. Salg, Partner. Her listed location of practice is Greenwood Village, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

62. Edwin N. Schwartz, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

63. Mikhail A. Shah, Partner. His listed location of practice is New York, New York. Upon information and belief, he is a citizen and domiciliary of the state of New York.

64. Greg Sitrick, Partner. His listed location of practice is Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Arizona.

65. Rowan P. Smith, Partner. His listed location of practice is Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Arizona.

66. Aaron N. Soleimani, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

67. Heather E. Stern, Partner. Her listed location of practice is Costa Mesa, California. Upon information and belief, she is a citizen and domiciliary of the state of California.

68. John H. Stevens, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

69. Deanne R. Stodden, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

70. Matthew R. Sullivan, Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

COMPLAINT

71. Jenny L. Thornton, Partner. Her listed location of practice is Greenwood Village, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

72. Wade Warthen, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

73. Andrew R. Welch, Partner. His listed location of practice is Salt Lake City, Utah. Upon information and belief, he is a citizen and domiciliary of the state of Utah.

74. Defendant Torben M. Welch, Partner. His listed location of practice is Salt Lake City, Utah. Upon information and belief, he is a citizen and domiciliary of the state of Utah.

75. Karie N. Wilson, Partner. Her listed location of practice is Las Vegas, Nevada. Upon information and belief, she is a citizen and domiciliary of the state of Nevada.

76. Douglas C. Wolanske, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

77. Jon B. Zimmerman, Partner. His listed location of practice is San Jose, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

12. Defendant Clearwater is a Wyoming limited liability company with one member, Todd Owen, who is a citizen of California.

13. Defendant Welch is a natural person and a citizen of Utah.

14. Defendant Chartraw a/k/a Chartue is a natural person and a citizen of California.

15. Defendant Titan is a Wyoming limited liability company with one member, Todd Owen, who is a citizen of California.

**JURISDICTION AND VENUE**

16.      Diversity jurisdiction is established under 28 U.S.C. § 1332. Plaintiff is a citizen of Florida. Defendant Messner is a citizen of Arizona, California, Colorado, Nevada, New York, and Utah. Defendant Clearwater is a citizen of California. Defendant Welch is a citizen of Utah. Defendant Chartraw is a citizen of California. Defendant Titan is a citizen of California. Accordingly, complete diversity exists between Plaintiff and Defendants.

17.      The amount in controversy requirement of 28 U.S.C. § 1332 is satisfied because more than $75,000 is at issue, exclusive of costs, interest, and attorneys' fees.

18.      Jurisdiction pursuant to 28 U.S.C. § 1331 is concurrently established pursuant to the RICO claim under 18 U.S.C. § 1961, et seq. The Court has supplemental jurisdiction over the state law claims because they are sufficiently related to the RICO claim, and they form the same case and controversy.

19.      This action properly lies in the Central District of California pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965. A substantial part of the events or omissions giving rise to the claims occurred here. Defendant Messner is subject to specific and general personal jurisdiction in California because Messner's contacts with this forum state, including 41 practicing California attorneys and 21 partners who are California citizens, are continuous and pervasive such that it is fair to subject Messner to personal jurisdiction in California for all purposes. Defendant Welch is subject to specific personal jurisdiction in California because he carried on a business  and committed unlawful, unfair, and fraudulent business acts and practices in this state, both individually and as part of an enterprise with two California citizens. Defendants Clearwater, Chartraw, and Titan are citizens of California and are therefore subject to specific and general personal jurisdiction in California.

20.      Venue is appropriate in this court.

21.      All conditions precedent to bringing this lawsuit, if any, have occurred, been excused, or waived.

## FACTS COMMON TO ALL COUNTS

22.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

23.    Defendants operated under the guise of common representation by Defendants Messner and Welch, while acting at the direction of a convicted felon and known fraudster, Chartraw. Defendants stole Plaintiff's escrow funds in a manner strikingly similar to Chartraw's previous criminal activities, which led to his wire fraud conviction and a 57-month federal prison sentence.

24.    Plaintiff was one of at least five victims whose money was stolen pursuant to the predicate acts of wire fraud committed by Defendants.

25.    On or about the dates listed below, for the purpose of executing and effectuating the scheme and artifice to defraud as discussed herein, and attempting to do so, Defendants, as more specifically set forth herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures and sounds.

| Predicate Act | Date of Wire | Wire Amount | Victim | Receiving Account |
|---|---|---|---|---|
| 1 | April 27, 2023 | $2,000,000 | Plaintiff | Northern Trust x-[redacted] |
| 2 | June 13, 2023 | $700,000 | Emerald Consulting Partners, LLC | Northern Trust x-[redacted] |
| 3 | June 19, 2023 | $1,145,000 | MSC Companies, LLC | Northern Trust x-[redacted] |
| 4 | June 29, 2023 | $3,500,000 | Abbson LLC | Northern Trust x-[redacted] |
| 5 | August 1, 2023 | $325,000 | Konala, LLC | Northern Trust x-[redacted] |
| Total | | $7,670,000 | | |

26.    Plaintiff operates a Kosher food business, and, in early 2023, Plaintiff sought financing for the expansion of his business.

27.     Defendant Messner is a law firm with 129 attorneys in 11 offices and 20 practice groups, including banking and financial services.

28.     Defendant Clearwater is a shell Wyoming entity created on May 24, 2022.

29.     Defendant Titan is a shell Wyoming entity created on November 7, 2023.

30.     Defendant Welch is the managing partner of Messner's Utah office.

31.     Defendant Chartraw is a convicted felon and parolee who continues to involve himself in fraudulent theft schemes.

32.     Defendant Welch has been a Messner partner since 2006, and according to the Messner website, Welch specializes in complex business transactions worldwide, providing practical, solutions-oriented operations and general counsel services to help clients achieve their business goals. Welch's practice areas include real estate, finance, international business, lending/banking, tech, hospitality, and sports.

33.     Messner states on its website that Welch is "a top-rated attorney with the skills, knowledge, and experience to help his clients navigate the complexities of legal matters." Messner claims that Welch's diverse experience, practical approach, and unique legal perspective make him an invaluable asset to any client. The website also highlights Welch's achievements in negotiating and closing a 10-figure financing deal for an entertainment and hospitality resort and negotiating and acquiring $100 million of bonds in the oil and gas industry.

34.     At all relevant times, all actions taken by Welch, as discussed herein, are attributable jointly and severally to Messner, who failed to supervise Welch or demonstrate oversight over his conduct.

I.     **Defendant Messner Undertook Representation in Connection with a Failing and Increasingly Fraudulent Attempt to Build a Sports and Entertainment Arena in Las Vegas.**

35.     Approximately 10 years ago, a former college basketball player named Jackie Robinson, who had recently filed for bankruptcy, sought to build a massive

sports and entertainment megaplex in Las Vegas. Robinson also played in the NBA for three seasons, averaging 3.8 points per game in 76 total games.

36.     Robinson filed for bankruptcy twice in 2012, and on both occasions, he attested under penalty of perjury that he had no income or assets whatsoever. *In re: Jackie L. Robinson*, 2:2012-bk-16189; *In re: Jackie L. Robinson*, 2:2012-bk-21635. Robinson is subject to an unpaid seven-figure judgment dating back to 2013, which has not been discharged, and he is a defendant in multiple cases.

37.     Insisting on building the arena megaplex named All Net Resort & Arena, despite the lack of demand, the opening of two other arenas in the same Las Vegas area, and the absence of an NBA team in Las Vegas, Robinson was the principal of All Net, LLC, also known as the Dribble Dunk project (collectively, "All Net").

38.     Messner and Welch represented All Net as project counsel, and Messner represented Robinson individually.

39.     Messner and Welch also represented Clearwater, a fraudulent outfit that purportedly became an "equity partner" in the All Net project.

40.     Clearwater's website, which has since been deleted and concealed, falsely referred to the company as a "Global Family Office" with generic stock photos and without identifying names or contact information for anyone. The non-existent family office was supposedly located at 30 North Gould Street, Sheridan, WY, 82801, but Clearwater never had any office in Wyoming or any other place. Clearwater was merely the latest iteration of the string of shadowy and dubious endeavors of Chartraw and his long-time business partner, Owen.

41.     On May 24, 2022, when Clearwater came into existence, the All Net project was a disaster, having burned through $37 million with virtually no progress on the construction. Numerous creditors had sued All Net, mechanics liens and unpaid judgments littered the record, and All Net was unable to pay rent.

42.     All Net was unable to obtain financing for the flailing project, and Robinson had taken to making blatant misrepresentations to the Las Vegas Zoning

Commission (the "Commission") to obtain extensions of the perpetually elapsing construction deadlines.

43.     On May 8, 2019, five years into the project, with virtually no construction completed, Robinson falsely represented to the Commission that All Net secured $3 billion in financing through the International Bank of Qatar via Credit Suisse with the assistance of Willis Thomas Watson. Robinson stated that he signed documents in Zurich to secure the $3 billion and he falsely claimed that All Net would have the financing by the end of May 2019.

44.     Robinson asserted that the project managers would not walk away because $37 million had been spent on the project.

45.     On June 5, 2019, Robinson appeared again before the Commission and contradicted his May 8, 2019, representation about funds being at Credit Suisse in Zurich, as this time Robinson claimed that the funds were transferred through Commerzbank in Frankfurt instead of Credit Suisse in Zurich. Neither scenario was true, as no funds existed.

46.     On the same day, Robinson told the Commission that he would provide a bank statement the following week with proof of funding. Robinson never provided a bank statement.

47.     That same day, Robinson also stated that All Net intended to purchase the property for $400 million "within the next few weeks" and that he would provide a bank statement the following week with proof of funding. No purchase occurred, and Robinson never provided a bank statement.

48.     The insolvent All Net project's initial budget of $1.3 billion in 2014 increased to $3 billion in 2019, to $4 billion in 2021, and to $4.9 billion by 2022.

49.     The outlandish $4.9 billion budget for the 27-acre property is nearly double the cost of the $2.7 billion spent on the Wynn in Las Vegas, which is 10 times the size over 215 acres.

50.     Lawsuits against All Net continued as the project could not pay its bills. In May 2022, All Net signed a settlement agreement, committing to pay the $17 million that it owed for excavation work, but All Net failed to make the payments even pursuant to the settlement agreement, and on September 19, 2023, a $17 million confession of judgment was entered against All Net, on which interest accrued at $141,666 per month. *Las Vegas Paving Corp. v. All Net Land Development, LLC, et al*., Clark County District Court, case no. A-18-771361-B.

51.     As additional creditors sued the All Net entities, the possibility of actual financing further diminished, as the property was mired in six pages of lawsuits, judgments, liens, and notices of lis pendens. **Ex. A.**

52.     On March 22, 2021, All Net signed a new lease through December 31, 2021, with an option to purchase the 27-acre property, obligating All Net to pay monthly rent of $100,000 plus utilities (the "2021 Lease"). **Ex. B.**

53.     The 2021 Lease conferred upon All Net the option to purchase the property for $400 million if the option were to be exercised before July 31, 2021. The 2021 Lease provided that the option period could be extended for a fee of $250,000 per month during the extension period.

54.     In addition to the $40 million that All Net says it spent by 2022, plus more than $20 million that it owed creditors, All Net had also earmarked over $50 million in developer fees, which would not be paid if the project was shut down.

55.     As of 2022, All Net was in arrears on its lease payments, had not exercised its option, and its debts were growing while the possibility of financing was slipping away.

**II.     As an Act of Desperation, Defendant Messner brought in Chartraw, a Convicted Felon and Notorious Fraudster, to Concoct Financing for the Defunct Arena Construction Project.**

56.     In 2012, while Robinson repeatedly filed for bankruptcy, Defendant Chartraw was repeatedly stealing money pursuant to fraud schemes. Chartraw

concealed himself in Mexico as a fugitive, using the alias of James Murphy to evade multiple open criminal cases and warrants. The FBI captured Chartraw, extradited him, and held him without bail. The United States Attorney's Office for the Eastern District of California indicted Chartraw on 18 counts of felony wire fraud. *United States of America v. Daniel Chartraw*, 2:12-cr-00184-MCE at ECF No. 11. **Ex. C.**

57.     Per the indictment, between 2007 and 2011, Chartraw knowingly devised, participated in, and executed a multitude of white-collar fraud schemes to obtain money through false pretenses, misrepresentations, phony promises, and the concealment of material facts. The purpose of these schemes was to obtain money from individuals in the form of loans, investments, and commodities. Chartraw had neither the intention, ability, expertise, nor financial means to repay the loans or fulfill his promises to prospective investors. Between 2007 and 2011, Chartraw collected approximately $2.4 million from investors.

58.     Chartraw's criminal conduct, as detailed in the indictment and pursuant to which he pled guilty, matches the criminal conduct perpetrated in this case. Defendants' crimes reflect Chartraw's distinctive modus operandi.

59.     Chartraw's indictment sets forth the following fraud schemes, whereby the victim's money is obtained through a false promise by the perpetrator to pay the victim a larger amount later in exchange for a smaller payment by the victim to the perpetrator. Pursuant to the scheme, the larger amount is never paid out, as the fraudster simply steals the victim's smaller payment and then lies about the larger future payment to the victim.

<u>Dairy Financing Fraud Scheme</u>

60.     Pursuant to the Dairy Financing Fraud Scheme, Chartraw fraudulently obtained $200,000 as an "advance fee" on a purported loan, as Chartraw offered to loan the victim $250 million from a bank that Chartraw claimed he controlled.

61.     Chartraw falsely represented that he owned a licensed and operational offshore bank, that he had a $1.5 billion Euro certificate of deposit from Cascabel Bank,

and that the CD could be placed with the bank in connection with a "trading program" that would generate sizeable returns. Chartraw fraudulently obtained the $200,000 from the victim, he never issued or facilitated the issuance of any loan, and instead, he used the $200,000 for his own personal expenses.

<u>Gold Refinery Fraud Scheme</u>

62.     Pursuant to the Gold Refinery Fraud Scheme, Chartraw fraudulently obtained a $100,000 "advanced fee" from the victim by promising to secure a $10,000,000 loan from the so-called Cascabel Bank, which Chartraw claimed was a licensed operational offshore bank that Chartraw owned in part.

63.     Chartraw did not issue or facilitate the issuance of any loan, and instead, he used the $100,000 for his own personal expenses.

<u>Dore Bar Fraud Scheme</u>

64.     Pursuant to the Dore Bar Fraud Scheme, Chartraw fraudulently obtained $1,000,000 from the victim in exchange for the purchase of "dore bars" from a company named AZ Rock Holdings which Chartraw claimed contained precious metals.

65.     Chartraw falsely stated that he and an accomplice were officers of AZ Rock Holdings and that the $1,000,000 would be placed in an escrow account in the name of Chartraw's accomplice. However, the account that received the escrow money was actually controlled by Chartraw and the accomplice.

66.     In furtherance of the fraud scheme, Chartraw falsely represented to the victim that his money would be safely held in an escrow account at J.P. Morgan Chase Bank in the name of 1st National Title Insurance Agency.

67.     Chartraw then presented false and forged documents to 1st National, inducing the escrow agent to wire $1,000,000 to personal accounts controlled by Chartraw and his accomplice, including a trust account.

68.     Chartraw and his accomplice then used the funds for their own personal expenses.

Trading Platform Fraud Scheme

69.     Pursuant to the Trading Platform Fraud Scheme, Chartraw fraudulently obtained $113,258 from the victim by falsely stating that the money would be invested in a "trading platform" at a bank where it would generate 15 per cent interest every 30 days before being returned after 90 days.

70.     No such platform existed.

71.     Chartraw then used the funds for his own personal expenses.

Gold Refining Equipment Loan Fraud Scheme

72.     Pursuant to the Gold Refining Equipment Loan Fraud Scheme, Chartraw fraudulently obtained loans from three different victims, totaling $150,000, by falsely telling the victims that Chartraw was a wealthy individual who was asset rich but cash poor and that he owned a gold mine.

73.     Chartraw falsely stated that the loan proceeds would be used to make a lease payment on gold refining equipment and that in return for the loans, Chartraw would transfer a quantity of gold to the victim as collateral and repay the loan plus six percent within five days.

74.     Chartraw falsely stated that he shipped the gold, and he provided a fraudulent bill of lading.

75.     Chartraw then proceeded to use the money for his own personal expenses.

76.     In this scheme, Chartraw used his attorney to bolster the legitimacy of Chartraw's fraud.

77.     At Chartraw's behest, his attorney at the time, who was later sued by the victims, and punitive damages were sought, circulated an "attestation letter" or "attorney comfort letter" echoing the false statements made by Chartraw to his victims. *Gimenez v. Law Offices of Hoffman & Hoffman, et al*, United States District Court for the Eastern District of New York, 2:12-cv-00669-JFB-ETB, ECF Nos. 25, 26.

78.     As a result of Chartraw's representations, and the representations of his attorney, both of which were false, the victims tendered their money to Chartraw's

1  attorney's trust account. The attorney then distributed the victims' money to Chartraw
2  to complete the wire fraud.

3  <u>Movie Production Fraud Scheme</u>

4  79.  Pursuant to the Movie Production Fraud Scheme, Chartraw fraudulently
5  obtained a $100,000 "advanced fee" from the victim movie producer who was seeking
6  financing for a movie.

7  80.  Chartraw falsely offered to fund the victim's movie in the initial amount
8  of $500,000 with a further agreement to provide $350 million in funds, with the sole
9  caveat that he would need a $100,000 fee from the victim producer to allow the use of
10  a $100 million certificate of deposit to generate revenue for the financing.

11  81.  Chartraw falsely claimed that he had a $100 million certificate of deposit
12  with Cascabel Bank and that he would use the $100,000 from the victim for fees
13  associated with the $100 million CD.

14  82.  Chartraw then proceeded to use the money for his own personal expenses.

15  83.  Six months before Chartraw was apprehended by the FBI in Mexico under
16  the alias James Murphy, Chartraw was facing three open criminal cases in Monterey
17  County Superior Court in California, including felony charges of grand theft,
18  embezzlement, and corporal injury on a spouse.

19  84.  On September 12, 2013, after he was extradited and held without a bond,
20  Chartraw pled guilty to wire fraud and was sentenced to four years and nine months in
21  federal prison.

22  85.  On September 22, 2014, Chartraw concurrently pled guilty in state court
23  to breaking his estranged wife's nose in the car after a baseball game in May 2011 in
24  front of their four children and another child.

25  86.  For that incident, Chartraw was also charged with violating a restraining
26  order resulting from a previous domestic violence conviction out of El Dorado County
27  in 2009. Chartraw was sentenced to seven years in state prison to run concurrent with
28  his four-year and nine-month sentence in federal prison.

87.     When Chartraw was released from prison, and to this day, Chartraw is still subject to multiple civil judgments, including a $17,277,524 judgment dated March 25, 2010, which has not been satisfied.

**III.   Lacking a Legitimate and Lawful Method of Financing the All Net Project, Defendants Deploy a Fraudulent Scheme to "Monetize" Worthless Bonds.**

88.     The enterprise consists of Messner, Clearwater, Welch, and Chartraw, and each Defendant played a defined role in each act of fraud as stated herein.

89.     Defendants came together in mid-2022 initially as part of their futile attempt to "monetize" worthless bonds.

90.     Deviating from the usual role of counsel, Welch publicly stated that his role with All Net is to "raise the financing" for the project.

91.     With the All Net project clearly unable to raise funds through legitimate channels, the fraudulent bond scheme was underway by August 2, 2022. On that date, Welch signed a letter on Messner letterhead confirming that Messner and Welch represent Clearwater and its sole member, Owen, as well as Clearwater Premiere Perpetual Master Trust, Global Infrastructure Finance & Development Authority, Inc. ("GIFDA"), and GIFDA's controlling shareholder Shah Mathias.[1]

92.     On September 8, 2022, Welch also signed a letter on Messner letterhead, reflecting that Messner and Welch represent Mathias' company, Ameri-Metro, Inc. ("Ameri-Metro") in connection with a purported $60 billion bond supposedly "owned by Clearwater, a Wyoming limited liability company with Todd Owen as its sole member." Ameri-Metro's prior counsel had been disbarred. The date of Welch's letter of representation is established by the metadata, as it is otherwise undated. As discussed herein, the shell company Clearwater never owned any asset worth $60 billion.

---

[1] Mathias has previously filed for bankruptcy and has been involved in many litigation matters. He is subject to a significant number and scale of judgments and liens.

93.     In the September 8, 2022, letter, Welch proclaimed that "Clearwater acquired rights to the Bond Certificate pursuant to that certain Transfer Agreement between it and GIFDA dated March 29, 2022, a copy of which is publicly available at https://www.sec.gov/Archives/edgar/data/1534155/000089109222001164/ex99-5.htm."

94.     As reflected in the hyperlinked March 29, 2022, Transfer Agreement, which predates the May 26, 2022, existence of Clearwater, the so-called consideration tendered by Clearwater for the purported bond (the so-called $60 billion asset) is the parties' agreement that Clearwater "shall monetize and create project funding for the Asset."

95.     Accordingly, the "consideration" tendered by Clearwater is the assertion by Clearwater that it would attempt to "monetize" the worthless bond.

96.     The subject matter of the purported bonds, or sub-bonds, pertains to 23 shell companies, all controlled by Mathias with generic names, no operations, and no revenue, and that loosely pertain to infrastructure. The ridiculous $459.5 billion valuation reflected in the bond paperwork is based on contracts entered into between Mathias's GIFDA or Ameri-Metro and Mathias's other shell entities. Essentially, Mathias signed pieces of paper reflecting "contracts" between his own companies, none of which had any operations or revenue. Mathias then proclaimed that such pieces of paper are "assets" and Clearwater, with the assistance of Messner, asserted that they could "monetize" those "assets" by selling the bonds backed by the worthless "assets."

97.     On July 13, 2022, the Delaware Court of Chancery confirmed that Ameri-Metro and its related shell companies have no revenue or operations. *Lentz v. Mathias, et al.*, case no. 2022-0374-JTL.

98.     Despite the absence of revenue and operations, Ameri-Metro filed a fraudulent 10-K reflecting $510 billion in "construction contracts," and "Comprehensive Income of $6.938T (trillion)" in the form of purported "unrealized gain on available-for-sale securities."

99.     In 2022, Mathias presented Ameri-Metro's shareholders with a phantom tender offer, ostensibly from Owen, Clearwater's sole principal—who lives in a modest single residence with a mortgage—whereby the tender offer price would correspond to a capital valuation in the amount of $20,240,090,812,480.

100.     The ridiculous $20,240,090,812,480 figure is nearly the size of the United States annual gross domestic product, and it corresponds to worthless shell entities with no operations or revenue.

101.     The Delaware Court of Chancery charitably described the machinations by Ameri-Metro, Messner's client as of 2022, as those of a "classic Ponzi scheme."

102.     Working essentially on commission and engaging in unlicensed securities brokerage at best, the agreement between Clearwater and Ameri-Metro, both clients of Messner and Welch, was that Clearwater would be entitled to receive 50% of the capital raised by Clearwater pursuant to Clearwater's efforts to "monetize" the nonsense bonds.

103.     While Owen was the "frontman" for Clearwater, Chartraw ran Clearwater's operations.

104.     The enterprise, consisting of Messner, Welch, Clearwater, and Chartraw, was focused on concocting phony notions of financing for the purpose of misleading and deceiving the Commission into allowing All Net to have yet another extension of time to commence the stalled construction in Las Vegas.

105.     The Commission vote was to occur during the upcoming November 16, 2022 meeting.

106.     On October 12, 2022, Welch directed his associate, J.B., who has since left his employment at Messner, to enter so-called bond information on a Bloomberg terminal pertaining to the shell companies with a June 30, 2052 maturity date. No evidence exists that anyone invested in the worthless bond.

107.     The typing of the information into the Bloomberg terminal by a Messner employee was the basis for Defendants, and particularly Clearwater, to fraudulently

proclaim that they now supposedly possess "assets" to finance the All Net project in the amount of $5 billion.

108.    On October 19, 2022, the All Net project principals, including Robinson, Clearwater through Owen, and Messner through Welch, held a press conference.



109.    The video appears to reflect Defendant Chartraw's presence sitting in the front row, as acknowledged by Owen as Clearwater's "team."



Leon "Danny" Chartue                                 Dan Chartraw

LinkedIn                  October 19, 2022                  Facebook

110.    At the press conference, Robinson stated, "[w]hen you're talking about billions… we had to bring things on, add things on according to the financing and also the feasibility."

111.    Owen stated, "[t]he financing before always came to a stall because of the actual assets. We are bringing the assets. Clearwater is bringing them to the table to be able to put the financing together, finally."

112.    Welch stated, "[o]ver the last year, the inflation numbers have kind of changed the numbers a little bit, so that made the sell a little more difficult, and

construction issues did that, but we were able to find somebody that was able to oversee those and say, 'Hey, this is gonna work this time.'"

113. Interviewed together on October 19, 2022, side by side, directly after the press conference, Welch and Owen stood together as Owen stated, "we're bringing the missing piece of this puzzle to the table, which is assets."



114. On November 16, 2022, the same Messner associate who entered the bond information a month earlier, J.B., appeared before the Commission, as directed by Welch, and the Messner associate falsely stated, at Welch's direction, that "financing has been secured for the Dribble Dunk [All Net] project."

115. The associate referred to Welch's letter dated November 7, 2022, in which Welch referred to a "line of credit" issued by Messner's client, Clearwater, to Messner's other client, All Net, for "up to $7 billion dollars."

116. The Messner associate stated that the "bonds" were "placed" with a Malaysian company named PG Asia Investment ("PG Asia"), and as a result, PG Asia provided All Net with a "funding commitment letter" confirming funding "in the amount of $5 billion dollars to Clearwater."

117. Referring to the November 15, 2022, PG Asia letter, the Messner associate stated, "I wanna let the Board know that it's signed by the Financial Director of the bank. It's printed on bank letterhead and – uh - is as good as cash." **Ex. D.**

118.   The PG Asia letter that the Messner associate presented to the Commission is a blatantly forged and fraudulent document.

119.   PG Asia placed an Attempted Fraud Alert Notice on its website:

It has come to our attention that PG Asia Investment Bank Ltd's logo and email has been used by unauthorised third parties without our prior knowledge nor approval for various correspondences including but not limited to the issuance of bank comfort letters, confirmation of bank accounts opening and other documents. These documents may be targeted at misleading and/or deceiving the public…

PG Asia Investment Bank Ltd is not in any way associated or involved in the financing of the All Net Resort & Arena project in Las Vegas, United States of America (the "Project"). We have neither approved nor issued any financial instrument/s to support any institution/s involved in the Project.

https://www.pgaib.com/ (visited June 18, 2024).

120.     Even a cursory analysis of the PG Asia letter reflects its fraudulent nature.

121.     The signer's name on the letter is "William Murphy," which is similar to the "James Murphy" alias used by Chartraw when Chartraw was a fugitive in Mexico. In two of Chartraw's prior fraud schemes, Chartraw falsely asserted that he was an owner of an offshore bank named Cascabel Bank.

122.     William Murphy is not a name typically associated with someone living in the region where PG Asia is purportedly located. A Google search reveals no evidence that anyone named William Murphy is the Financial Director and CFO of PG Asia Bank, nor that anyone by that name could issue a $5 billion letter of credit on behalf of PG Asia.

123.     The telephone number on the letter, (631) 375-0701, is a local New York number publicly reflected on a vendor website that has no connection to PG Asia. https://fedlinks.com/profile/William-Murphy-Inc--Amityville-NY  (visited  June  18, 2024). When that number is called, there is no answer, and an anonymous automatic prompt of "the wireless customer you are trying to reach is not available" is played.

124.     The purported domestic office on the letter is 233 S. Wacker Dr. 67th Floor, Chicago, IL 60606. This is the address of The Metropolitan private social club, which has no connection to PG Asia.

125.     At the November 16, 2022 hearing before the Commission, as a follow up to the false representations by the Messner employee about the bonds and the PG Asia letter, Robinson falsely told the Commission that bonds, which had been logged into a Bloomberg terminal one month earlier by the Messner associate, were purportedly "backed by the Federal Government."

126.     Defendants' forged letter and false statements had the intended effect, as the Commission narrowly voted by a 4-3 margin on November 16, 2022 to extend the All Net project for another year.

**IV.     Defendants Engage Brokers in a Scheme to Obtain Capital for the All Net Project, Leading to the BELOC Scheme.**

127.    As of November 17, 2022, Defendants engaged brokers in their attempt to monetize the worthless bonds for the All Net project.

128.    By December 6, 2022, Defendants disseminated at least eight bond-related documents to brokers, including A.S. and others, as the enterprise engaged brokers to find victims in connection with the fraudulent and increasingly unlawful attempts to finance the All Net project.

129.    Defendants provided the following eight documents to the brokers, and Defendants dispatched the brokers to disseminate the documents to others:

**CUSIP Global Services CL Malibu ($60bn) 8-2-2022**. August 2, 2022 letter from Welch on Messner letterhead referring to a $60 billion Malibu Homes, Inc. bond.

> We serve as bond counsel and bookrunner for Global Infrastructure Finance & Development Authority, Inc., Clearwater Premiere Perpetual Master Trust, Clearwater Premiere Perpetual Master, LLC, Todd Owen and Shah Mattias (collectively, "Clients") as the sponsor/issuers of the above-referenced Bonds.

> The purpose of this communication is to set forth our Opinion regarding that aforementioned Bonds that satisfy the requirements applicable for the issuance of CUSIP/ISIN numbers from CUSIP Global Services ("CGS") and other legal requirements for the transactions contemplated therein.

**Executive Summary - January 2022_**. Promotional summary of the All Net project dated January 2022.

**ALL NET_ProForma Financial Model.11-447.v05.xlsx**  -  All Net project financial projections, updated as of November 30, 2022 per the metadata.

**Phoenix Project Intake Form**. Dated November 17, 2022.

**Borrower Resume**. Reflecting principals of the All Net project, dated December 2, 2022.

**ANLD DD Reinstatement LWOP August 2022**. Dated August 26, 2022, indicating that the All Net March 22, 2021 Lease, as amended on May 25, 2021, had expired, the option to purchase had expired, and All Net was in arrears $1,300,000 in rent plus $350,000 in legal fees. Moreover the list of judgments, liens, and notices of lis pendens on the property and the project is six pages long.

**$500_Million_Use_of_Funds_**. Reflecting a proposed disbursement schedule for the first $500,000,000 in funding for the All Net project. Dated November 30, 2022 and prepared by a All Net principal.

**$60bn GIFDA Clearwater Bond Package**. Dated September 8, 2022 and characteristically wiped of metadata, consistent with the practice of Messner. This is a 233-page document reflecting the closest approximation of a prospectus on the Malibu Homes Master Trust Indenture.

130.    Messner's rendering of its "legal opinion" on the propriety of the bonds was not based on legitimate legal analysis, it was done in furtherance of the unlawful scheme.

131.    Messner and Welch, who were in charge of obtaining financing for the All Net project, disseminated the misleading attachments to brokers, without a prospectus, and with the intention of deceiving victims in furtherance of a scheme.

132.    On February 10, 2023, the Messner associate, J.B., emailed a link to the "data room" for the purported $60 billion bond data to the broker, D.F., copied to Welch.

133.    On February 13, 2023, Mathias, on behalf of Ameri-Metro and all the shell companies corresponding to the bonds, referred to conversations with Chartraw, who was acting on behalf of Clearwater, and Mathias sent a termination letter addressed to Chartraw's attention and captioned to Clearwater, among others. **Ex. E.**

134.    Per the February 13, 2023 Termination Letter, Mathias severed ties and terminated all agreements, collaboration, and bond assignments between Ameri-Metro and its shell entities and Clearwater and its affiliates.

135.    The February 13, 2023 Termination Letter "irrevocably decommissioned and terminated" all bond rights relative to Clearwater, Messner, Chartraw, and Owen.

136.    Defendants did not inform the brokers of the Termination Letter.

137.    In fact, on February 20, 2023, seven days after the February 13, 2023 Termination Letter was issued, Welch acted as if no termination had occurred as he emailed brokers M.H. and M.C., copied to J.B. and Owen, continuing to promote the fraudulent monetization of the worthless Ameri-Metro bonds.

138.    On February 20, 2023, Welch provided the brokers with a link to the Bond Information Data Room, "which includes the due diligence and additional information" and attachments including a KYC/CIS for Clearwater, which was referred to as "owner of the bonds."

139.    The documents attached to Welch's February 20, 2023 email are as follows:

**TODD KYC CIS OCTOBER 18 2022.** Dated November 3, 2022. Addressed anonymously to "Trade Authority / Program Manager." Per Owen's sworn statements, Messner is holding $60 billion of Clearwater's funds in "safe keeping." Owen's source of funds affidavit does not indicate how the $60 billion was obtained. But it states that there are no liens or encumbrances of any kind. The bond is not identified by CUSIP number or any other identifier. Moreover, at best, Clearwater only owned 50% of the non-existent monetization of the bond. And those rights were revoked on February 13, 2023.

**CIS 9-21-2022.** Dated November 3, 2022. Identifies Owen's personal information, including related financial information.

**USCG Intake Form - Clearwater Bond Monetization 2-20-2023.** Dated February 20, 2023.

140.    When Welch sent this email to the brokers on February 20, 2023, he knew that neither Clearwater nor Owen had any ownership or rights associated with the purported $60 billion bond, which was worthless anyway.

141.    Welch intended for the brokers to act as conduits in relaying Welch's false representations regarding the ownership of the bonds, and on February 20, 2023, broker M.H. relayed the information provided by Welch to broker D.F. Welch subsequently engaged the same brokers in connection with Defendants' BELOC fraud scheme.

### V.    Defendants Conspire and Effectuate a Pattern of Racketeering Activity by Committing Multiple Acts of Wire Fraud in Connection with Phony Loans and Theft of Borrowers' Escrowed Deposit Money.

142.    On September 26, 2022, a shell entity named INBE Capital LLC ("INBE") was formed in Wyoming with an address, 30 North Gould Street, Sheridan, WY, 82801, that was identical to Clearwater's address.

143.    Like Clearwater, INBE was represented by Messner and Welch.

144.    By March 2023, with eight months remaining before the November 21, 2023 Commission vote on a final All Net extension, Defendants knew that the Bank of Qatar story was false, their PG Asia letter was a forgery, their bond gambit was defunct, they had no lawful manner in which to raise money for the doomed All Net project, and the financial pressure of All Net's unpaid obligations was mounting. Moreover, the All Net project owed Messner a substantial amount of money in unpaid legal fees.

145.    Defendants Messner, Welch, Clearwater, and Chartraw conspired to form a structure pursuant to which the enterprise would operate.

146.    The roles of Messner and Welch included acting as legal counsel for co-conspirators Clearwater and Chartraw, as well as INBE. As such, Messner and Welch would draft the key legal documents. Because Messner and Welch represented Clearwater, Chartraw, and INBE, as well as All Net and Robinson, communications among the parties could be considered privileged under the attorney-client privilege. This would provide cover, and it would make it more difficult for parties to obtain communications in discovery. In addition, Defendants took steps to communicate

through shrouded means, such as via Signal, which is an app that provides end-to-end encryption of messages.[2]

147.    Moreover, Messner's prominent involvement in the scam, posing as an escrow holder under the guise of a reputable law firm, provided the essential security and reassurance that the borrowers' escrow money would be safe in Messner's trust account.

148.    As further discussed herein, Welch and Messner also revised a fraudulent Business Expansion Line of Credit ("BELOC") document on April 20, 2023.

149.    The April 20, 2023 Messner version of the BELOC document, which was used to defraud Plaintiff and the other victims, is sourced to a January 21, 2023 Word version of the BELOC pertaining to Prime Capital Ventures, LLC ("Prime") as the lender.

150.    A "blackline comparison" of the April 20, 2023 Messner BELOC and the January 21, 2023 Prime BELOC reveals few substantive changes, except for (1) Messner's removal of a real estate collateral requirement, and (2) Messner's inclusion of Messner as the Trustee to serve as the escrow holder of the Interest Credit Account deposit ("ICA").

151.    Messner's revisions made the Messner BELOC even more pernicious, enticing, and dangerous to the public than the Prime BELOC. In the Messner BELOC, Messner falsely promised that the victims' money would be "held by a nominated Trustee (attorney) [Messner]" and that the ICA deposit "shall be in Trustee [Messner]'s sole possession and control."

152.    In contrast, the Prime BELOC provided no such assurances of escrow account safekeeping by a reputable law firm.

---

[2] Ample evidence exists to establish the crime-fraud exception to the attorney-client privilege when the appropriate time arises.

153.    On May 31, 2024, Prime's owner was arrested and charged with wire fraud.    https://cbs6albany.com/news/local/prime-capital-ventures-owner-arrested-on-wire-fraud-charge-queensbury-albany-kris-roglieri (visited June 17, 2024). The charges against Prime's owner reflect an ICA deposit fraud scheme nearly identical to the scheme perpetrated by Defendants. **Ex. F.**

154.    Messner was further motivated by other factors and conflicts of interest, as Messner was also a creditor of All Net, to which All Net owed attorneys' fees. Therefore, Messner stood to gain and would be positioned to be paid if All Net came into money, regardless of the source.

155.    Clearwater's role in the enterprise included its status as an equity partner of All Net. Clearwater had purportedly made a financial investment in the All Net project, and thus, it would benefit from any increased likelihood of the project moving forward. The cancellation of the All Net project would be detrimental to Clearwater, as it would result in the loss of whatever investment it had made. Additionally, Clearwater could face litigation for any wrongdoing perpetrated by All Net and it may have also owed attorneys' fees to Messner, its counsel.

156.    In an earlier phase of Defendants' pattern of misconduct, Clearwater played the role of phony financier of the All Net project in multiple contexts.

157.    Despite Clearwater's false assertions about a so-called "family office," Clearwater was operated by nobody except Chartraw and Owen. At all relevant times, Chartraw's actions were undertaken on his own account and on behalf of Clearwater.

158.    Chartraw's role in the enterprise was to devise, formulate, and provide operational functionality in carrying out the fraudulent scheme. Chartraw has extensive experience in perpetrating wire fraud. His conduct since his release from prison, much of it in connection with Clearwater's member Owen, has been questionable at best, and it has led to litigation.

159.    As discussed herein, Chartraw and Clearwater directed others to make false representations on their behalf, including and particularly broker M.H. about the

purportedly forthcoming nature of money which Defendants knew had long since disappeared.

160.   At all relevant times, Defendants' intent has been specific, targeted, and willful.

161.   Each of the principals—Welch for Messner, and Chartraw and Owen for Clearwater—is experienced, sophisticated, and willing to present fraudulent documents and narratives, including through others, to achieve their objectives.

162.   The acts of wire fraud discussed herein are predicated on a scheme based on Defendants' intent to defraud, use of the mail or wires to further that scheme, together with artifice and deceit intended to deprive an owner of his or her property or money.

163.   At all relevant times, Defendants' acts in furtherance of the fraud scheme affected interstate commerce.

164.   Defendants' fraud scheme involved the use of a wire.

165.   Defendants' fraudulent acts were not isolated, as those acts encompassed a pattern of racketeering activity in pursuit of the same overarching scheme. Defendants' unlawful conduct is ongoing, and it poses a continuing threat to the welfare of the general public unless stopped by judicial action.

166.   On March 22, 2023, Messner drafted a Memorandum of Cooperation between Clearwater and INBE.

167.   On March 31, 2023, Messner drafted a Memorandum of Understanding between Clearwater and INBE.

168.   These documents were intended to memorialize the basis of the agreement among Messner, Clearwater, and INBE.

169.   INBE was being used as a pawn. INBE did not intend to loan millions of dollars to small companies without a personal guarantee, without real estate collateral, and pursuant to repayment only after ten years with six percent interest only paid during the 10-year repayment timeframe.

170.     No rational lender would issue a loan on those terms, where the best-case scenario is essentially an inflation-adjusted return of zero percent and a risk of loss of the entirety of the principal amount of the loan.

171.     Moreover, INBE never intended to, and did not, scrutinize the borrowers' creditworthiness pursuant to any genuine underwriting.

172.     The intent of the scheme involving the phony loans was to obtain money from each victim deposited into Messner's Northern Trust COLTAF escrow account as a purported ICA deposit from would-be borrowers.

173.     Defendants intended to then steal the victims' money by transferring it out of the Messner trust account, while the victim/borrower was under the false belief that INBE intended to issue a loan that would never be made.

174.     On April 10, 2023, Welch filed articles of organization for an entity named INBE-Clear Capital Group, LLC with the Wyoming Secretary of State, reflecting a principal address of 30 North Gould Street, Sheridan, WY 82801, the same location as Clearwater and INBE.

175.     Welch was the sole organizer of INBE-Clear Capital Group, LLC, signing his name with an email address of ddefalco@messner.com, corresponding to Welch's assistant and Messner employee, D.D. In a subsequent attempt to conceal his wrongdoing, less than a year later, on March 29, 2024, Welch filed articles of dissolution of this entity.

176.     On April 10, 2023, Messner drafted the Manager Appointment Resolution of INBE-Clear Capital Group, LLC.

177.     On April 10, 2023, Messner obtained the EIN for INBE-Clear Capital Group, LLC.

178.     On April 18, 2023, Messner drafted the Operating Agreement of INBE-Clear Capital Group, LLC. In so doing, Defendants demonstrated their willingness to form new joint ventures with one another in a manner not disclosed in the BELOC and inconsistent with the representations made in the BELOC.

179.    On April 20, 2023, Messner revised the draft of the BELOC between INBE and Hard AF Seltzer, LLC ("Hard AF").

180.    The terms of the BELOC between INBE and Hard AF are the same substantive terms reflected in a January 21, 2023 BELOC document, confirmed by metadata, with Prime reflected as the lender.

181.    A comparison between the January 21, 2023 Prime BELOC and the April 20, 2023 BELOC draft, after edits made by Messner and which became the BELOC between INBE and Hard AF, reflects immaterial changes. The two documents are both sourced to the fundamental terms in the January 21, 2023 Prime BELOC, critically including usage of the term "ICA" as a euphemism for an advanced fee.

182.    On April 23, 2023, Messner drafted the Joint Venture Partnership Agreement between Clearwater and INBE.

183.    In connection with drafting and revising the fraudulent BELOC document, which is based on the Prime draft, but with the enhancement featuring Messner as emblematic of the safety of the ICA funds in escrow in Messner's trust account, Welch conspired and coordinated with Clearwater and Chartraw as Defendants planned to steal Plaintiff's money.

184.    The scheme which Defendants used to steal the victims' ICA funds under the BELOC scam closely resembles several schemes that Chartraw employed a decade ago when defrauding his other victims.

185.    For example, the BELOC scheme with INBE is similar to the Dairy Financing Fraud Scheme and the Gold Refinery Fraud Scheme in Chartraw's indictment because, in all three instances, the party committing the fraud falsely promises the victim that the victim will receive a large loan on favorable terms in exchange for payment of an advance fee to either the purported lender (Chartraw) or another designated party (Messner in the current case).

186.    The victim then pays the advance fee or ICA money to the designated recipient, expecting a loan to be subsequently issued. However, pursuant to the fraud

scheme, the loan is never made, and the victim's escrow money is stolen and never returned.

187.   The BELOC scheme is also similar to Chartraw's Dore Bar Fraud Scheme because, in both instances, the victim is fraudulently induced to pay money to an escrow and then the escrow funds are never returned to the victim.

188.   The BELOC scheme is similar to the Gold Refining Equipment Fraud Scheme because, in both instances, the party committing the fraud convinces the victim to pay a relatively small amount of money to the fraudster in exchange for the fraudster's promise to pay the victim a large amount of money after receiving the victim's money. In both instances, the victim's money was stolen, and no money was paid to the victim.

189.   The BELOC scheme is also similar to the Movie Production Fraud Scheme because, in both cases, the party committing the fraud deceives the victim into paying the fraudster an "advanced fee" with the expectation that the fraudster will subsequently issue a loan to the victim for substantially more than the amount of the advanced fee. In both cases, the victims' money was stolen, and no loan was made.

190.   Defendants dispatched INBE, as a purportedly authentic working capital lender, to make representations on their behalf due to the joint venture between Messner, Clearwater, and INBE. Messner also provided joint representation and drafted the documents, including the BELOC itself.

191.   The BELOC is a false representation by Messner, made through INBE, to the victim of each act of wire fraud.

192.   Defendants, including Messner as counsel, also coordinated to place false information on INBE's website.

193.   Defendants knew that Plaintiff and other victims would look at INBE's website and consider the information on the fraudulent INBE website in deciding whether to provide ICA money to be held in escrow by Messner.

194.     Messner and Defendants were aware that the false presentation of INBE as an entity with substantial resources and capabilities as a lender would increase the likelihood that an ICA deposit would be made to Messner by a victim.

195.     Although INBE was created on September 26, 2022, and had no material assets, Defendants, including Messner as counsel, orchestrated and presented false statements on INBE's website to the public and the victims.

196.     By December 3, 2022, just 68 days after INBE's inception, the INBE website falsely claimed to have $13.36 billion in the "rapidly growing global investment pipeline" and that it had the "capacity up to $50B per transaction."

197.     If INBE, represented by Messner, actually had that kind of capital or liquidity, it could directly loan the money to All Net, another one of Messner's clients, which was in dire need of capital.

198.     As an entity in need of capital, All Net would certainly benefit from a massive amount of capital to be repaid at an outlandishly low rate of six percent with interest-only payments for ten years.

199.     Defendants and INBE would have no need to spend their time engaging brokers to seek out unrelated small businesses across the country and pretending to be serious about loaning those businesses millions of dollars on economically nonsensical terms while proclaiming expert financial proficiency on a website.

200.     If the information on INBE's website was accurate, including the so-called $13.36 billion in the investment pipeline with the "capacity" for up to $50 billion per transaction, INBE could have directly financed the $5 billion in capital needed to construct the All Net arena and Defendants' fraud would have been unnecessary.

201.     If INBE's business practice indeed consisted of lending tens of millions of dollars to small businesses without a personal guarantee or real estate collateral and having those loans repaid via interest only at six percent over ten years, the business would not survive. Moreover, strikingly, none of the transactions with Plaintiff or other BELOC fraud victims are reflected on INBE's website.

202.    INBE's website as of March 24, 2023, reflected $13.36 billion in the pipeline. But by June 3, 2023, the pipeline had purportedly tripled to $35.72 billion.

March 23, 2023, INBE website          June 3, 2023, INBE website



203.    If lending money to small businesses at six percent interest only with repayment after a decade without a personal guarantee or real estate collateral was indeed INBE's business model, then INBE's business would not have grown so quickly as INBE would have deployed all its capital, four times what it received in the form of ICA payments, to borrowers with no personal guarantee.

204.    Moreover, the people purportedly associated with INBE have no experience in lending. INBE's two principals purportedly consist of C.B., a consultant, and J.W., a person associated with a beer brewing company.

205.    Neither of these individuals has any apparent experience in lending millions or billions of dollars, and neither appears to have much, if any, wealth to lend to borrowers.

206.    INBE stated under oath, in May 2024, that it has no capitalization table.

207.    INBE stated under oath, in May 2024, that it has no documents reflecting any capital contributions to INBE or distributions from INBE.

208.    INBE stated under oath, in May 2024, that it has no corporate resolutions, tax returns, balance sheets, income statements, records of debt owed to INBE, or records of debt owed by INBE.

209.    INBE stated under oath, in May 2024, that it has no contracts with Clearwater or Titan and that INBE received no invoices from Messner, it paid no money to Messner, it received no money from Messner, and it received no payment of money in connection with actions taken by Messner.

210.    INBE asserted in May 2024 that it never received the ICA money, that it never authorized Messner to transfer it, and that INBE does not know where the ICA money would be other than with Messner.

211.    INBE stated under oath in May 2024 that, to the extent of its knowledge, the ICA money is still with Messner, and INBE claimed that it has no documents reflecting any reason why the victims' ICA money has not been returned by Messner and the other Defendants.

212.    INBE stated under oath in May 2024 that it neither received nor expected to receive any other benefit(s), upside, or consideration in connection with obligating itself to loan millions of dollars pursuant to the BELOC without a personal guarantee or real estate collateral, on an interest only basis for 10 years at 6%.

213.    INBE stated under oath in May 2024 that it has no contractual agreement with Messner other than what is stated in the BELOC, that it has no contractual agreement with Clearwater, and that it does not know what happened with the ICA money.

**Predicate Act of Wire Fraud #1, Plaintiff, $2,000,000, Wired April 27, 2023**

214.    Pursuant to the fraudulent scheme devised by Defendants as discussed herein, on or about April 24, 2023, Defendants directed J.W. or INBE, on Defendants' behalf, as Defendants' agent, and in furtherance of Defendants' common scheme and plan, to make false representations to Plaintiff intended to defraud, deceive, and induce Plaintiff into paying $2 million into Messner's Northern Trust escrow account.

215.    When the BELOC was disseminated to Plaintiff, to N.L., on or about April 24, 2023 by email by J.W. or INBE, it was a false statement by Messner and Defendants, as neither INBE nor any Defendant had any intention of issuing any loan to Plaintiff.

216.    The purpose of the BELOC was to steal Plaintiff's money by defrauding Plaintiff into believing that it would receive a loan as long as Plaintiff sent Messner the ICA deposit of $2 million.

217.    The BELOC is fundamentally a fraudulent document, based on an even more dangerous draft of the fraudulent BELOC that Messner received from Prime. Drafted by Messner, and dispatched by Messner, the BELOC contains numerous false statements.

218.    In addition, specific statements in the BELOC are particularly false.

219.    The provision in the BELOC which states that INBE supposedly "has the financial ability and wherewithal to fully fund" an $8 million loan to Plaintiff is a false assertion by Defendants, through INBE, and it was known to be false when made by Defendants, through INBE.

220.    The provision in the BELOC which states that INBE supposedly will "fully and timely fund each Advance" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE.

221.    The provision in the BELOC which states that the BELOC "omit[s] no material facts" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Among other things, the BELOC omits

the material fact that no loan would actually be made and that Messner and Defendants intended, all along, to take Plaintiff's ICA money without the issuance of a loan.

222. The provision in the BELOC which states that Plaintiff's $2 million ICA deposit will be "held by a nominated Trustee (attorney) [Messner]" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the nominated Trustee, Messner, to hold the ICA money.

223. The provision in the BELOC which states that Plaintiff's $2 million ICA deposit "shall be in Trustee's sole possession and control" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the ICA deposit to be in the Trustee's sole possession and control.

224. The provision in the BELOC which states that INBE "will step in and reimburse" Plaintiff if Plaintiff's ICA money is not returned is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE, as INBE has no ability or wherewithal to "step in and reimburse" Plaintiff's ICA money.

225. Having reasonably relied on the false statements, made on or about April 24, 2023 as reflected above, to its detriment, Plaintiff wired $2 million to Messner's Northern Trust COLTAF account on April 27, 2023.

226. Despite demand for the return of the ICA money, Plaintiff's $2 million was never returned.

227. The $8 million loan to Plaintiff referenced in the BELOC never occurred as Plaintiff never received any loan funds whatsoever, and Plaintiff sustained substantial incidental and consequential damages as a result.

228. On April 28, 2023, J.W. confirmed that Plaintiff's $2 million wire was received, and J.W. falsely stated that he would send Plaintiff weekly communications with updates even if there were no new updates.

229.    On May 2, 2023, when Plaintiff asked about the factors that determine the timeframe for tender of the first tranche of funding, J.W. provided a false explanation the next day, claiming that "the size of the loan and the risk play a apart [sic]."  In fact, J.W. knew that the loan was never going to be issued, so the truthful answer would have been that the delay was inherent in the scheme to defraud because no loan would ever be made.

230.    On May 9, 2023, Messner processed a client information sheet for Clearwater.

231.    On May 19, 2023, and May 30, 2023, Plaintiff followed up with J.W. regarding the status of the loan, and J.W. responded each time on Defendants' behalf by falsely stating to Plaintiff that "everything is still on track."

232.    On June 2, 2023, Messner received an Axos Bank account welcome letter for INBE-Clear Capital Group, LLC.

233.    On June 6, 2023, a satisfaction of the $1,147,000 judgment owed by the All Net entities to judgment-creditors Construction Testing Services, LLC and Fenagh Engineering and Testing, LLC ("CTS") was recorded. **Ex. F.**

234.    The satisfaction, which benefits Defendants, was signed by CTS's counsel on June 5, 2023, the Monday following Messner's Friday, June 2, 2023 receipt of the Axos Bank account welcome letter for INBE-Clear Capital Group, LLC and after receipt of Plaintiff's $2 million ICA deposit to Messner.

### Predicate Act of Wire Fraud #2, Emerald Consulting Partners, LLC on behalf of Hard AF, $700,000, Wired June 13, 2023

235.    Pursuant to the fraudulent scheme devised by Defendants as discussed herein, on June 8, 2023, Defendants directed J.W. or INBE, on Defendants' behalf, as Defendants' agent, and in furtherance of Defendants' common scheme and plan, to make false representations to Emerald Consulting Partners LLC ("Emerald"), as Hard AF's bridge lender who effectuated payment to Defendants, and Hard AF, intended to

defraud, deceive, and induce Emerald into paying $700,000 into Messner's Northern Trust escrow account.

236. When the BELOC was disseminated to Emerald and Hard AF, to R.P., J.F., and S.E., on or about June 8, 2023 by email by J.W. or INBE, it was a false statement by Messner and Defendants, as neither INBE nor any Defendant had any intention of issuing any loan to Emerald and Hard AF.

237. The purpose of the BELOC was to steal Emerald and Hard AF's money by defrauding Emerald and Hard AF into believing that Hard AF would receive a loan as long as Emerald or Hard AF paid Messner the ICA deposit of $700,000.

238. The BELOC is fundamentally a fraudulent document, based on an even more dangerous draft of the fraudulent BELOC that Messner received from Prime. Drafted by Messner, and dispatched by Messner, the BELOC contains numerous false statements.

239. In addition, specific statements in the BELOC are particularly false.

240. The provision in the BELOC which states that INBE supposedly "has the financial ability and wherewithal to fully fund" an $2.8 million loan to Emerald is a false assertion by Defendants, through INBE, was known to be false when made by Defendants, through INBE.

241. The provision in the BELOC which states that INBE supposedly will "fully and timely fund each Advance" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE.

242. The provision in the BELOC which states that the BELOC "omit[s] no material facts" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Among other things, the BELOC omits the material fact that no loan would actually be made and that Messner and Defendants intended, all along, to take Emerald and Hard AF's ICA money without the issuance of a loan.

243.    The provision in the BELOC which states that Emerald's $700,000 ICA deposit will be "held by a nominated Trustee (attorney) [Messner]" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the nominated Trustee, Messner, to hold the ICA money.

244.    The provision in the BELOC which states that Emerald and Hard AF's $700,000 ICA deposit "shall be in Trustee's sole possession and control" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the ICA deposit to be in Trustee's sole possession and control.

245.    The provision in the BELOC which states that INBE "will step in and reimburse" Emerald and Hard AF if their ICA money is not returned is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE, as INBE has no ability or wherewithal to "step in and reimburse" Emerald and Hard AF's ICA money.

246.    Having reasonably relied on the false statements to its detriment, made on or about June 8, 2023 as reflected above, Emerald wired $700,000 to Messner's Northern Trust COLTAF account on June 13, 2023.

247.    Despite demand for the return of the ICA money, Emerald's $700,000 was never returned.

248.    The $2.8 million loan to Hard AF, including the payment directly to Emerald, referenced in the BELOC and the accompanying documents never occurred as Hard AF never received any loan funds whatsoever and Emerald and Hard AF sustained substantial incidental and consequential damages as a result.

249.    On June 14, 2023, after Messner received Emerald's $700,000 wire, which corresponds to a purported obligation to loan an additional $2.8 million, Defendants directed INBE to represent on Defendants' behalf that "everything is still on track" for issuance of the loan.

**Predicate Act of Wire Fraud #3, MSC Companies, LLC, Wired June 19, 2023**

250.    Pursuant to the fraudulent scheme devised by Defendants as discussed herein, on or about June 19, 2023, Defendants directed J.W., on Defendants' behalf, as Defendants' agent, and in furtherance of Defendants' common scheme and plan, to make false representations to MSC Companies, LLC ("MSC") intended to defraud, deceive, and induce MSC into paying $1,145,000 into Messner's Northern Trust escrow account.

251.    When the BELOC was disseminated to MSC, to N.C., on or about June 19, 2023 by email by J.W. or INBE, it was a false statement by Messner and Defendants, as neither INBE nor any Defendant intended to issue any loan to MSC.

252.    The purpose of the BELOC was to steal MSC's money by defrauding MSC into believing that it would receive a loan as long as MSC paid Messner the ICA deposit of $1,145,000.

253.    The BELOC is fundamentally a fraudulent document, based on an even more dangerous draft of the fraudulent BELOC that Messner received from Prime. Drafted by Messner, and dispatched by Messner, the BELOC contains numerous false statements.

254.    In addition, specific statements in the BELOC are particularly false.

255.    The provision in the BELOC which states that INBE supposedly "has the financial ability and wherewithal to fully fund" an $4,580,000 loan to MSC is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE.

256.    The provision in the BELOC which states that INBE supposedly will "fully and timely fund each Advance" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE.

257.    The provision in the BELOC which states that the BELOC "omit[s] no material facts" is a false assertion by Defendants, through INBE, and as known to be false when made by Defendants, through INBE. Among other things, the BELOC omits

the material fact that no loan would actually be made and that Messner and Defendants intended, all along, to take MSC's ICA money without the issuance of a loan.

258.    The provision in the BELOC which states that MSC's $1,145,000 ICA deposit will be "held by a nominated Trustee (attorney) [Messner]" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the nominated Trustee, Messner, to hold the ICA money.

259.    The provision in the BELOC which states that MSC's $1,145,000 ICA deposit "shall be in Trustee's sole possession and control" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the ICA deposit to be in the Trustee's sole possession and control.

260.    The provision in the BELOC which states that INBE "will step in and reimburse" MSC if MSC's ICA money is not returned is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE, as INBE has no ability or wherewithal to "step in and reimburse" MSC's ICA money.

261.    Having reasonably relied on the false statements to its detriment, made on or about June 19, 2023 as reflected above, MSC wired $1,145,000 to Messner's Northern Trust COLTAF account on June 23, 2023.

262.    Despite demand for the return of the ICA money, MSC's $1,145,000 was never returned.

263.    The $4,580,000 loan to MSC referenced in the BELOC never occurred as MSC never received any loan funds whatsoever, and MSC sustained substantial incidental and consequential damages as a result.

264.    On June 23, 2023, Messner further drafted the Operating Agreement, or the amended operating agreement, of INBE-Clear Capital Group, LLC.

1

**Predicate Act of Wire Fraud #4, Abbson LLC, Wired June 29, 2023**

2      265.    Pursuant to the fraudulent scheme devised by Defendants as discussed

3  herein, on or about June 29, 2023, Defendants directed J.W. or INBE, on Defendants'

4  behalf, as Defendants' agent, and in furtherance of Defendants' common scheme and

5  plan, to make false representations to Abbson LLC ("Abbson") intended to defraud,

6  deceive, and induce Abbson into paying $3,500,000 into Messner's Northern Trust

7  escrow account.

8      266.    When the BELOC was disseminated to Abbson, to C.A. and I.B, on or

9  about June 29, 2023 by email by J.W. or INBE, it was a false statement by Messner

10  and Defendants, as neither INBE nor any Defendant intended to issue any loan to

11  Abbson.

12      267.    The purpose of the BELOC was to steal Abbson's money by defrauding

13  Abbson into believing that it would receive a loan as long as Abbson paid Messner the

14  ICA deposit of $3.5 million.

15      268.    The BELOC is fundamentally a fraudulent document, based on an even

16  more dangerous draft of the fraudulent BELOC that Messner received from Prime.

17  Drafted by Messner, and dispatched by Messner, the BELOC contains numerous false

18  statements.

19      269.    In addition, specific statements in the BELOC are particularly false.

20      270.    The provision in the BELOC that INBE supposedly "has the financial

21  ability and wherewithal to fully fund" a $14 million loan to Abbson a is false assertion

22  by Defendants, through INBE, and was known to be false when made by Defendants,

23  through INBE.

24      271.    The provision in the BELOC which states that INBE supposedly will

25  "fully and timely fund each Advance" is a false assertion by Defendants, through

26  INBE, and was known to be false when made by Defendants, through INBE.

27      272.    The provision in the BELOC which states that the BELOC "omit[s] no

28  material facts" is a false assertion by Defendants, through INBE, and was known to be

false when made by Defendants, through INBE. Among other things, the BELOC omits the material fact that no loan would actually be made and that Messner and Defendants intended, all along, to take Abbson's ICA money without the issuance of a loan.

273.    The provision in the BELOC which states that Abbson's $3.5 million ICA deposit will be "held by a nominated Trustee (attorney) [Messner]" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the nominated Trustee, Messner, to hold the ICA money.

274.    The provision in the BELOC which states that Abbson's $3.5 million ICA deposit "shall be in Trustee's sole possession and control" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the ICA deposit to be in the Trustee's sole possession and control.

275.    The provision in the BELOC which states that INBE "will step in and reimburse" Abbson if Abbson's ICA money is not returned is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE, as INBE has no ability or wherewithal to "step in and reimburse" Abbson's ICA money.

276.    Having reasonably relied on the false statements to its detriment, made on or about June 29, 2023 as reflected above, Abbson wired $3,500,000 to Messner's Northern Trust COLTAF account on June 29, 2023.

277.    Despite demand for the return of the ICA money, Abbson's $3.5 million was never returned.

278.    The $14 million loan to Abbson referenced in the BELOC never occurred as Abbson never received any loan funds whatsoever, and Abbson sustained substantial incidental and consequential damages as a result.

279.     On June 29, 2023, Welch sent an email to "Leon Chartue," which is the alias for Chartraw, and Messner refused to produce the communication between Welch and Chartraw in other litigation as purportedly privileged.

280.     On July 1, 2023, and for the next 19 days, Defendants directed J.W. to make repeated false representations to Plaintiff that "everything is still on track" for Plaintiff's July 27, 2023, funding date, even though INBE had no intent or wherewithal to make the loan to Plaintiff.

281.     On July 5, 2023, Welch sent an email to "Leon Chartue," the alias for Chartraw, and Owen, who is Clearwater's principal regarding INBE.  Messner refused to produce the communication between Welch, Chartraw, and Owen in other litigation as purportedly privileged.

282.     On July 20, 2023, Defendants directed J.W. to falsely represent to Plaintiff as follows by email "I hope to have your funding by COB tomorrow."

283.     INBE and Defendants became temporarily unresponsive as the July 27, 2023, funding deadline elapsed.

284.     On July 28, 2023, J.W. represented to Plaintiff's advisor by telephone that the delay in funding was due to Messner as the purported "paymaster."

285.     On July 28, 2023, Defendants directed J.W. to falsely represent to Plaintiff as follows by email, "[w]e are working to get funds out. Will update you as I know more."

286.     On July 31, 2023, Defendants directed C.B to falsely represent to Plaintiff as follows by email, "As I believe Jonathan explained on the call on Friday we have had a short delay in the movement and subsequent release of funds. My self and our senior management team are working on resolving the issue and anticipate having everything in place towards the end of this week possibly next week."

**Predicate Act of Wire Fraud #5, Konala LLC, Wired August 1, 2023**

287.     Pursuant to the fraudulent scheme devised by Defendants as discussed herein, on or about August 1, 2023, Defendants directed J.W. or INBE, on Defendants'

behalf, as Defendants' agent, and in furtherance of Defendants' common scheme and plan, to make false representations to Konala LLC ("Konala") intended to defraud, deceive, and induce Konala into paying $325,000 into Messner's Northern Trust escrow account.

288.    When the BELOC was disseminated to Konala, to T.M., on or about August 1, 2023 by email by J.W. or INBE it was a false statement by Messner and Defendants, as neither INBE nor any Defendant intended to issue any loan to Konala.

289.    The purpose of the BELOC was to steal Konala's money by defrauding Konala into believing that it would receive a loan as long as Konala paid Messner the ICA deposit of $325,000.

290.    The BELOC is fundamentally a fraudulent document, based on an even more dangerous draft of the fraudulent BELOC that Messner received from Prime. Drafted by Messner, and dispatched by Messner, the BELOC contains numerous false statements.

291.    In addition, specific statements in the BELOC are particularly false.

292.    The provision in the BELOC which states that INBE supposedly "has the financial ability and wherewithal to fully fund" a $1.3 million loan to Konala is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE.

293.    The provision in the BELOC which states that INBE supposedly will "fully and timely fund each Advance" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE.

294.    The provision in the BELOC which states that the BELOC "omit[s] no material facts" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Among other things, the BELOC omits the material fact that no loan would actually be made and that Messner and Defendants intended, all along, to take Konala's ICA money without the issuance of a loan.

295. The provision in the BELOC which states that Konala's $325,000 ICA deposit will be "held by a nominated Trustee (attorney) [Messner]" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the nominated Trustee, Messner, to hold the ICA money.

296. The provision in the BELOC which states that Konala's $325,000 ICA deposit "shall be in Trustee's sole possession and control" is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE. Defendants did not intend for the ICA deposit to be in Trustee's sole possession and control.

297. The provision in the BELOC which states that INBE "will step in and reimburse" Konala if Konala's ICA money is not returned is a false assertion by Defendants, through INBE, and was known to be false when made by Defendants, through INBE, as INBE has no ability or wherewithal to "step in and reimburse" Konala's ICA money.

298. Having reasonably relied on the false statements to its detriment, made on or about August 1, 2023 as reflected above, Konala wired $325,000 to Messner's Northern Trust COLTAF account on August 1, 2023.

299. Despite demand for the return of the ICA money, Konala's $325,000 was never returned.

300. The $1.3 million loan to Konala referenced in the BELOC never occurred as Konala never received any loan funds whatsoever, and Konala sustained substantial incidental and consequential damages as a result.

301. In August 2023, Plaintiff repeatedly followed up with J.W., and J.W. engaged in a game of "run around."

302. On August 7, 2023, Defendants directed J.W. to falsely represent to Plaintiff as follows by email, "[g]ood afternoon its looking good. Should have a better timeframe by tomorrow."

303. On August 16, 2023, Defendants directed J.W. to falsely represent to Plaintiff as follows by email, "Hey Noah working on it."

304. On August 17, 2023, Welch responded to an inquiry from Plaintiff's advisor by stating as follows by email:

Matt – thanks for chatting yesterday. Some clarification here as it does deviate from our discussion a bit:
1. I will keep you informed as to status on the funds as the clear into the US accounts. As I mentioned, this is and has been the hiccup here given the size and process. I anticipate to have more information today from the relative banks (there are three working on this side) – when I spoke to the banks yesterday they had hoped that the funds would be in clearance process today or tomorrow – as I explained to you, if that occurs, then funds would be deployable be the end of next week. I have another discussion with all of the bankers this afternoon for a status update.
2. This is correct.
3. I am discussion with INBE on the accelerated tranche schedule. As I mentioned, there was discussion as to a new tranche schedule to push up 2 and 3 in advance of the prior schedule – while the funds may be available, the schedule itself will be with Craig and Jonathan. I'll confirm and revert.

305. On August 17, 2023, Welch further stated to Plaintiff's advisor by email:

Bankers are waiting for additional approvals. We submitted another set

of AML documents today. All remains routine but i anticipate

additional news tomorrow.

306. Upon information and belief, no legitimate and non-fraudulent "bankers" existed who were "waiting for additional approvals," and the scenario with the BELOC loan was not "routine."

307. On August 18, 2023, Welch falsely stated to Plaintiff's advisor by email:

Discussed with the bankers facilitating the move today - they have indicated that the initial messages have been sent for the final transfers and they will respond to each other Monday - then movement will happen. On pace for end of next week per their status update today.

308. On August 22, 2023, Welch falsely stated to Plaintiff's advisor by email:

Matt - we remain on track as discussed Thursday and Friday. This is subject just to banking procedures and time frames but the estimate given last week and relayed to you (funds available the end of this we have completed everything on our side.

As for tranching the disbursements, once the first tranche is release (and assuming your client wishes to accept the tranche rather than a refund of the ICA deposit), my clients will make the second tranche after the 2nd.

Torben Welch

309.    On August 23, 2023, Welch signed a letter known as an "attorney comfort letter," in which Welch stated as follows:

Letter    from    Messner    Reeves,    signed    by    T.    Welch.

Re: INBE CAPITAL, LLC and its affiliates ("INBE")
To Whom It May Concern:
We serve as outside counsel to INBE Capital, LLC and its affiliates and partners ("INBE").

It is our understanding that you are exploring a potential business relationship with INBE for the receipt of a business expansion line of credit (a "BELOC") from INBE. The purpose of this communication is to confirm that INBE stands ready, willing and able to proceed with the financing subject to the terms and conditions of its standard agreements governing such BELOC.
We look forward to proceeding with this transaction and working with you and your company moving forward.

Should you have any questions or concerns, please contact me directly to discuss.

310.    On August 23, 2023, Welch stated to Plaintiff's advisor by email that he was "awaiting confirmation from the banks" and "[o]nce funds hit they should be available same day if received before 2 EDT." Welch had no reasonable belief that "funds" were coming, he claimed that he was "simply passing along" what he deemed "estimates only subject to bank procedures and protocols."

311.    On August 24, 2023, Welch stated to Plaintiff's advisor by email that "[t]he bankers are still working through transfer protocols and clearance of the funds. I remain hopeful funds are cleared and deposited tomorrow."

312.    On August 25, 2023, Welch falsely stated to Plaintiff's advisor by email that "the funds are still in process into the INBE account for disbursement. It did not happen today. The financial parties are coordinating on Monday to see if we can get a clear pathway. Torben."

313.    On August 28, 2023, Welch stated to Plaintiff's advisor by email that "we will continue to finalize receipt of disbursement funds and will notify [sic] when they are received."

314.    On August 28, 2023, Welch further stated to Plaintiff's advisor by email, "[t]he bankers will not be on the call. As I mentioned to you the funds have been moved to aggregate into a larger amount for memorization [sic]. We remain in control of those funds (which are being moved)."

315.    On August 30, 2023, responding to an inquiry from Plaintiff's advisor about the purpose of the August 23, 2023, attorney comfort letter, Welch responded as follows by email:

> That is a generic form letter sample we prepared some time ago that I usually mark-up and send myself due our DD phase of review of potential partners. I don't know why it was sent.
> Your comment that it "isn't accurate" needs to be tempered a lot. Nonsense like that does a disservice here.

316.    As of September 7, 2023, Defendants authorized their agent M.H. to repeatedly make false and delay-oriented statements on Defendants' behalf to Plaintiff and other victims about the purportedly imminent nature of the forthcoming loan funds.

317.    The explanation for the "delay" shifted.

318.    On September 7, 2023, M.H. stated:

> Noah. Again. The assertion that "whatever party is supposed to fund my $8 Million had money a month ago and paid other obligations" IS NOT TRUE OR ACCURATE. The money for your loan will be

proceeds from an investment trade. This trade did NOT happen as quickly as expected. Torben [Defendant Welch] & Danny [Defendant Chartraw] are aware of this issue and are working diligently to remedy this. But this remedy will take a little more time. And you have made it clear that you do not have time.

So, in an effort, to meet your current, dire needs I have sourced a "bridge funding" option for you. Also, as I expressed to you earlier this morning, once the funding process is complete any additional cost(s) associated with the bridge loan will be borne by the entity that funds your loan.

If you would like to speak about any particulars of this matter, please feel free to contact me. As for the final funding date, I will speak with Torben and Danny and get back to you as soon as possible. Thank you.

319.    In September 2023, on a near daily basis, M.H. provided Plaintiff with "updates" which consisted of references to "Danny" (Defendant Chartraw) as the person with knowledge of the loan funds. None of the victims authorized Chartraw to hold their ICA deposit funds.

320.    On September 8, 2023, while Defendants were stalling, obfuscating, and and giving the run-around to Plaintiff and other BELOC scam victims, Defendants simultaneously authorized the following announcement regarding financing of the All Net arena: "the project is 'utilizing a BELOC line of credit for $5,000,000,000.00 and retiring that with the $5,000,000,000.00 equity investment of Clearwater Premier Perpetual Master Trust, LLC.'"

321.    On September 21, 2023, Welch sent an email to C.B. at INBE and "Leon Chartue," the alias for Defendant Chartraw, regarding the ICA money of Emerald and Hard AF. Messner refused to produce the email on grounds of a privilege invocation.

322.    On September 22, 2023, Welch received an email from C.B. at INBE regarding the ICA money of Emerald and Hard AF. Messner refused to produce the email on grounds of a privilege invocation.

323. For the week of September 28, 2023, M.H. stated as follows as such communications are characteristic of M.H.'s repeated references to Chartraw:

> I will call you back as soon as possible.
> I'm waiting for Danny to arrive and update me. I'm on back to back zoom calls this morning. I will be back to you with an update shortly.
>
> Danny is in route back to me
> He told me he will update when he gets here but expects to have things wrapped up shortly. I will ask him what shortly means and circle back to you.
> Talking to Danny. Give me a few minutes
> He just arrived
> Not tomorrow
> Thursday is possible
> Waiting for west coast end of day update
> I'm still trying to connect with Danny
> We keep missing each other
> My first day back in 3 weeks has been chaotic

324. On October 5, 2023, Defendants directed M.H. to dissuade Plaintiff from communicating with Welch, as M.H. stated via text to Plaintiff:

> No. Do not call torben
> I will speak to Danny shortly and come back to you

325. In the ensuing weeks in October 2023, M.H. continued to reference essentially games of phone tag with "Danny" Chartraw:

> Morning
> Talked to Danny last night briefly. Hopeful about today. Speaking to Danny again shortly and will call you after
>
> I will call you back as soon as possible.
> Playing phone tag with Danny. Best with me please
> Danny was checking. Said he'd back to me as soon as he heard back from his people. Office is closed today
>
> Not sure
> Spoke to Danny for like 15 seconds then call cut off and now not even texts are going thru

So I'm waiting

326.     As directed by Defendants, on October 11, 2023, M.H. then began a cruel series of false representations to Plaintiff via text message that the funds would be imminently arriving:

> Noah
> I told you
> Expecting money literally at any time
> It's 11am in CA
> I will have an update soon
>
> And will contact you when it's recevied
> Noah. It's just not done for compliance purposes
> Stay calm another day or 2
>
> We are literally wrapping things up
> Well based on the information I've been given we are just about to the finish line
> Like literally any time
> Potentially
>
> Yes. I've messaged Danny to please call me as soon as he gets my messages
>
> I'm on a zoom call
> Haven't connected with Danny yet
> Will try him after this call and come back to you
>
> I've reached out to Danny and am awaiting a response
> He will contact me soon
>
> Noah
> Unbeknownst to me meetings started at 7am with a group of people
> Trying to get Danny aside to speak to him
> Got part of info then people came
> Bear with me a little longer.

327.     On October 27, 2023, Welch sent an email to "Leon Chartue," the alias for Defendant Chartraw, regarding the ICA money of Emerald and Hard AF. Messner refused to produce the email on grounds of a privilege invocation.

328.    By October 30, 2023, Defendants were well aware that the INBE purported loans were not going to be made, as the initial tranche funding deadlines were already missed for five of the currently known victims of the ICA scam.

329.    On October 30, 2023, Emerald's principal emailed Welch, stating as follows: "We are done chasing for answers and seeking clarity on what happened to our funds. Your immediate attention to this matter is requested. We are seeking clear and accurate communication as to the whereabouts of our interest reserve funds."

330.    On November 3, 2023, Welch sent a letter to Plaintiff, along with similar letters to the other victims of the BELOC scam. In this letter, Welch referred to communications through M.H., and Welch asserted that Plaintiff was "mistaking truthful communications" that "do not contain the content that [Plaintiff] wishes" to be "incorrect or inaccurate."

331.    In his November 3, 2023, letter, Welch did not acknowledge his own direct communications, such as his representations on August 17, 2023, about "bankers" and "routine approvals" or the incorrect and inaccurate statements that Welch made in his August 23, 2023, attorney comfort letter, as Welch falsely stated at that time, "INBE stands ready, willing and able to proceed with the financing subject to the terms and conditions of its standard agreements governing such BELOC." Welsh never corrected his false statements.

332.    In the November 3, 2023, letter, Welch made a patently false assertion that "INBE is entitled to utilize the [ICA] funds prior to delivery of any amount" of the loan.

333.    Welch's reading directly contradicts the unambiguous language in the BELOC, which provides that the ICA deposit will be "held by a nominated Trustee (attorney) [Messner]" and the ICA deposit "shall be in Trustee [Messner]'s sole possession and control." The BELOC does not whatsoever permit INBE to "utilize" the ICA funds, as the ICA funds must stay in Messner's sole possession and control.

334.    Moreover, INBE attested that it neither received nor used the ICA money.

335.    Welch then stated in the letter, without evidence, that "[t]he funds are under the possession and control of the Firm [Messner] awaiting deployment," but Welch conflictingly then stated that Plaintiff's claim "that the funds were never going to be moved or transferred is simply an intentional misreading of the Agreement."

336.    Welch referred to his frustration and threatened that the "continued misreading of the Agreement" can "only lead to protracted litigation on the issue."

337.    Welch did not actually provide clarity on the usage, status, or condition of the ICA deposit money, which is escrow money and property of the victims, and not property of any of the Defendants, including and especially Messner. From his perch as one of Messner's managing partners, Welch declared that inquiries about the missing ICA money may result in "protracted litigation," was Welch essentially threatened to further financially punish those who might inquire about their missing escrow funds.

338.    Welch threatened direct legal action against those who sought the truth about the missing money, stating, "misrepresentations and allegations of wrongdoing" will "not be tolerated" and "nonsensical arguments" will be addressed promptly and directly through "all applicable defenses, counterclaims, and related actions."

339.    On November 21, 2023, Welch appeared before the Commission, which is a tribunal, and made a series of false statements on behalf of All Net as stated below.

340.    Welch proclaimed that "the partners" were able to "secure financing for this project through assets that they had."  But financing had never been secured, and the only assets to which Welch could have been referring were the rights to a portion of the proceeds from the failed "monetization" of the worthless Ameri-Metro bonds.

341.    Welch then falsely represented to the Commission that Clearwater "secured financing on behalf of All Net and have provided $5 billion in an account, an offshore account for the purposes of building this project."

342.    Welch asserted that the so-called account is not U.S. based because, supposedly, "U.S. based accounts don't act as escrow agents and hold that kind of money."

343.    Welch falsely claimed that "the accounts have been opened and HSBC UK is where that money [$5 billion] will be stored."

344.    Welch falsely stated that "there are additional construction loans and lines of credit" and that all the outstanding construction invoices "are in the process of being paid."

345.    Welch stated "[e]verybody working on the site today has been prepaid for their work, so to speak."

346.    Welch then put up on the screen what he claimed was a bank statement of Fides Bank in Mexico, as Welch represented that the document was a "bank statement evidencing the account number [redacted] that is in the name of Dribble Dunk [All Net]." Welch stated that the account contains $5 billion and it was "funded by their partner, Clearwater, on 8/25, and as we sit here today, it remains at that amount, $5 billion."



347.    After hearing Welch's presentation on November 21, 2023, as well as the presentation of a person on All Net's behalf who claimed to have verified that the phantom $5 billion in the Mexican bank account was purportedly "clean" and unconnected to "cartels," and another All Net compatriot who was sued six days later for running his own ICA fraud scheme [*North Haven v. McMann Commercial, et al*, 1:23-cv-16264, ILND],  the Commission voted 7-0 to terminate the All Net project.

348.   On November 22, 2023, Welch emailed J.W. and C.B. at INBE regarding a letter from Emerald's undersigned counsel. Messner refused to produce the email on grounds of a privilege invocation.

349.   On November 27, 2023, Welch emailed an attorney representing M.H. regarding the letter from Emerald's undersigned counsel. Messner refused to produce the email on grounds of a privilege invocation.

350.   On December 1, 2023, Welch sent a reply letter to Emerald's counsel in which Welch reversed course on the lending entity for which Messner had recently vouched, as Welch stated, "we do not represent INBE related to these matters at this time." Welch falsely asserted that Messner "served only as the Paymaster and recipient of the ICA Payment under the Agreement."

351.   Welch failed to account for the ICA deposit money, which belongs to Plaintiff and the other victims, as Welch and Messner would not commit to returning the missing deposit money.

352.   On January 25, 2024, Welch sent another email to Emerald's undersigned counsel, this time stating that "the funds remain part of the escrow under our control at Titan Financial, LLC – a copy of that statement evidencing the same is attached hereto as of today's date (please note that your clients $700k is co-mingled with other funds)."

353.   Titan had been created on November 7, 2023, as a Wyoming LLC under the organizer's name Todd Owen, reflecting the same 30 North Gould Street, Sheridan, WY 82801 address. But the filer's signature reflects Donna DeFalco and ddefalco@messner.com, which is the same filing credentials for INBE-Clear Capital Group, LLC with Welch as the principal.

354.   The purported Titan document attached to Welch's January 25, 2024 email, which contains scrubbed metadata, appears to be yet another forged or fraudulent bank or financial document presented by Welch, even after Welch peddled in the phony PG Asia and Fides Bank documents. The "account" number and account

type reflect a purported "IOLTA" account, but Titan is not even a bank, and only banks can administer IOLTA accounts.

**USER DETAILS**

| | |
|---|---|
| COMPANY NAME | Messner Reeves, LTD |
| USERNAME | Messner |
| FULL NAME | Messner Reeves LTD |
| MAILING ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah,  8402 |
| PHYSICAL ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah,  8402 |

**ACCOUNT DETAILS**

| | |
|---|---|
| NUMBER | IOLT█████ |
| TYPE | IOLTA |
| CURRENCY | USD |
| AVAILABLE BALANCE | 10,300,000.00 |
| CURRENT BALANCE | 10,300,000.00 |
| STATUS | Active |

| Date | ID | Description | Debit/Credit | Current Balance |
|---|---|---|---|---|
| 01/25/2024 14:52 | 73 | TBU/Messner Reeves Account | 10,300,000.00 | 10,300,000.00 |

355.    The purported $10.3 million the so-called Titan account is as fraudulent as the $5 billion in the PG Asia account and the $5 billion in the Fides Bank account.

356.    Moreover, if Welch had been truthful about the purported $10.3 million in a Titan account, or any account, such a balance would reflect sufficient funds for the return of the victims' ICA money. And yet more than four more months have passed and Messner inexplicably persists in its failure to return any of the missing ICA deposit funds.

357.    Defendants Welch and Messner's pattern of involvement with fraudulent documents, disreputable parties, and non-existent financing schemes indicates, at best, a colossal and recklessly negligent failure to perform the most basic due diligence.

358.    Acting in his capacity as an officer of the court and with investigative responsibilities, this is unlikely as Defendant Welch knew or should have known that Clearwater and its principals were not legitimate actors.

359.    On June 5, 2023, Messner was in possession of Plaintiff's $2 million wire received on April 27, 2023. June 5, 2023 is one business day after June 2, 2023 when Welch an Axos Bank account welcome letter for INBE-Clear Capital Group, LLC. On June 5, 2023, creditor CTS executed a satisfaction of a $1,147,000 judgment against All Net which had been entered on October 19, 2021, and recorded on February 15, 2023. The insolvent All Net entity in the summer of 2023 would not have been able to satisfy this judgment without additional capital.

360.    Through the end of 2022, All Net owed rent of approximately $1.3 million. Through November 2023, the rent amount in arrears likely increased by at least $1.1 million, rendering the amount likely in excess of $2.4 million in past due rent by November 2023.

361.    On November 2, 2023, the owner of the property for the All Net site recorded a termination of the lease.

362.    But on November 21, 2023, at the Zoning Commission Hearing, the owner did not mention any rent owed by All Net as he effusively stated, "we've been a hundred percent in support of the All Net Arena project from day one, and we remain in a hundred percent support today."

363.    At the November 21, 2023 Zoning Commission Hearing, Welch represented that labor was "prepaid," but he failed to explain how the insolvent judgment-debtor All Net was able to "prepay" for labor which had not even occurred.

364.    As of today's date, Clearwater's website is deleted, Chartraw operates under an alias of Leon "Danny" Chartue, INBE does not list any of the ICA scam victims among its client list on its website, and Welch and Messner still have not accounted for the disappearance of the ICA deposit money.

365.    Plaintiff sustained damages which were devastating to its business, including incidental and consequential damages, including the cost of additional capital on short notice, and lost business.

## COUNT ONE

### RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT – 18 U.S. CODE § 1962

(Against Messner, Clearwater, Welch, and Chartraw)

366.    Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

367.    Pursuant to 18 U.S.C. § 1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

368.    A RICO claim must plausibly allege that the Defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff.

369.    To show a pattern, a plaintiff must demonstrate that Defendants committed at least two predicate acts within a ten-year span, that the predicate acts were related, and that the predicate acts demonstrate criminal conduct of a continuing nature.  Continuity can be established as either a closed period of repeated conduct, or open-ended continuity as to past conduct that by its nature projects into the future with a threat of repetition.

370.    Pursuant to open-ended continuity, a plaintiff must show that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, or that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.

371. An enterprise is a group of individuals or business entities who associate with each other for a common purpose.

372. Defendants Messner, Clearwater, Welch, and Chartraw ("RICO Defendants") constitute an enterprise (collectively, "Enterprise") as defined by 18 U.S.C. § 1961.

373. RICO Defendants are persons, as defined by 18 U.S.C. § 1961, employed by and associated with the Enterprise who have participated, directly and indirectly, in the conduct of the Enterprise's affairs, and have specifically participated in the racketeering activity perpetrated by the Enterprise, and are thereby liable to Plaintiff under 18 U.S.C. § 1962.

374. The RICO Defendants associated for a common purpose, which was to engage in fraud to obtain money. With that money, the RICO Defendants further sought to obtain financing, or the appearance of financing, or the appearance of progress and achievement pursuant to the development of the All Net arena leading up to the November 21, 2023 Zoning Commission Hearing.

375. The RICO Defendants stood to gain tens of millions of dollars, if not more from a favorable ruling at the November 21, 2023 hearing, and the RICO Defendants went to great lengths to carry out their common purpose and goals.

376. As set forth herein, the RICO Defendants carried out five acts of wire fraud between April 27, 2023 and August 1, 2023, including the following dates.

| Predicate Act | Date of Wire | Wire Amount | Victim | Receiving Account |
|---|---|---|---|---|
| 1 | April 27, 2023 | $2,000,000 | Plaintiff | Northern Trust |
| 2 | June 13, 2023 | $700,000 | Emerald | Northern Trust |
| 3 | June 19, 2023 | $1,145,000 | MSC | Northern Trust |
| 4 | June 29, 2023 | $3,500,000 | Abbson | Northern Trust |
| 5 | August 1, 2023 | $325,000 | Konala | Northern Trust |
| Total | | $7,670,000 | | |

377. The elements of all five predicate acts of wire fraud are established with the requisite level of heightened specificity.

378.   The predicate acts perpetrated by the RICO Defendants reflect a clear and unmistakable pattern, as the predicate acts were related and demonstrable of criminal conduct of a continuing nature.

379.   Closed-ended continuity is established as the RICO Defendants engaged in a series of related unlawful acts over a significant period of time.

380.   At alleged herein, the RICO Defendants engaged in at least five predicate acts of wire fraud in less than a year.

381.   Open-ended continuity is also established because the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future and the predicate acts or offenses are part of an ongoing entity's regular way of doing business.

382.   The brazen nature of the RICO Defendants' theft scheme, which utilizes a law firm's escrow account, reflects a specific threat of repetition extending indefinitely into the future. Without judicial action to halt the unlawful conduct, the RICO Defendants' unlawful conduct could continue unabated into the future.

383.   Moreover, the predicate acts and offenses are the Enterprise's regular way of doing business.

384.   The RICO Defendants have worked together continuously since mid-2022 and their modus operandi is fraud. Messner and Welch positioned themselves as counsel for all dimensions of the Enterprise and they edited the fraudulent BELOC which formed the basis of the fraud scheme.

385.   The RICO Defendants not only perpetrated the theft of Plaintiff's ICA deposit, as well as the deposits of at least four other victims, totaling $7,670,000 in stolen money, the RICO Defendants also engaged others to run interference and make false statements on their behalf.

386.   The RICO Defendants directly engaged in a scheme of making false statements and threats as well as counterattacks to obstruct the uncovering of the truth.

387.   In a manner affecting interstate commerce, the RICO Defendants secured funds from Plaintiff and other victims through wire transfers.

388.   The RICO Defendants participated as principals to further the Enterprise through their investment with the income derived by from the Enterprise's acts of racketeering against Plaintiff and the RICO Defendants are thereby liable to Plaintiff under 18 U.S.C. § 1962(a).

389.   The RICO Defendants acquired or maintained their interest in, and/or control of, the Enterprise through their ownership or other material interest and are thereby liable to Plaintiff under 18 U.S.C. § 1962(b).

390.   The RICO Defendants who were employed by or associated with the Enterprise, engaged in, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity and are thereby liable to Plaintiff under 18 U.S.C. § 1962(c).

391.   The RICO Defendants conspired to act in furtherance of the Enterprise to the detriment of Plaintiff and others and are thereby liable to Plaintiff under 18 U.S.C. § 1962(d).

392.   Plaintiff seeks compensatory damages of $2,000,000, trebled to $6,000,000 pursuant to 18 U.S.C. § 1964(c).

393.   Plaintiff also seeks reasonable attorneys' fees, costs, and prejudgment interest.

## **COUNT TWO**

### **CIVIL THEFT**

(Against Messner)

394.   Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

395.   California Penal Code § 496(a) provides that a person who withholds, or aids in withholding any property from the owner, knowing the property is stolen or obtained, is guilty of a felony if the property is worth more than $950. The elements of

civil theft are that (1) the plaintiff rightfully owned property, (2) that was dispossessed of it, (3) the defendants received, concealed, or withheld the property from the plaintiff, and (4) the defendants knew that the property was stolen.

396.   Defendant Messner has prevented Plaintiff from accessing, possessing, or controlling the ICA deposit rightfully owned by Plaintiff.

397.   As explained in detail above, the ICA deposit is Plaintiff's property, even after its transfer to Messner to be held in escrow.

398.   The ICA deposit is property that is subject to theft under California Penal Code § 484, and thus, Plaintiff's loss is actionable under California Penal Code § 496.

399.   Plaintiff was dispossessed of its money due to Defendant Messner's fraud scheme, as Messner falsely represented in the BELOC that Plaintiff's ICA deposit would be "held by a nominated Trustee (attorney) [Messner]" and that the ICA deposit "shall be in Trustee [Messner]'s sole possession and control."

400.   Messner knew that the purported BELOC loan would not be funded.

401.   Messner took possession of Plaintiff's ICA deposit with the criminal intent to retain the ICA money and entirely dispossess Plaintiff of the ICA deposit.

402.   Plaintiff revoked its consent for its ICA deposit to remain with Messner.

403.   Nonetheless, Messner has continued to prevent the return of the ICA deposit to Plaintiff. Messner took and received or converted the ICA money from Plaintiff and others knowing that the deposits did not belong to Messner, which meets the definition of "theft" under Penal Code § 484.

404.   Messner took and received or converted the ICA money from Plaintiff and others knowing that they belonged to another, which meets the definition of "theft" under Penal Code § 484.

405.   As a direct and proximate result of Messner's civil theft of Plaintiff's property, Plaintiff has been damaged in the principal amount of $2,000,000.

406.   Pursuant to Pen. Code, § 496(c) Plaintiff is entitled to three times the actual damages sustained by Plaintiff, costs of suit, and reasonable attorneys' fees.

407.   Therefore, Plaintiff seeks compensatory damages of $2,000,000, trebled to $6,000,000 pursuant to 18 U.S.C. § 1964(c).

408.   Plaintiff also seeks reasonable attorneys' fees, costs, and prejudgment interest.

## COUNT THREE

### CONVERSION

(Against Messner)

409.   Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

410.   A conversion claim is established when (1) plaintiff owns the property or has a right to possession of the property, (2) the defendant converts the property by a wrongful act or in a manner that is inconsistent with the plaintiff's property rights, and (3) resulting damages.

411.   Plaintiff is the owner of the ICA deposit.

412.   Because the phony BELOC loan did not fund, and was never going to fund, Messner had no right to possess Plaintiff's ICA deposit.

413.   Defendant Messner converted the property, Plaintiff's ICA deposit, pursuant to a wrongful act and in a manner that is inconsistent with Plaintiff's property rights.

414.   Plaintiff demanded the return of its ICA deposit, however Defendant wrongfully refused to return the ICA deposit.

415.   As a result, Plaintiff sustained damages pursuant to the loss of the $2,000,000.

1
2
3

# COUNT FOUR

## FRAUD – FALSE PROMISE

(Against Messner)

4   416.   Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365
5   as if fully set forth herein.

6   417.   On April 27, 2023, Defendant Messner made false representations to
7   Plaintiff regarding its role and its intentions as an escrow holder of Plaintiff's ICA
8   deposit as set forth within the Verified Complaint.

9   418.   Defendant Messner's representations, made directly and through others
10   including J.W. and INBE, were, in fact, false and made by Defendant Messner without
11   any intention to fulfill the promises made.

12   419.   When Defendant Messner made these representations and promises,
13   Messner knew them to be false and made the representations with the intention to
14   deceive and defraud Plaintiff into acting in reliance on the representations, or with the
15   expectation that Plaintiff would so act.

16   420.   When Defendant Messner made the false representations, Plaintiff was
17   unaware of the falsity of the representations and Plaintiff believed them to be true. In
18   reliance on these the false representations, Plaintiffs were induced to and did pay
19   $2,000,000 to Messner as an ICA deposit.

20   421.   If Plaintiff had known of the falsity of the representations, Plaintiff would
21   not have taken such actions.

22   422.   Plaintiff reasonably relied on Defedant's representations and believed
23   Defendant Messner would fulfill its promises and abide by the basic obligation to act
24   as an escrow holder by safeguarding Plaintiff's ICA deposit. Plaintiff believed that
25   Defendant Messner intended to fulfill its promises.

26   423.   As a proximate result of Defendant's misconduct, Plaintiff has been
27   damaged in the amount of $2,000,000.

28

## COUNT FIVE

## FRAUD – CONCEALMENT

(Against Messner)

424.   Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

425.   On April 27, 2023, Defendant Messner made false representations to Plaintiff regarding its role and its intentions as an escrow holder of Plaintiff's ICA deposit as set forth within the Verified Complaint.

426.   Defendant concealed the true facts about its intentions as an escrow holder of Plaintiff's ICA deposit.

427.   Defendant concealed the true facts about what would be done with Plaintiff's ICA deposit.

428.   Defendant concealed the true facts regarding INBE's financial condition, despite its proffer of false facts in the attorney comfort letter.

429.   Defendant concealed from Plaintiff material terms regarding Messner's role in the BELOC lending scheme.

430.   Defendant's suppression of these material facts was intended to mislead Plaintiff and did in fact mislead Plaintiff in light of the other representations made by Defendant concerning the ICA deposit.

431.   The representations and failures to disclose information and suppressions of information were carried out with the intent to induce Plaintiff to act in the manner herein alleged in reliance thereon.

432.   Defendant's concealment caused Plaintiff to be unaware of material facts.

433.   If Plaintiff had known the facts not disclosed by Defendant, Plaintiff would not have acted as it did by wiring $2,000,000 to Defendant's account to be held in escrow.

434.   As a proximate result, Plaintiff sustained incidental damages in the amount of $2,000,000.

435.    Plaintiff also sustained consequential damages.

## COUNT SIX

### UNFAIR BUSINESS PRACTICES

### (CAL. BUS. & PROF. CODE § 17200, ET SEQ.)

(Against Messner, Clearwater, Welch, Chartraw, and Titan)

436.    Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

437.    California's Unfair Competition Law prohibits any unlawful, unfair, or fraudulent business act or practice.

438.    An unlawful business act or practice is one that is perpetrated in violation of an existing civil or criminal statute.

439.    An unfair business act or practice is one that offends an established public policy or an act or practice that is immoral, unethical, oppressive, unscrupulous or that substantially injures consumers.

440.    A fraudulent business act or practice is one that is likely to deceive members of the public. Intent is not a requirement and negligence can be sufficient to establish a violation.

441.    Standing is established when the plaintiff sustained an economic injury as a result of an unfair act or practice.

442.    As set forth herein, Defendants engaged in unlawful, unfair, and fraudulent business practices.

443.    As a result of those unlawful, unfair, and fraudulent business practices, Plaintiff sustained $2,000,000 in principal damages.

444.    Messner and Welch stated that Titan possesses Plaintiff's money, while Messner and Welch's counsel stated that Clearwater possesses Plaintiff's money.

445.    Either way, neither company should have Plaintiff's money absent Defendants' misconduct as discussed herein.

446.     Plaintiff seeks an injunction to prevent Defendants from further transferring, dissipating, and concealing Plaintiff's ICA deposit.

447.     Plaintiff also seeks restitution for the money which it lost, in the amount of $2,000,000, as a result of Defendant's unfair business practices.

**COUNT SEVEN**

**NEGLIGENCE**

(Against Messner)

448.     Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

449.     In the escrow context, an escrow holder is obligated to use the ordinary standard of skill, care, and diligence in carrying out its duties.

450.     Moreover, an escrow holder is impliedly obligated to undertake all obligations normally undertaken by an escrow holder unless expressly excluded under the escrow agreement and the escrow holder must use ordinary skill and diligence in carrying out these tasks.

451.     If the escrow holder negligently breaches its duty of care pursuant to the escrow agreement, the escrow holder is liable for any foreseeable loss arising from its negligence.

452.     Loss of Plaintiff's money was the foreseeable result of Messner's failure to hold Plaintiff's money in its trust account in Messner's "sole possession and control."

453.     Even if the escrow holder's liability is not the sole cause of the damages suffered, the escrow holder may still be held liable for negligence if the escrow holder's breach was a substantial factor in the harm experienced. Messner's negligence was a substantial factor in the harm that Plaintiff suffered.

454.     Messner owed Plaintiff a duty of care as an escrow holder. That duty of care consisted of the obligation to "hold" Plaintiff's $2,000,000 in Messner's "sole possession and control."

455.    Messner breached the duty of care by failing to "hold" Plaintiff's $2,000,000 in Messner's "sole possession and control."

456.    Instead of holding Plaintiff's $2,000,000 ICA deposit in Messner's sole possession and control, Messner transferred Plaintiff's money out of its sole possession and control in an unknown and unauthorized manner.

457.    Messner's breach of contract caused the damages that Plaintiff sustained.

458.    Plaintiff sustained incidental damages of $2,000,000.

459.    Plaintiff also sustained consequential damages.

460.    Plaintiff is entitled to recover costs and prejudgment interest.

## COUNT EIGHT

### BREACH OF FIDUCIARY DUTY

(Against Messner)

461.    Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

462.    An escrow holder's fiduciary duties include ensuring strict compliance with the terms of the escrow agreement and the instructions contained therein.

463.    Messner was an escrow holder, attorney, trustee, and Messner had a fiduciary relationship with Plaintiff.

464.    Messner was duty bound to act with the utmost good faith for the benefit of Plaintiff given that confidence was reposed in Messner and Messner voluntarily accepted or assumed to accept that confidence.

465.    Messner is precluded from taking advantage of its acts relating to the interest of Plaintiff without Plaintiff's knowledge and consent.

466.    Messner knowingly undertook to act on behalf and for the benefit of another, and Messner entered into the escrow relationship as a matter of law.

467.    Messner had a fiduciary duty of care to ensure that it adhered to the instruction to "hold" Plaintiff's $2,000,000 ICA deposit in Messner's "sole possession and control."

468.     Messner also had a fiduciary duty to disclose to Plaintiff if Messner intended to deviate from the instruction to "hold" Plaintiff's $2,000,000 ICA deposit in Messner's "sole possession and control."

469.     Upon information and belief, Messner had an interest in the transaction, pursuant to a joint venture at a minimum. Therefore, Messner was obligated to disclose that interest to Plaintiff before becoming an escrow agent for the parties.

470.     Messner had an additional fiduciary duty to ensure that Clearwater and any other party did not violate Plaintiff's rights.

471.     Messner breached the fiduciary duty of care by failing to adhere to the instruction to "hold" Plaintiff's $2,000,000 ICA deposit in Messner's "sole possession and control."

472.     Messner breached the fiduciary duty to disclose to Plaintiff if Messner intended to deviate from the instruction to "hold" Plaintiff's $2,000,000 ICA deposit in Messner's "sole possession and control."

473.     Messner breached its fiduciary duties by failing to disclose its interest in the transaction to Plaintiff before becoming an escrow agent for the parties.

474.     Messner also breached its fiduciary duties by failing to ensure that Clearwater, Chartraw, Titan or any other party did not violate Plaintiff's rights.

475.     As a result of Messner's breaches of its fiduciary duties, Plaintiff sustained damages.

476.     Plaintiff sustained incidental damages of $2,000,000.

477.     Plaintiff also sustained consequential damages.

478.     Plaintiff is entitled to recover costs and prejudgment interest.

**COUNT NINE**

**INTENTIONAL INTERFERENCE**

**WITH PROSPECTIVE ECONOMIC ADVANTAGE**

(Against Messner, Clearwater, Welch, and Chartraw)

479.    Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

480.    Plaintiff and a third-party, INBE, had an economic relationship which involved a reasonably probable future economic benefit or advantage to Plaintiff.

481.    This relationship, whereby INBE contracted to loan Plaintiff $8,000,000 at 6% interest only for ten years, would have led to future benefits for Plaintiff.

482.    Defendants intentionally acted wrongfully to interfere with Plaintiff's relationship with INBE.

483.    Defendants' actions, which include transferring Plaintiff's ICA deposit out of Messner's trust account, actually interfered with the relationship between Plaintiff and INBE.

484.    Defendants committed many independent wrongful acts as discussed herein.

485.    As a result of Defendants' actions, Plaintiff sustained incidental damages of $2,000,000 with consequential damages to be determined.

**COUNT TEN**

**NEGLIGENT INTERFERENCE**

**WITH PROSPECTIVE ECONOMIC ADVANTAGE**

(Against Messner, Clearwater, Welch, and Chartraw)

486.    Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

487.    Plaintiff and a third-party, INBE, had an economic relationship which involved a reasonably probable future economic benefit or advantage to Plaintiff.

80
COMPLAINT

488.     This relationship, whereby INBE contracted to loan Plaintiff $8,000,000 at 6% interest only for ten years, would have led to future benefits for Plaintiff.

489.     Defendants knew of the existence of the relationship or should have been aware that if they did not act with due care, their actions would interfere with this relationship and cause Plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship.

490.     Defendants were negligent.

491.     Defendants' negligence caused damage to Plaintiff in that the relationship with actually interfered with or disrupted and Plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship.

492.     Defendants committed many independent wrongful acts as discussed herein.

493.     As a result of Defendants' actions, Plaintiff sustained incidental damages of $2,000,000 with consequential damages to be determined.

## COUNT ELEVEN

### ACTION FOR RESTITUTION BASED ON
### QUASI-CONTRACT AND UNJUST ENRICHMENT

(Against Messner)

494.     Plaintiff incorporates by reference the allegations of Paragraphs 1 to 365 as if fully set forth herein.

495.     This count is pled in the alternative to any allegations regarding the existence of any applicable contractual agreement.

496.     Plaintiff conferred benefits on Messner, who had knowledge thereof. The benefits include, but are not limited to, the use, arrogation, and usurpation of Plaintiff's $2,000,000.

497.     Defendant voluntarily appreciated, accepted, and retained the benefits conferred.

498.     The circumstances are such that it would be unjust for Defendant to retain the benefit at the expense of Plaintiff without paying the value thereof to Plaintiff.

499.     Plaintiff can recover in quasi-contract for restitution based on Messner's unjust enrichment.

500.     The purpose of a quasi-contract claim is to restore Plaintiff, the aggrieved parties, to its former position through the return of the wrongfully obtained property or equivalent in money.

501.     The unjust enrichment which Defendant obtained should be returned to Plaintiff.

502.     Plaintiff's funds apparently sit in an account in Messner's name or the name of a Messner affiliate at a bank named Titan Private Bank, LLC.

503.     As a result of Defendant's unjust enrichment, Plaintiff sustained damages of $2,000,000 which should be paid by Messner.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendants, jointly and severally, as follows:

A.     Pursuant to Count One, sounding in RICO, compensatory damages in the principal amount of $2,000,000, trebled to $6,000,000, against Defendants Messner, Clearwater, Welch, and Chartraw, plus reasonable attorneys' fees, costs, and prejudgment interest;

B.     Pursuant to Count Two, sounding in civil theft, compensatory damages in the principal amount of $2,000,000, trebled to $6,000,000, against Defendant Messner, plus reasonable attorneys' fees, costs, and prejudgment interest;

C.     Pursuant to Count Three, sounding in conversion, compensatory damages in the principal amount of $2,000,000 against Defendant Messner;

D.     Pursuant to Count Four, sounding in fraud – false promise, compensatory damages in the principal amount of $2,000,000 against Defendant Messner;

E.   Pursuant to Count Five, sounding in fraud – concealment, compensatory damages in the principal amount of $2,000,000 Defendant Messner;

F.   Pursuant to Count Six, sounding in California Unfair Competition Law, compensatory damages in the principal amount of $2,000,000 against Defendants Messner, Clearwater, Welch, Chartraw, and Titan, plus a preliminary and permanent injunction directing Defendants to refrain from further transferring, dissipating, or concealing Plaintiff's ICA deposit;

G.   Pursuant to Count Seven, sounding in negligence, compensatory damages in the principal amount of $2,000,000 against Defendant Messner;

H.   Pursuant to Count Eight, sounding in breach of fiduciary duty, compensatory damages in the principal amount of $2,000,000 against Defendant Messner;

I.   Pursuant to Count Nine, sounding intentional interference with prospective economic advantage, compensatory damages in the principal amount of $2,000,000 against Defendants Messner, Clearwater, Welch, and Chartraw;

J.   Pursuant to Count Ten, sounding negligent interference with prospective economic advantage, compensatory damages in the principal amount of $2,000,000 against Defendants Messner, Clearwater, Welch, and Chartraw; and,

K.   Pursuant to Count Eleven, sounding in restitution based on quasi-contract and unjust enrichment, compensatory damages in the principal amount of $2,000,000 against Defendant Messner.

1

## **VERIFICATION**

2

3    I, Noah Lasko, on behalf of Plaintiff Kosher Eats LLC, verify under penalty of
4    perjury under the laws of the United States of America that the factual statements in
     the foregoing Verified Complaint upon which I have personal knowledge are true and
5    correct, and if called on to testify I would competently testify as to the matters stated
     herein.

6

7

8                                DocuSign by:
                                 *Noah Lasko*                          6/18/2024
                                 05A8600F1667459...
9          By: _____        _____
           Noah Lasko                              Dated
10         for Frysta Management LLC
           on behalf of Plaintiff Kosher Eats LLC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:   */s/ Kenneth E. Chase*
       Kenneth E. Chase (SBN 326307)
       kchase@chaselaw.com
       CHASE LAW & ASSOCIATES, P.A.
       2700 N. Military Trail, Suite 150
       Boca Raton, FL 33431
       Telephone: (561) 709-7000

       *Attorneys for Plaintiff Kosher Eats LLC*

# EXHIBIT A

Search Criteria - Full Name: all net , Party Type: All, Matching Mode: StartsWith, Date From: 1/1/1984, Date To: 5/19/2024, Doc Types: All, Book Types: All

| Party Type | First Party Name | First Cross Party | # Pages | Instrument# | Document Type | Modifier | Record Date | Parcel # | Legal Description | Total Value |
|---|---|---|---|---|---|---|---|---|---|---|
| From | ALL NET DEVELOPMENT INC | CONSTRUCTION TESTING SERVICES LLC | 5 | 201810230001698 | LIS PENDENS | | 10/23/2018 | 162-09-602-005 | | $0.00 |
| From | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 8 | 202405100000753 | JUDGMENT | SATISFACTION | 05/10/2024 | | | $0.00 |
| From | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 8 | 202405100000752 | JUDGMENT | SATISFACTION | 05/10/2024 | | | $0.00 |
| To | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 3 | 202405060000031 | LIS PENDENS | RELEASE | 05/06/2024 | 162-09-602-005 | | $0.00 |
| To | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 3 | 202405060000030 | LIS PENDENS | RELEASE | 05/06/2024 | 162-09-602-001 | | $0.00 |
| To | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 114 | 202311090003944 | JUDGMENT | AMEND | 11/09/2023 | | | $0.00 |
| To | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 81 | 202311090003943 | JUDGMENT | | 11/09/2023 | | | $0.00 |
| From | ALL NET DEVELOPMENT INC | SAHARA LAS VEGAS CORP | 2 | 202311020000958 | LEASE | TERMINATE | 11/02/2023 | 162-09-602-001 | | $0.00 |
| To | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 7 | 202306060002029 | JUDGMENT | SATISFACTION | 06/06/2023 | | | $0.00 |
| From | ALL NET DEVELOPMENT INC | ALL NET DEVELOPMENT INC | 7 | 202306060002029 | JUDGMENT | SATISFACTION | 06/06/2023 | | | $0.00 |
| From | ALL NET DEVELOPMENT INC | CONSTRUCTION TESTING SERVICES LLC | 8 | 202302150001844 | JUDGMENT | | 02/15/2023 | | | $0.00 |
| From | ALL NET DEVELOPMENT INC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201811200000378 | LIS PENDENS | | 11/20/2018 | 162-09-602-005 | | $0.00 |
| From | ALL NET DEVELOPMENT INC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201811200000377 | LIS PENDENS | | 11/20/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET DEVELOPMENT INC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201810240003000 | LIS PENDENS | | 10/24/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003620 | REQUEST NOTICE | | 03/20/2018 | 162-09-602-005 | | $0.00 |
| From | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003619 | REQUEST NOTICE | | 03/20/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003618 | LIS PENDENS | | 03/20/2018 | 162-09-602-005 | | $0.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| From | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003617 | LIS PENDENS | | 03/20/2018 | 162-06-001 | $0.00 |
| From | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003616 | LIEN | | 03/20/2018 | 162-09-602-005 | $0.00 |
| From | ALL NET DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003615 | LIEN | | 03/20/2018 | 162-09-602-001 | $0.00 |
| From | ALL NET DEVELOPMENT INC | KLEINFELDER INC | 2 | 201612140000022 | AFFIDAVIT | JUDGMENT | 12/14/2016 | | $0.00 |
| From | ALL NET DEVELOPMENT INC | KLEINFELDER INC | 5 | 201611290002472 | STIPULATION | JUDGMENT | 11/29/2016 | | $0.00 |
| From | ALL NET DEVELOPMENT INC | RENTALS, SUNBELT | 3 | 201607110003134 | LIEN | | 07/11/2016 | 162-09-602-001 | $0.00 |
| To | ALL NET DEVELOPMENT INC | SAHARA LAS VEGA CORP | 3 | 201502110001771 | LEASE | OPTION | 02/11/2015 | 162-09-602-001 | $0.00 |
| From | ALL NET DEVELOPMENT LLC | STURGEON ELECTRIC COMPANY INC | 4 | 201912230001488 | LIEN | THIRD | 12/23/2019 | 162-09-602-001 | $0.00 |
| From | ALL NET DEVELOPMENT LLC | KLEINFELDER INC | 2 | 201612140000022 | AFFIDAVIT | JUDGMENT | 12/14/2016 | | $0.00 |
| From | ALL NET DEVELOPMENT LLC | KLEINFELDER INC | 5 | 201611290002472 | STIPULATION | JUDGMENT | 11/29/2016 | | $0.00 |
| From | ALL NET DEVELOPMENT LNC | CONSTRUCTION TESTING SERVICES LLC | 5 | 201811210002205 | LIS PENDENS | | 11/21/2018 | 162-09-602-001 | $0.00 |
| From | ALL NET LAND DEVELOMENT LLC | CONSTRUCTION TESTING SERVICES LLC | 5 | 201810230001698 | LIS PENDENS | | 10/23/2018 | 162-09-602-005 | $0.00 |
| To | ALL NET LAND DEVELOPMENT INC | LAS VEGAS PAVING CORPORATION | 10 | 202206090004199 | AGREEMENT | RELEASE | 06/09/2022 | 162-09-602-001 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 3 | 202405060000031 | LIS PENDENS | RELEASE | 05/06/2024 | 162-09-602-005 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 3 | 202405060000030 | LIS PENDENS | RELEASE | 05/06/2024 | 162-09-602-001 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | STURGEON ELECTRIC COMPANY INC | 9 | 202403270001379 | JUDGMENT | | 03/27/2024 | | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | STURGEON ELECTRIC COMPANY INC | | 202403210004313 | LIEN | DISCHARGE | 03/21/2024 | 162-09-602-001 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | STURGEON ELECTRIC COMPANY INC | 4 | 202403210004312 | LIEN | DISCHARGE | 03/21/2024 | 162-09-602-005 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES LLC | 4 | 202403130003000 | MECHANIC LIEN | | 03/13/2024 | 162-09-602-005 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES LLC | 3 | 202403120001126 | MECHANIC LIEN | | 03/12/2024 | 162-09-602-001 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 114 | 202311090003944 | JUDGMENT | AMEND | 11/09/2023 | | $0.00 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| From | ALL NETLAND DEVELOPMENT LLC | PUBLIC WORKS CLARK COUNTY | 92 | 202306270001353 | ASSESSMENT ROLL | | 06/27/2023 | 162-09-212-001 | | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 7 | 202306060002029 | JUDGMENT | SATISFACTION | 06/06/2023 | | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | ALL NET DEVELOPMENT INC | 7 | 202306060002029 | JUDGMENT | SATISFACTION | 06/06/2023 | | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES LLC | 8 | 202302150001844 | JUDGMENT | | 02/15/2023 | | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CLARK COUNTY | 6 | 202212080000320 | EASEMENT | | 12/08/2022 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CLARK COUNTY | 7 | 202212080000319 | MISCELLANEOUS (RP) | DEDICATE | 12/08/2022 | 162-09-602-001 | | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | ACCURATE ELECTRIC INC | 1 | 202207270001629 | LIEN | RELEASE | 07/27/2022 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | | 4 | 202201110001327 | SURVEY | | 01/11/2022 | | PT YES QTR NE S 9 T 21S R 61E SUR # 11829 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CLARK COUNTY | 7 | 202109220003281 | EASEMENT | | 09/22/2021 | 162-09-602-005 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | PUBLIC WORKS CLARK COUNTY | 106 | 202106160003828 | ASSESSMENT ROLL | | 06/16/2021 | 162-09-212-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CLARK COUNTY NEVADA | 88 | 202105050001186 | AGREEMENT | | 05/05/2021 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | STURGEON ELECTRIC COMPANY INC | 4 | 202104080001649 | LIEN | AMEND | 04/08/2021 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | PUBLIC WORKS CLARK COUNTY | 158 | 202010140000802 | ASSESSMENT ROLL | | 10/14/2020 | 162-09-212-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | PUBLIC WORKS CLARK COUNTY | 88 | 201906190002370 | ASSESSMENT ROLL | | 06/19/2019 | 162-09-212-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | STURGEON ELECTRIC COMPANY INC | 4 | 201903290000017 | LIEN | AMEND | 03/29/2019 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | PUBLIC WORKS CLARK COUNTY | 2 | 201902060002062 | NOTICE | | 02/06/2019 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES LLC | 5 | 201811210002205 | LIS PENDENS | | 11/21/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201811200000378 | LIS PENDENS | | 11/20/2018 | 162-09-602-005 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201811200000377 | LIS PENDENS | | 11/20/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201810240003000 | LIS PENDENS | | 10/24/2018 | 162-09-602-001 | | $0.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| From | ALL NET LAND DEVELOPMENT LLC | PUBLIC WORKS CLARK COUNTY | 89 | 201806210001354 | ASSESSMENT ROLL | | 06/21/2018 | 162-09-204-002 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | STURGEON ELECTRIC COMPANY INC | 4 | 201806040002391 | LIEN | AMEND | 06/04/2018 | 162-09-602-001 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | STURGEON ELECTRIC COMPANY INC | 2 | 201804230000753 | LIEN | | 04/23/2018 | 162-09-602-001 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | FENAGH ENGINEERING AND TESTING LLC | 3 | 201803230001737 | LIEN | AMEND | 03/23/2018 | 162-09-602-005 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | FENAGH ENGINEERING AND TESTING LLC | 3 | 201803230001736 | LIEN | AMEND | 03/23/2018 | 162-09-602-001 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES | 3 | 201803230001735 | LIEN | AMEND | 03/23/2018 | 162-09-602-005 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES LLC | 3 | 201803230001734 | LIEN | AMEND | 03/23/2018 | 162-09-602-001 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003620 | REQUEST NOTICE | | 03/20/2018 | 162-09-602-005 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003619 | REQUEST NOTICE | | 03/20/2018 | 162-09-602-001 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003618 | LIS PENDENS | | 03/20/2018 | 162-09-602-005 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003617 | LIS PENDENS | | 03/20/2018 | 162-06-602-001 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003616 | LIEN | | 03/20/2018 | 162-09-602-005 | $0.00 |
| From | ALL NET LAND DEVELOPMENT LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003615 | LIEN | | 03/20/2018 | 162-09-602-001 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES | 2 | 201711060001289 | LIEN | DISCHARGE | 11/06/2017 | 162-09-602-005 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | FENAGH ENGINEERIGN AND TESTING LLC | 2 | 201711060001288 | LIEN | DISCHARGE | 11/06/2017 | 162-09-602-005 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | FENAGH ENGINEERIGN AND TESTING LLC | 2 | 201711060001287 | LIEN | DISCHARGE | 11/06/2017 | 162-09-602-001 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES | 2 | 201711060001286 | LIEN | DISCHARGE | 11/06/2017 | 162-09-602-001 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | FENAGH ENGINEERING AND TESTING LLC | 3 | 201711030000675 | LIEN | | 11/03/2017 | 162-09-602-001 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | CONSTRUCTION TESTING SERVICES | 3 | 201711030000674 | LIEN | | 11/03/2017 | 162-09-602-001 | $0.00 |
| To | ALL NET LAND DEVELOPMENT LLC | SAHARA LAS VEGAS CORP | 4 | 201710090001531 | DEED | | 10/09/2017 | 162-09-602-001 | $0.00 |
| From | ALL NET LAND DEVEOPLMENT LLC | FENAGH ENGINEERING & TESTING LLC | 3 | 201803140001255 | LIEN | | 03/14/2018 | 162-09-602-005 | $0.00 |

| Dir | Party 1 | Party 2 | No | Document Number | Type | Status | Date | Parcel | | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| From | ALL NET LAND DEVEOPLMENT LLC | FENAGH ENGINEERING & TESTING LLC | 3 | 201803140001254 | LIEN | | 03/14/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET LAND DEVEOPLMENT LLC | CONSTRUCTION TESTING SERVICES | 3 | 201803140001253 | LIEN | | 03/14/2018 | 162-09-602-005 | | $0.00 |
| From | ALL NET LAND DEVEOPLMENT LLC | CONSTRUCTION TESTING SERVICES | 3 | 201803140001252 | LIEN | | 03/14/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 8 | 202405100000753 | JUDGMENT | SATISFACTION | 05/10/2024 | | | $0.00 |
| To | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 3 | 202405060000031 | LIS PENDENS | RELEASE | 05/06/2024 | 162-09-602-005 | | $0.00 |
| To | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 3 | 202405060000030 | LIS PENDENS | RELEASE | 05/06/2024 | 162-09-602-001 | | $0.00 |
| To | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 114 | 202311090003944 | JUDGMENT | AMEND | 11/09/2023 | | | $0.00 |
| To | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 81 | 202311090003943 | JUDGMENT | | 11/09/2023 | | | $0.00 |
| From | ALL NET LLC | ALL NET DEVELOPMENT INC | 7 | 202306060002029 | JUDGMENT | SATISFACTION | 06/06/2023 | | | $0.00 |
| To | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 7 | 202306060002029 | JUDGMENT | SATISFACTION | 06/06/2023 | | | $0.00 |
| From | ALL NET LLC | CONSTRUCTION TESTING SERVICES LLC | 8 | 202302150001844 | JUDGMENT | | 02/15/2023 | | | $0.00 |
| From | ALL NET LLC | ACCURATE ELECTRIC INC | 2 | 202206290001395 | LIEN | | 06/29/2022 | 162-09-602-001 | | $0.00 |
| To | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 10 | 202206090004199 | AGREEMENT | RELEASE | 06/09/2022 | 162-09-602-001 | | $0.00 |
| From | ALL NET LLC | ROOT, THOMAS M JR | 7 | 201909110000072 | NOTICE | JUDGMENT | 09/11/2019 | | | $0.00 |
| From | ALLNET LLC | ROOT, THOMAS M JR | 7 | 201909110000072 | NOTICE | JUDGMENT | 09/11/2019 | | | $0.00 |
| From | ALL NET LLC | CONSTRUCTION TESTING SERVICES LLC | 5 | 201811210002205 | LIS PENDENS | | 11/21/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET LLC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201811200000378 | LIS PENDENS | | 11/20/2018 | 162-09-602-005 | | $0.00 |
| From | ALL NET LLC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201811200000377 | LIS PENDENS | | 11/20/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET LLC | FENAGH ENGINEERING AND TESTING SERVICES LLC | 5 | 201810240003000 | LIS PENDENS | | 10/24/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET LLC | CONSTRUCTION TESTING SERVICES LLC | 5 | 201810230001698 | LIS PENDENS | | 10/23/2018 | 162-09-602-001 | | $0.00 |
| From | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003620 | REQUEST NOTICE | | 03/20/2018 | 162-09-602-005 | | $0.00 |

| From | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003619 | REQUEST NOTICE | | 03/20/2018 | 162-09-602-001 | | $0.00 |
|------|-------------|------------------------------|---|-----------------|----------------|--|------------|----------------|--|-------|
| From | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003618 | LIS PENDENS | | 03/20/2018 | 162-09-602-005 | | $0.00 |
| From | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003617 | LIS PENDENS | | 03/20/2018 | 162-06-602-001 | | $0.00 |
| From | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003616 | LIEN | | 03/20/2018 | 162-09-602-005 | | $0.00 |
| From | ALL NET LLC | LAS VEGAS PAVING CORPORATION | 3 | 201803200003615 | LIEN | | 03/20/2018 | 162-09-602-001 | | $0.00 |
| To | ALL NET LLC | FENAGH ENGINEERING AND TESTING LLC | 3 | 201711030000677 | LIEN | | 11/03/2017 | 162-09-602-005 | | $0.00 |
| To | ALL NET LLC | CONSTRUCTION TESTING SERVICES | 3 | 201711030000676 | LIEN | | 11/03/2017 | 162-09-602-005 | | $0.00 |
| From | ALL NET LLC | KLEINFELDER INC | 2 | 201612140000022 | AFFIDAVIT | JUDGMENT | 12/14/2016 | | | $0.00 |
| From | ALL NET LLC | KLEINFELDER INC | 5 | 201611290002472 | STIPULATION | JUDGMENT | 11/29/2016 | | | $0.00 |
| To | ALL NET RESORT AND ARENA | SUNBELT RENTALS | 2 | 201608180002192 | LIEN | DISCHARGE | 08/18/2016 | 162-09-602-001 | | $0.00 |

Acclaim Copyright 1999 - 2024. Harris Recording Solutions. All Rights Reserved.

# EXHIBIT B

## LEASE
### with
## OPTION TO PURCHASE

THIS LEASE WITH OPTION TO PURCHASE (this "Lease") is made and entered into as of the 22nd day of March, 2021 ("Effective Date"), by and between All Net Land Development, LLC, a Nevada limited liability company ("Landlord"), and Dribble Dunk, LLC, a Nevada limited liability company ("Tenant").

### RECITALS

A. Landlord owns an approximately 27-acre parcel of land located at 2601 Las Vegas Boulevard South and 2737 Paradise Road in Las Vegas, Nevada, which land is legally described on Exhibit "A" attached hereto and incorporated herein by reference (the "Property").

B. Tenant wishes to occupy the Property as a tenant while continuing entitlement, as a developer, to build and operate a sports and entertainment arena, together with a hotel and various concessions, operations and businesses related thereto available to the general public (the "Project").

C. Tenant wishes to have an option for the exclusive right to purchase the Property on which it will build the Project.

D. Whereas, Landlord as Owner, Tenant as Developer and the County of Clark, Nevada have entered into a Development Agreement of even date herewith and Tenant intends to take assignment of the Development Agreement upon its exercise of the option and purchase of the Property, Landlord and Tenant now enter into this Lease as hereinafter set forth.

### ARTICLE 1
### Description of Demised Premises

Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord for the term, at the rental, and upon all of the terms, covenants, conditions, and limitations set forth herein, the Property, together with any and all of the currently existing improvements, appurtenances, rights, privileges and easements benefiting, belonging or pertaining thereto, any right, title and interest of Landlord in and to any land lying in the bed of any street, road or highway (open or



proposed) to the center line thereof, in front of or adjoining said tract, piece or parcel of land and together with any strips and gores relating to said tract, piece or parcel of land, all rights of use, air rights, servitudes, licenses, tenements, hereditaments and appurtenances now or hereafter belonging to the foregoing (all the foregoing hereinafter sometimes referred to as the "Demised Premises"). The lease of the Demised Premises is subject to any governmental laws, rules, regulations or zoning ordinances affecting the Demised Premises. Landlord expressly reserves from this demise of the Property any and all mineral rights, and oil and gas rights, provided, however, that Landlord shall have no right to direct surface entry or to affect or interfere with the lateral support of any improvements on the Property.

## ARTICLE 2
### Term

2.1  Term.  Unless terminated earlier as elsewhere herein provided, the term of this Lease (the "Lease Term") shall be for a period commencing on the Effective Date, and ending on the earlier of (i) the date Tenant purchases the Property, (ii) the date this Lease is terminated pursuant to any of the provisions of this Lease, or (iii) December 31, 2021.

2.2  Option to Purchase the Property.  During the period from the Effective Date through July 31, 2021 (the "Option Period"), Tenant shall have the exclusive right to purchase the Property on the terms and conditions contained in Article 14 hereof (the "Option").

2.3  Option Period Extensions.  In the event Tenant has not exercised its Option to purchase the Property and close escrow for the sale and purchase of the Property prior to expiration of the Option Period on July 31, 2021, then Tenant may extend the Option Period for up to five (5) additional calendar months by Tenant paying in advance to Landlord the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) for each such calendar month extension (the last such optional extension, if purchased, expiring on December 31, 2021). The fees for Option Period extensions shall apply to the purchase price if the Option is exercised and the Property is purchased. The fees for Option Period extensions shall be deemed fully earned and retained by Landlord in the event the Lease and/or Option expire or are terminated according to the provisions of this Lease without the Option being exercised.

2.4  Termination.  This Lease, if not terminated sooner according to provisions contained herein, shall terminate and become null and void without further notice upon the expiration of the term specified, and any holding over by Tenant, without Landlord consent,

after the expiration of said term shall not constitute a renewal hereof or give Tenant any rights hereunder in or to the leased Property.

## ARTICLE 3
### Rent

3.1  Rent During the Lease Term.  During the Lease Term of this Lease, Tenant shall pay Landlord as rent for the Demised Premises the sum of One Hundred Thousand Dollars ($100,000.00) per month.  Monthly rent shall be paid in advance of the first day of each monthly period without abatement, deduction or offset, commencing on the Effective Date. Monthly rent shall be prorated for any partial month of the Lease Term.  Billboard rent paid by LAMAR during the Lease Term shall be retained by Landlord.

3.2  Place of Payment.  All rents and other monies required to be paid by Tenant hereunder shall be paid to Sahara Las Vegas Corp., sole owner of Landlord, without deduction or offset, prior notice or demand, in lawful money of the United States of America, at Sahara Las Vegas Corp., 3221 S. Torrey Pines, Las Vegas, NV 89146, or at such other place as Landlord may, from time to time, designate in writing.

3.3  Rent Net.  Rent shall be absolutely net to Landlord so that this Lease shall yield to Landlord the full amount of the installments of rent throughout the Lease Term, and Tenant shall pay all expenses of operation and maintenance of the Property during the Lease Term, except for Clark County real property taxes and Special Improvement District #97B assessments which shall be paid by Landlord.  Rent, and all other sums payable by Tenant hereunder, shall be paid without notice (except as otherwise expressly herein provided), demand, counterclaim, setoff, deduction or reduction, and the obligations and liabilities of Tenant hereunder shall in no way be released, discharged or otherwise affected by reason of (i) any damage to or destruction of any part of the Property or improvements constructed thereon which is not caused by Landlord whether directly or indirectly; (ii) any restriction or prevention of or interference with any use of the Property; or (iii) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to Landlord, or any action taken with respect to this Lease by such proceeding.  Except as expressly provided in this Lease, Tenant waives all rights now or hereafter to quit, terminate or surrender this Lease or the Property or any part thereof, or to any abatement, suspension, deferment, diminution or reduction of rent or any other sum payable by Tenant hereunder.



3.4 <u>Additional Consideration</u>.  As additional consideration for Landlord to enter into this Lease, in the event Tenant constructs a sports and entertainment arena on the Property, Tenant shall provide to Landlord, for Landlord's exclusive use during the period commencing the date Tenant's arena opens for business and continuing for a period of ten (10) years, one (1) arena seating box of size similar to those boxes intended for sale or rent to major Las Vegas Resort Hotels.  The seating box shall be fully finished for use and shall be located on the lower level of box levels in the arena and shall be either one of the boxes adjacent to the box on the players' benches side of the arena which is closest to the center court line of the basketball court configuration for the arena.  Landlord's use of the box shall terminate upon expiration of the ten-year period described above.

## ARTICLE 4
### Taxes, Utilities and Maintenance

4.1 <u>Taxes</u>.  Landlord shall pay all Clark County real property taxes and Special Improvement District Assessments during the Lease Term.  In addition to the rent specified herein, Tenant shall pay and discharge all other charges of every description which during the Lease Term may be levied upon or assessed against the Property and any or all improvements and other property thereon or therein, whether owned by Tenant or Landlord.

Tenant shall protect and hold harmless Landlord and the Property, and all improvements in, on, or about the same, from all liability for any and all of the aforementioned taxes, assessments, and charges payable by Tenant, together with any and all interest, penalties, or other sums thereby imposed, and from any sale or other proceeding to enforce payment thereof.

4.2 <u>Utilities</u>.  Tenant shall pay all charges for water, gas, heat, electricity, power, garbage service, air conditioning, telephone service, sewer service charges and sewer rentals charged or attributable to the Property, and all other services or utilities used in, upon or about the Property by Tenant or any of its subtenants, licensees or concessionaires during the Lease Term.

4.3 <u>Maintenance and Repairs</u>.  Landlord shall not be required or obligated to make any changes, alterations, additions, improvements or repairs in, on or about the Property, or any part thereof, during the term of this Lease.  However, should the Owner be required to make any changes, alterations, additions, improvements or repairs in, on or about the Property pursuant to the terms and provisions of the Development Agreement, Tenant shall pay all costs



for such in the amount and in the manner prescribed in Article 14 hereof, and Landlord, as Owner, shall have no obligation to perform such unless Tenant and Landlord agree to proceed with such according to the provisions of Article 14 hereof. Tenant at its expense will keep the Property, all the improvements thereon, and the adjoining sidewalks and curbs in good and clean order and condition, and will promptly make or cause others to make all necessary or appropriate repairs, replacements and renewals thereof, whether interior or exterior, structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen. All repairs, replacements and renewals shall be at least equal in quality to the original work. Tenant waives any rights created by any law now or hereafter in force to make repairs to the Property or any part thereof at Landlord's expense. Any and all landscaping, maintenance and other expenses or costs incurred in connection with the Property, and the operation of a business or businesses thereon, shall be solely the obligation of Tenant, and shall be paid and discharged by Tenant when due; it being understood and agreed that the rent to be paid to Landlord as specified in Article 3 hereof is to be a net rental to Landlord, with any and all expenses attributable to the Property during the term of this Lease being solely the obligation of Tenant, except for Clark County real property taxes and Special Improvement District #97B assessments.

## ARTICLE 5
### Use of the Property

5.1 Use. The Property is leased to Tenant for the purpose of maintaining entitlement to build and operate a sports and entertainment arena, together with a hotel and various concessions, operations and businesses related thereto available to the general public. Tenant shall not use or suffer to be used the Property, or any portion thereof, for any other purpose or purposes whatsoever, nor shall Tenant change the manner or scope of use.

Tenant shall not use or permit any other person to use the Property, or any part thereof, for any purpose tending to injure the reputation of the Tenant, the Landlord or the Property or for any improper or offensive use or one which constitutes a nuisance; and Tenant shall at all times during the Lease Term conform to, and cause all persons using or occupying any part of the Property to comply with all public laws, ordinances and regulations from time to time applicable thereto and to all operations thereon.

Tenant covenants and agrees to indemnify and save Landlord harmless from any and all penalties, damages, losses and expenses (including reasonable attorneys' fees) incurred by or imposed upon Landlord for any violation or alleged violation of any law, ordinance or regulation applicable to the use and occupancy of the Property, whether occasioned by neglect, omission or willful act of Tenant, or any person upon the Property by permission or invitation of Tenant or holding or occupying the same or any part thereof under or by right of Tenant.

## ARTICLE 6
### Insurance and Indemnification

6.1  <u>Liability Insurance</u>.  Tenant shall, at all times during the Lease Term, at its sole cost and expense, procure and maintain in full force and effect with insurance carriers duly licensed to conduct business in the State of Nevada and with a BEST rating of A+ or better a policy of Commercial General Liability insurance with coverages including, but not limited to, bodily injury, property damage, personal and advertising injury, employer's liability, fire damage liability, and any other liability coverages reasonably required to insure Tenant and Landlord against claims of liability arising out of Tenant's use of the Property and the improvements thereon or arising out of Tenant's conduct of its business on the Property and upon or within the improvements thereon.  Such liability policy shall have a limit of not less than $2,000,000 per each occurrence and a $10,000,000 limit as general aggregate.  Such liability policy or policies will show Landlord, its owner and its owner's parent company as additional insured parties and as such, the defense of any legal action or suit against the Tenant or Property involving the Landlord will be tendered to the Tenant's insurance carrier.  Landlord will not monetarily share or participate in the retention or deductible amount contained in the Tenant's liability policy.

6.2  <u>Workers' Compensation</u>.  At all times during the Lease Term Tenant shall maintain in full force and effect Workers' Compensation insurance as required by the State of Nevada.

6.3  <u>Proof of Insurance</u>.  A certificate issued by the insurance carrier for each policy of insurance required to be maintained by Tenant hereunder together with a certified copy of each such policy shall be delivered to Landlord and all other additional insureds on or before the Effective Date hereof and thereafter, as to policy renewals, Tenant shall deliver to Landlord a binder not less than fifteen (15) days prior to the expiration of the policy and a certified copy of the renewal policy within sixty (60) days after inception.  Each of said certificates of insurance and each such policy of insurance required to be maintained by Tenant hereunder shall be from an insurer and in form and substance satisfactory to Landlord and shall expressly evidence insurance coverage as required by this Lease.

6.4  <u>Waiver of Liability and Change in Policy Terms</u>.  Tenant hereby waives any and all rights of recovery from Landlord, its officers, agents and employees for any loss or damage, including consequential loss or damage, caused by any peril or perils (including negligent acts)

enumerated in each form of insurance policy required to be maintained by Tenant hereunder. All insurance maintained by Tenant pursuant to this Article 6, except for workers' compensation insurance, shall name Landlord and Tenant as insureds (and such other Persons as are designated by Landlord), as their respective interests may appear, and shall include an effective waiver by the issuer of all rights of subrogation (if Tenant is able to obtain a waiver of the right of subrogation after using its best efforts) against any named insured or such insured's interest in the Property, the improvements thereon or any income derived therefrom, and all such policies shall provide that no cancellation, reduction in amount or material change in coverage thereof shall be effective until at least thirty (30) days after receipt by Landlord and Tenant of written notice thereof.

6.5   Indemnification.   Tenant is deemed to be in possession and control of the Property during the term of this Lease.   Any right of entry by Landlord hereunder other than upon Tenant's default is for purposes of inspection or compliance with requirements of the Development Agreement if Landlord elects to do so.   Except to the extent of Landlord's gross negligence or willful misconduct Tenant will protect, indemnify and hold harmless Landlord and the Property from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses imposed upon or incurred by or asserted against Landlord or the Property by reason of the occurrence or existence of any of the following: (a) any accident, injury to or death of persons (including workmen) or loss of or damage to property occurring on or about the Property or improvements thereon or any part thereof or the adjoining sidewalks, curbs, streets or ways, except for any accident, injury to or death of persons or loss or damage to property to the extent caused by the willful or negligent act of Landlord, (b) any use, nonuse or condition of the Property or the improvements thereon or any part thereof or the adjoining sidewalks, curbs, streets or ways, (c) any failure on the part of Tenant to perform or comply with any of the terms of this Lease, or (d) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or improvements thereon or any part thereof.   In case any action, suit or proceeding is brought against Landlord by reason of any such occurrence, Landlord will notify Tenant of such action, suit or proceeding, or cause the same to be resisted and defended by counsel designated by Tenant and approved by Landlord. Without limiting Tenant's obligations hereunder, Landlord shall have the right to appear on its own and at Landlords cost in any such action, suit or proceeding.

ARTICLE 7
Improvements and Alterations

7.1   Tenant's Improvements.   During the term of this Lease, Tenant shall not take any action or make any alteration, addition or improvement to the Property which will initiate or

cause an obligation or expense of the Owner under the provisions of the Development Agreement. Tenant shall have the right to make alterations, additions or improvements on or to the Property **only** with Landlord's written consent, even if such alterations, additions or improvements are pursuant to the Development Agreement. Written consent will be at the sole discretion of Landlord. To provide consent, Landlord may require that (i) Tenant deliver to Landlord prior to any construction, a complete set of plans and specifications for the proposed construction, Tenant's good faith estimate of total construction costs, copies of contracts with general contractors, evidence of contractor's insurance and bonds, and all necessary permits for such construction, (ii) Landlord may require Tenant to establish a construction disbursement account or to provide lien and completion bonds in form and amount satisfactory to Landlord, (iii) construction of all improvements, alterations and additions will be accomplished in a good and workmanlike manner, in conformity with all applicable laws and regulations, and by a contractor reasonably acceptable to Landlord, and (iv) upon completion of any such work, Tenant shall provide Landlord with "as built" plans and drawings and proof of payment for all labor and materials.

     7.2   <u>Landlord's Non-responsibility for Improvements</u>.   Landlord shall not under any circumstances whatsoever be required under this Lease to build any improvements on the Property, or to maintain or make any maintenance, repairs, replacements, alterations or renewals of any nature or description to the Improvements on the Property, which now exist or are hereafter constructed by Tenant. Any improvements, alterations, additions, repairs or replacements of any nature that Landlord elects to perform pursuant to the Development Agreement are subject to the provisions of Article 14 herein. Landlord shall have no obligation to improve, construct, maintain, operate, hold, manage, finance or guarantee the financing of or warrant in any way any improvements now existing or hereafter constructed in or to the Property, or any part thereof.

     Nothing contained in this Lease shall constitute a consent or request by Landlord, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any improvements thereon, or be construed as giving Tenant any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Landlord or the Property. Tenant shall (except in the case of work costing less than $10,000 or work undertaken in an emergency situation which does not allow time for advance notice to Landlord, in which event such notice shall be given to Landlord as promptly as possible) be required to obtain the written consent of Landlord prior to performing, or having performed, any work of improvement in on or about the Property, and Tenant shall give Landlord written notice of any work that could result in a mechanic's or materialman's lien being placed against the Property sufficiently prior to the

commencement of any such work to allow Landlord to post a notice of non-responsibility or any similar notice on the Property, but in no event less than fifteen (15) days prior to the commencement of such work.

Subject to the provisions of Article 14 herein, Landlord shall cooperate in all reasonable respects with Tenant in order to obtain permits and/or approvals, including executing, acknowledging and delivering any consents or any other instruments as may be required in connection with improvements to be made upon the Property or to other improvements thereon; provided, however, that in no event shall Landlord incur any liability, cost or expense in connection therewith.

## ARTICLE 8
### Liens and Subordination

8.1  <u>Landlord's Lien</u>.  As security for the payment of all rent and other amounts required to be paid by Tenant as specified herein, Tenant hereby grants to Landlord a valid lien upon the leasehold estate of Tenant created pursuant to the terms of this Lease.

8.2  <u>Mechanic's Liens</u>.  Tenant shall not suffer or permit to be enforced against the Property, or any part thereof, any mechanic's, materialman's, contractor's or subcontractor's liens arising from or any claim for damage growing out of the work of any construction, repair, restoration, replacement, or improvement, or any other claim or demand howsoever the same may arise, but Tenant shall pay or cause to be paid all of such liens, claims and/or demands before any action is brought to enforce the same against the Property, and Tenant agrees to indemnify and hold Landlord and the Property free and harmless from all liability, damages and expenses (including reasonable attorneys' fees) for any and all such liens, claims and/or demands.

If Tenant shall in good faith contest the validity of any such lien, claim or demand, then Tenant shall, at its expense, defend itself and Landlord against the same and shall pay and satisfy any adverse judgment that may be rendered thereon before the enforcement thereof against Landlord or the Property, upon the condition that if Landlord shall require, Tenant shall furnish to Landlord a surety bond satisfactory to Landlord in an amount equal to such contested lien, claim or demand indemnifying Landlord against liability for the same, and holding the Property free from the effect of such lien or claim, or if Landlord shall request, Tenant shall procure and record a bond freeing the Property from the effect of such lien, claim or action thereon.

If Tenant fails to discharge such lien or furnish a bond against the foreclosure thereof as provided by the statutes of the State of Nevada, Landlord may, but is not obligated to,

discharge the same or take such other action as Landlord deems necessary to prevent a judgment of foreclosure upon said lien from being executed against the Property, and all costs and expense, including reasonable attorneys' fees incurred by Landlord, shall be repaid by Tenant upon demand, and if unpaid may be treated as additional rent.

## ARTICLE 9
### Assignments and Subletting

Tenant shall not encumber, assign or otherwise transfer this Lease, or any right or interest hereunder, or in or to any of the improvements that hereafter may be constructed or installed on the Property, without the prior written consent and approval of Landlord. Written consent shall be at the sole discretion of Landlord. No such encumbrance, assignment or other transfer, whether voluntary or involuntary, by operation of law, under legal process, through receivership or bankruptcy, or otherwise, and no such subletting shall be valid or effective without such prior written consent and approval.

Should Tenant attempt to make or suffer to be made any such encumbrance, assignment, transfer or subletting, except with Landlord's consent, Landlord may, at its option, send written notice of intent to terminate this Lease pursuant to this Article 9. Tenant shall have fifteen (15) days to void any transaction that makes or suffers to be made or attempts to make or suffer to be made any encumbrance, assignment, transfer or subletting without Landlord consent. Should Tenant fail to void any such transaction or attempted transaction within fifteen (15) days of receipt of Landlord's notice of intent to terminate, then Landlord may, at its option, terminate this Lease forthwith by written notice, and upon such termination this Lease shall cease and be of no further force or effect, except as hereinafter otherwise provided.

Should Landlord consent to any such encumbrance, assignment, transfer or subletting, none of the restrictions of this Article 9 shall be thereby waived, but the same shall apply to each successive encumbrance, assignment, transfer or subletting hereunder, if any, and shall be severally binding upon each and every encumbrancer, assignee, transferee, subtenant and other successor in interest of Tenant.

In the event that Landlord gives consent and approval to any transfer or assignment, then before such transfer or assignment becomes effective for any purpose, the transferees and assignees must, in writing, assume all the obligation of this Lease, and agree to be bound by all terms of the Lease without in any way limiting, releasing, or discharging the original Tenant from any liability under any provision of this Lease on account of such transfer or assignment.

If Tenant is a corporation, limited liability company or an unincorporated association or a partnership, the transfer, assignment or hypothecation of any stock or interest in said entity in excess of fifty (50) percent in the aggregate shall be deemed an assignment within the meaning and provisions of this Article 9.


## ARTICLE 10
### Eminent Domain

The term "total taking" as used in this article means the taking of the entire Property under the power of eminent domain or taking of so much of the Property as to prevent or substantially impair the conduct of Tenant's business thereon. The term "partial taking" means the taking of a portion only of the Property which does not constitute a total taking as above defined.

If during the term of this Lease there shall be a total taking by public authority under the power of eminent domain, then the leasehold estate of Tenant in and to the Property shall cease and terminate as of the date the actual physical possession thereof shall be so taken. If during the Lease Term there shall be a partial taking of the Property which does not result in the inability of Tenant to continue its intended use of the Property, then this Lease shall terminate as to the portion of the Property taken upon the date upon which actual possession of the portion of the Property is taken pursuant to the eminent domain proceedings, but this Lease shall continue in force and effect as to the remainder of the Property. If during the Lease Term there shall be a partial taking of the Property resulting in the inability of the Tenant to continue its intended use of the Property, then the Tenant shall have the right, but not the obligation to terminate this lease or continue in force and effect as to the remainder of the property by written notice to Landlord and Landlord agrees to renegotiate in good faith the reduction of rent.

All compensation and damages awarded for the taking of the Property, or any portion thereof, shall, except as otherwise herein provided, belong to and shall be the sole property of Landlord, and Tenant shall not have any claim or be entitled to any award for the diminution in value of any unexpired term of this Lease  All compensation and damages awarded for the taking of or injury to Tenant's improvements, or on account of any cost or loss Tenant may sustain in the removal of Tenant's fixtures, equipment or furnishings, or as a result of any alterations, modifications or repairs which may be reasonably required by Tenant in order to place the remaining portion of the Property not so condemned in a suitable condition for the continuance of Tenant's occupancy of the Property and conduct of its business thereon, shall be the sole property of Tenant and Landlord shall not have any claim or be entitled to any of the award.

If this Lease is terminated, in whole or in part, pursuant to any of the provisions of this Article 10, all rentals and other charges payable by Tenant to Landlord hereunder and attributable to the Property taken, shall be paid up to the date upon which actual physical possession shall be taken by the condemning authority, and the parties shall thereupon be released from all further liability.

## ARTICLE 11
### Destruction and Restoration

If during the Lease Term any building or improvement erected by Tenant on the Property, or any part thereof, shall be damaged or destroyed by fire or other casualty, Tenant shall, at its sole cost and expense, repair or restore the same according to the original or similar plans. Such work of repair or restoration shall be commenced within ninety (90) days after the damage or loss occurs and shall be completed with due diligence.

All insurance proceeds collected for such damage or destruction shall be applied to the cost of such repairs or restoration, and if such insurance proceeds shall not be sufficient for such purpose, Tenant shall make up the deficiency out of its own funds. Should Tenant fail or refuse to make the repairs or restoration as hereinabove provided, after thirty (30) days written notice by Landlord, then such failure or refusal shall constitute a default under the covenants and conditions hereof and all insurance proceeds so collected shall be forthwith paid over to and retained by Landlord on its own account and Landlord may, but shall not be required to, use and apply the same for and to the repair or restoration of the Property and improvements thereon, or Landlord may, at its option, terminate this Lease.

## ARTICLE 12
### Default and Remedies

Should Tenant (a) fail to pay or cause to be paid any tax, assessment, insurance premium, lien, claim, charge or demand herein provided to be paid by Tenant at the times and in the manner herein provided; or (b) default in the payment of any installment of rent or any other sum when due as herein provided; or (c) fail to complete the construction, repair, restoration or replacement of the building or other improvement to be constructed on the Property within the times and in the manner herein provided; or (d) fail to use, maintain, and operate the Property as herein required, or abandon the Property; or (e) default in the performance of or breach any other covenant, condition or restriction of this Lease herein provided to be kept or performed by Tenant; and if (i) any of the defaults or breaches specified

in subparagraphs (a) or (b) above shall continue uncured for a period of ten (10) days; or (ii) any of the defaults or breaches specified in subparagraphs (c), (d) or (e) above shall continue uncured for a period of thirty (30) days, from and after service upon Tenant of written notice by Landlord, then in such event, Landlord may, at its option, terminate this Lease and thereupon the rights of Tenant in and to the Property and all improvements thereon shall cease and end, and Landlord may, without further notice or demand or legal process, reenter and take possession of said Property and all improvements thereon and oust Tenant and all persons shall quit and surrender possession of said Property and all improvements thereon to Landlord. It is further understood and agreed that any breach of the restrictions of Article 9 hereof or breach of the restrictive covenant in Article 14 hereof shall give Landlord the right to immediately terminate this Lease upon notice to Tenant.

Any termination of this Lease as herein provided shall not relieve Tenant from the payment of any sum or sums that shall then be due and payable to Landlord hereunder or any claim for damages then or theretofore accruing against Tenant hereunder, and any such termination shall not prevent Landlord from enforcing the payment of any such sum or sums or claim for damages by any remedy provided for by law, or from recovering damages from Tenant for any default thereunder. All rights, options and remedies of Landlord contained in this Lease shall be construed and held to be cumulative, and no one of them shall be exclusive of the other, and Landlord shall have the right to pursue any one or all of such remedies or any other remedy or relief which may be provided by law, whether or not stated in this Lease.

At Landlord's option, if Tenant has breached this Lease and abandoned the Property, no notice of termination need be given, and this Lease will continue in effect for so long as Landlord does not terminate Tenant's right to possession. Landlord may in that case enforce all of its rights and remedies under this Lease, including the right to recover rent as it becomes due.

### ARTICLE 13
### Surrender and Removal

Upon the expiration of the term of this Lease or any earlier termination thereof, Tenant shall surrender to Landlord possession of the Property and all improvements constructed and installed thereon. If Tenant shall not then be in default under any of the covenants and conditions hereof, Tenant may remove or cause to be removed all movable furniture, furnishings and equipment installed in the buildings on the Property, so long as Tenant repairs any and all damage occasioned by the removal of such equipment. Any of said personal property that is not removed from said premises within twenty (20) days after the date of any

termination of this Lease thereafter shall belong to Landlord without the payment of any consideration.

Upon the expiration of the Lease Term or any sooner termination of this Lease, Tenant agrees to execute, acknowledge and deliver to Landlord a proper instrument in writing, releasing and quitclaiming to Landlord all right, title and interest of Tenant in and to the Property and all improvements thereon.


# ARTICLE 14
## Development Agreement

**14.1**  **Development Agreement and Intent of Tenant and Landlord.**  Landlord as Owner and Tenant as Developer have entered into a Development Agreement (the "Agreement") with the County of Clark, State of Nevada, as part of entitlement for the Project to be constructed upon the Property.  It is the intent of the Landlord and Tenant that Tenant, upon its exercise of its option and purchase of the Property, take assignment of the Agreement, assuming all obligations of the Owner thereunder.  The Agreement contains provisions that may obligate Landlord, as the Owner, to perform certain tasks and/or incur expenses prior to the assignment of the Agreement to Tenant.  Tenant and Landlord agree that it is not the intent of Landlord to be the Developer or participate with the Developer in the development of the Project or to incur any expenses related thereto.  However, the failure or refusal of the Owner to comply with requirements of the Agreement could result in suspension or termination of the Agreement resulting in loss of entitlement to construct the Project.  Therefore, in order to protect and preserve full entitlement to the extent possible, for the benefit of Tenant, Tenant and Landlord agree to the provisions of this Article 14.

**14.2**  **Tenant's Restrictive Covenant.**  Tenant agrees not to take any action or perform any task, or authorize any other person or party to take any action or perform any task, which would initiate or cause an obligation, financial or otherwise, on the part of the Owner, or cause continuation of an obligation on the part of the Owner, under the provisions of the Agreement.  Breach of this restrictive covenant by Tenant shall give Landlord the right to immediately terminate this Lease.

**14.3**  **Out-conveyance of Property or Granting of Easements.**  Should the Agreement require the Owner to convey any portion of the Property to Clark County or the State of Nevada, or grant any easement for any purpose whatsoever, prior to Tenant taking assignment of the Agreement, and Landlord agrees to do so, Tenant agrees, that prior to the conveyance of such property or the granting of such easement, Tenant shall pay to Landlord, in lawful cash of



the United States of America, a sum equal to a portion of the Option Price for the Property proportional to the size of the conveyance or granting compared to the 27-acre size of the Property, calculated as:

> [size of the property conveyed or size of the easement granted in square feet]
>> divided by
>
> [size of the Property in square feet]
>> multiplied by
>
> [the Option Price].
>
> For example, an out-conveyance for one half of an acre would require payment of:
>> (43,560 x 0.5 = 21,780) ÷ (27 x 43,560 = 1,176,120) x $400,000,000 = $7,407,407.

Such payment shall be non-refundable, but shall apply 100% to the purchase price in the event the Option is exercised and the Property is purchased.

14.4  <u>Payments Due or Construction Required Under the Agreement</u>.  Should the Agreement require the Owner to pay any costs of any nature whatsoever, prior to Tenant taking assignment of the Agreement, Tenant must, and agrees to, pay such costs directly to Clark County or as directed by Clark County or the Agreement.

Should the Agreement require the Owner, at Owner's expense, to perform construction of any nature whatsoever, prior to Tenant taking assignment of the Agreement, and Landlord agrees to do so, Tenant must, and agrees to, pay to Landlord a sum equal to 150% of the actual, if known, or estimated cost of such construction.  Tenant shall then cause the construction to be performed and completed by a contractor or contractors duly licensed in the State of Nevada and qualified in all other respects to perform the construction.  Landlord shall pay the costs directly to the contractor or contractors, and any cost overruns shall be the responsibility of Tenant, and any surplus funds held by Landlord shall be 100% credit toward the Option Price for purchase of the Property if the Option is exercised, but otherwise retained by Landlord.

14.5  <u>Tenant's Failure to Pay</u>.  It is understood by Tenant, and agreed between Landlord and Tenant, that Landlord is not a participant in any manner in development of Tenant's Project.  As such, Landlord's execution of the Agreement prior to Tenant purchasing the Property and taking assignment of the Agreement, is an accommodation to Tenant and its plans, and it's the intent of both parties that Landlord not incur any expense or suffer any loss in doing so.  Should Tenant fail to pay any sums due under Article 14.3 or Article 14.4 above, then Landlord may allow the Agreement to be terminated for non-compliance or by agreement with Clark County.  In addition, in the event Tenant and Landlord fail to agree on a remedy for any circumstance that causes actual or possible expense, loss or liability on the part of

Landlord, relative to the Agreement, prior to Tenant taking assignment, Landlord may allow the Agreement to be terminated for non-compliance or by agreement with Clark County.

## ARTICLE 15
### Tenant's Option to Purchase

15.1 <u>Option to Purchase the Property</u>. From the Effective Date of this Lease until July 31, 2021, or until any date for which Option Extensions have been purchased pursuant to Article 2.3 of this Lease, provided Tenant is not in default of any of the terms or provisions of this Lease, Tenant shall have the exclusive right to purchase the Property on the terms and conditions contained in this Article 15.

15.2 <u>Option Purchase Price</u>. Should Tenant exercise its option to purchase the Property, the purchase price of the Property shall be Four Hundred Million Dollars ($400,000,000.00). Rent paid by Tenant shall not be a credit toward the purchase price. Option extensions fees paid by Tenant shall be a credit toward the purchase price.

15.3 <u>Exercise of Option to Purchase</u>. During the Lease Term, Tenant may exercise its Option to Purchase the Property by either:

(1) giving written notice to Landlord at least forty-five (45) days in advance that Tenant shall take title to the Property directly from Landlord by closing escrow on a specified date, which date may not, under any circumstances, be after the date on which (i) the Option Period or an extension of the Option Period if purchased has expired, or (ii) the Lease Term has expired; or

(2) giving written notice to Landlord, at least forty-five (45) days in advance, specifying a closing date, which date may not, under any circumstances, be after the date on which (i) the Option Period or an extension of the Option Period if purchased has expired, or (ii) the Lease Term has expired, that Tenant shall acquire one hundred percent (100%) of the membership interests of All Net Land Development, LLC, the Nevada limited liability company that holds title to the Property.

15.4 <u>Close of Escrow</u>. Close of Escrow for the purchase of the Property shall occur according to written notice from Tenant to Landlord in accordance with Article 15.3 above; provided, however, that the close of escrow may not, under any circumstances, occur after (i) expiration of the Lease Term, or (ii) expiration of the Option Period or any extension of the Option Period if purchased. Upon closing of escrow, each party shall pay half the escrow fee



and half of any applicable real property transfer taxes. Property taxes and special assessments levied against the Property shall be prorated as of the close of escrow.

If Tenant elects to take title to the Property directly from Landlord, then upon the close of escrow, Landlord shall convey fee simple title to the Property to Tenant, by a duly executed and acknowledged grant, bargain and sale deed, free and clear of all liens, encumbrances, leases, easements, restrictions, rights, covenants and conditions of any kind, except for Tenant's leasehold and except for such matters shown in a preliminary title report, which matters are agreed between Tenant and Landlord to be permitted exceptions. Tenant may not object to conditions of title caused directly or indirectly by its, or any of its subtenants', concessionaires', licensees' or agents', use or occupancy of the Property. Landlord shall pay the cost of a CLTA Title Policy, and Tenant shall pay any additional costs incurred if Tenant requires an ALTA Title Policy or any special endorsements to the Title Policy. Tenant shall pay the cost of recording the deed.

If Tenant elects to purchase one hundred percent (100%) of the membership interests of All Net Land Development, LLC, then upon the close of escrow, Landlord shall convey the membership interests to Tenant by duly executed assignment agreement, free and clear of all liens, encumbrances, security interests and adverse claims of any kind or nature whatsoever, except for the permitted exceptions. The limited liability company, as of the close of escrow, shall have no liabilities other than the Property's taxes and assessments and any prorated portions thereof due post-closing, and as of the closing, shall have no non-monetary liabilities or obligations that would interfere with Tenant's development or use of the Property.

15.5 <u>Section 1031 Exchange</u>. Landlord may consummate the purchase and sale transaction contemplated by the Option to Purchase as part of a so-called like kind exchange (the "Exchange") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that: (a) the closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange be a condition precedent or condition subsequent to the Landlord's obligations under this agreement; (b) in no event shall Tenant be required to take title to any property other than the Property; and (c) Tenant shall not be required to incur any additional expense or liability. In connection with the Exchange, the Tenant agrees to execute such documents as may be reasonably required to effect the Exchange. Landlord shall indemnify, defend, protect and hold harmless the Tenant from and against any and all claims arising from or in connection with (i) structuring the transaction contemplated by this agreement as an exchange under Section 1031 of the Code or (ii) the execution of any documents in connection with the Exchange.

## ARTICLE 16
### Representations and Warranties

**16.1** <u>Landlord's Representations and Warranties</u>.  Landlord represents and warrants to Tenant as of the date of this Lease and as of the date of the closing of escrow, if Tenant elects to exercise the Option to Purchase:

(a)    Landlord is a limited liability company duly organized and validly existing and in good standing under the laws of the State of Nevada.  Landlord has full limited liability company power and authority to enter into this Lease with Option to Purchase and to perform this agreement.  This agreement is a legal, valid and binding obligation of Landlord, enforceable against Landlord in accordance with its terms.

(b)    To Landlord's best knowledge, no hazardous substances are present in, on or under the Property, and there is no present release or threatened release of any hazardous substances in, on or under the Property.

(c)    There is no litigation, arbitration or other legal or administrative suit, action, proceeding or investigation of any kind pending or, to the best knowledge of Landlord, threatened or being contemplated against or involving Landlord relating to the Property or any part thereof, except for litigation known to Tenant, being related to the Property, improperly filed liens against the Property, Landlord, Tenant and Tenant's contractors and former contractors, if such litigation is not resolved prior to the close of escrow.  No bankruptcy, insolvency, reorganization or similar action or proceeding, whether voluntary or involuntary, is pending, or, to Landlord's knowledge, threatened against it.

(d)    Landlord is not a "foreign person" as defined in the Internal Revenue Code and the Income Tax Regulations thereunder.

(e)    Neither Landlord nor any Landlord affiliate has dealt with any investment adviser, real estate broker or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker or finder, in connection with this agreement.

(f)    As of the effective date of this agreement and as of the close of escrow, if Tenant exercises its Option to Purchase, no lease, sublease, license, or other agreement providing any occupancy right with respect to the Property shall exist which is not terminable on thirty (30) days, or less, advance notice without premium or penalty except for Tenant's leasehold and any of its subleases as of the close of escrow if Tenant exercises its Option to Purchase.



(g)    No tenant or occupant of any of the Property or any third party has any right of first refusal, right of first offer, or other option or right to lease, purchase or otherwise acquire any interest in the Property or any portion thereof, except for Tenant's Option to Purchase hereunder.

16.2    <u>Tenant's Representations and Warranties</u>.  Tenant represents and warrants to Landlord as of the date of this Lease with Option to Purchase and as of the date of closing of escrow, if Tenant exercises its Option to Purchase:

(a)    Tenant is a limited liability company duly organized and validly existing and in good standing under the laws of the State of Nevada.  Tenant has full limited liability company power and authority to enter into this Lease with Option to Purchase and to perform this agreement.  This agreement is a legal, valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms.

(b)    Neither Tenant nor any Tenant affiliate has dealt with any investment adviser, real estate broker or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker or finder, in connection with this agreement.

## ARTICLE 17
### General Provisions

17.1    Tenant shall permit Landlord or Landlord's agents, representatives or employees to enter the Property upon scheduled notice, for the purpose of inspection, determining whether agreements in this Lease are being complied with, for the purpose of showing the Property to prospective or existing mortgagees or beneficiaries under trust deeds, and for purposes of the Agreement related to tasks for which the Landlord has agreed to comply.

17.2    In the event Tenant shall fail to pay and discharge or cause to be paid and discharged, when due and payable: (i) any tax, assessment or other charge upon or in connection with the Property; (ii) any lien or claim for labor or material employed or used in, or any claim for damages arising out of the construction, repair, restoration, replacement, maintenance or use of the Property; (iii) any judgment on any contested lien or claim; (iv) any insurance premium or expense in connection with the Property; or (v) any other claim, charge or demand which Tenant has agreed to pay or cause to be paid under the covenants and conditions of this Lease, and if Tenant, after three (3) days written notice from Landlord so to do, shall fail to pay and discharge the same, then Landlord may, at its option, pay any such tax, assessment, insurance expense, lien, claim, charge or demand, and settle or discharge any action therefore or judgment thereon, and all costs, expenses, and other sums incurred or paid



by Landlord (including reasonable attorneys' fees) in connection with any of the foregoing shall be paid by Tenant to Landlord upon demand, together with interest thereon at the rate of ten (10) percent per annum from the date incurred or paid, and any default in such repayment shall constitute a breach of the covenants and conditions of this Lease.

17.3    No payment by Tenant or receipt by Landlord of a lesser amount than the rental due hereunder shall be deemed to be other than on account of the rental, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of the rental or pursue any other remedy provided for in this Lease.

17.4    In the event Landlord shall sell or transfer the Property or any part thereof and as a part of such transaction shall assign its interest as Landlord in and to this Lease, then from and after the effective date of such sale, assignment or transfer, Landlord shall have no further liability under this Lease to the Tenant except as to matters of liability which shall have accrued and are unsatisfied as of such date, it being intended that the covenants and obligations contained in this Lease on the part of Landlord shall be binding upon Landlord and its successors and assigns only during and in respect of their respective successive periods of ownership of the fee.

17.5    All of the provisions of this Lease shall be deemed as running with the land, and construed to be "conditions" as well as "covenants" as though the words specifically expressing or imparting covenants and conditions were used in each separate provision; excluding, however, the provisions of Article 3.4, which provisions shall apply only to Landlord and its parent company Archon Corporation or Archon Corporation's successor in interest.

17.6    Each and all of the covenants, conditions and restrictions in this Lease shall inure to the benefit of and shall be binding upon the successors in interest of Landlord, and, subject to the restrictions of Article 9, shall inure to the benefit of and shall be binding upon the authorized encumbrances, assignees, transferees, subtenants, licensees and other successors in interest of Tenant.

17.7    This Lease contains the entire agreement of the parties with respect to the matters covered by this Lease, and no other agreement, statement or promise made by any party, or to any employee, officer or agent of any party which is not contained in this Lease shall be binding or valid.



17.8   If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

17.9   Nothing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant, and no provisions contained in this Lease nor any acts of the parties shall be deemed to create any relationship between Landlord and Tenant, other than the relationship of Landlord and Tenant.

17.10   This Lease shall be governed and construed in accordance with the laws of the State of Nevada.  In the event either Landlord or Tenant shall bring any action or proceeding for damages for an alleged breach of any provision of this Lease, to recover rents or to enforce, protect or establish any right or remedy of either party, the prevailing party shall be entitled to recover as part of such action or proceedings reasonable attorney's fees and court costs, including all such fees incurred upon any appeals.

17.11   Any sum accruing to Landlord or Tenant under the provisions of this Lease which shall not be paid when due shall bear interest at the rate of ten (10) percent per annum from the due date until paid.

17.12   All rents or other sums, notices, demands or requests from one party or another may be personally delivered or sent by USPS mail, certified or registered, postage prepaid, or by Federal Express or other express mail service with tracking, to the addresses stated in this section of Article 16, and shall be deemed to have been given at the time of personal delivery, or at the end of the second full day following the date of mailing in the USPS system, or at the time of delivery recorded by a tracking delivery service:

> (a)  All notices, demands, requests from Tenant to Landlord shall be given to Landlord at: All Net Land Development, LLC, 3221 S. Torrey Pines, Las Vegas, NV 89146, attention David G. Lowden.

> (b)  All notices, demands, or requests from Landlord to Tenant shall be given to Tenant at: Dribble Dunk, LLC, 2300 West Sahara Avenue, Suite 800, Las Vegas, NV 89102, attention Jackie L. Robinson, Manager

Each party shall have the right, from time to time, to designate a different address by notice given in conformity with this section of Article 17.

17.13   Neither party shall record this Lease in whole or in part, or a Memorandum of this Lease, without the written consent of the other party.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

ALL NET LAND DEVELOPMENT, LLC, Landlord          DRIBBLE DUNK, LLC, Tenant
       BY: Sahara Las Vegas Corp., Sole Owner

By: David G. Lowden, President                   By: Jackie L. Robinson, Manager

BY: Archon Corporation, Manager

By: Paul W. Lowden, President

# EXHIBIT C

BENJAMIN B. WAGNER
United States Attorney
MICHAEL D. ANDERSON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone:  (916) 554-2700
Facsimile:  (916) 554-2900

**FILED**

MAY 17 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

2:12 - CR - 0 1 8 4 WBS

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| Plaintiff, | VIOLATION:  18 U.S.C.  § 1343 – WIRE FRAUD (18 COUNTS) |
| v. | |
| DANIEL CHARTRAW, | |
| Defendant, | |

### I N D I C T M E N T

<u>COUNTS ONE THROUGH EIGHTEEN</u>:     [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury charges:

DANIEL CHARTRAW,

defendant herein, as follows:

### I.  INTRODUCTION

At all times relevant to the indictment:

1.       Defendant DANIEL CHARTRAW is an individual with a primary residence in El Dorado County, California, until late 2010, at which time he moved to Monterey County.

2.       Geneva Capital Solutions, Grande Armi, LLC, Geneva Prestige Global Group, LLC, and Geneva Partners, LLC, are entities in which defendant CHARTRAW had an ownership and management interest that purport to deal in investments in mining, precious metals and other

1

1  investments.  Geneva Capital Solutions has a Wells Fargo bank account located in El Dorado

2  County, California.  In fact, these entities appear to be shell companies with no employees and no

3  assets.

4       3.     Defendant CHARTRAW maintained personal and/or business bank accounts with

5  J.P. Morgan Chase, El Dorado Savings Bank, and Wells Fargo in the Eastern District of California.

6       4.     The Darwin Mine is a mine owned by J.S. that is located in California, near the

7  Nevada border.  The Darwin Mine was neither owned nor managed by defendant CHARTRAW.

8       5.     The Miller's Mill is a facility that refines mined minerals that is located in Nevada.

9  J.S. had an option to purchase the Miller's Mill.  The Miller's Mill was neither owned nor managed

10  by defendant CHARTRAW.

11       6.     AZ Rock Holdings ("AZ Rock") is a mining company based in Arizona.  AZ Rock

12  was neither owned nor managed by defendant CHARTRAW or by L.G.

13       7.     Cascabel Bank is a shell company that is not licensed to operate as a financial

14  institution of any kind.

15                               II.  SCHEME TO DEFRAUD

16       8.     Beginning on a date unknown to the Grand Jury, but not later than on or about

17  January 1, 2007, and continuing to and including on or about November 31, 2011, in the State and

18  Eastern District of California and elsewhere, defendant knowingly devised, participated in, and

19  executed a material scheme to defraud and to obtain money by means of materially false and

20  fraudulent pretenses, representations and promises, and the concealment of material facts.

21       9.     The purpose of the scheme was to obtain money from individuals in the form of

22  loans, investments and the purchase of various types of commodities.  In all cases, defendant

23  CHARTRAW had neither the intention, ability, expertise, or financial means to repay the loans or to

24  perform on the promises that he made to prospective investors.

25       10.     Between in or about February 2007 and November 2011, CHARTRAW collected

26  approximately $2.4 million from investors.

27  ////

28  ////

### III.  MANNER AND MEANS

11.  The Darwin Mine Fraud

a.   Between in or about late 2007 and in or about January 2008, defendant CHARTRAW approached an investment company located in San Francisco, California, seeking a $15 million loan.

b.   In connection with the loan request, defendant CHARTRAW made the following false and fraudulent statements of material fact to T.F., a partner in the investment company:

(1)   That he owned a company that had an ownership interest in the Darwin Mine;

(2)   That he had an ownership interest in Miller's Mill;

(3)   That he had a current net worth in excess of $75 million;

(4)   That the purpose of the loan was to permit the Darwin Mine and Miller's Mill to resume operations;

(5)   That he was pursuing financing for equipment to be used at the mine, that he intended to use the loan proceeds to make payments related to mining equipment, and that as security for the loan he intended to record liens on real property in favor of T.F.

c.   Based on the foregoing representations, T.F. extended a $75,000 loan to defendant CHARTRAW, which defendant CHARTRAW used for his own personal expenses.

12.  The Oil Broker Fraud

a.   In approximately March 2009, defendant CHARTRAW fraudulently obtained $25,000 each from A.R. and P.W. by claiming that he could help them become brokers of oil and refined oil commodities.

b.   In connection with this transaction, defendant CHARTRAW made the following false and fraudulent statements of material fact to A.R. and P.W.:

(1)   That in return for $50,000, he would set up bank accounts in their names into which he would deposit $100 million so A.R. and P.W. could build credibility as high asset individuals;

(2)    That the $50,000 provided by A.R. and P.W. would be placed in segregated accounts that would not be drawn upon for any purpose;

(3)    That the $50,000 provided by A.R. and P.W. would be secured by a promissory note signed by S.L., when, in fact, S.L.'s signature was forged;

c.    Based on the foregoing representations, A.R. and P.W. each gave $25,000 to Geneva Capital Solutions, LLC, an entity controlled by defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

13.    Fraud Involving Contract for Sale of "Concentrate"

a.    In approximately March 2009, defendant CHARTRAW fraudulently obtained $25,000 from M.H. and $75,000 from R.M. by entering into a contract to sell 180 barrels of "concentrate" to them that defendant Chartraw claimed contained precious metals.

b.    In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to M.H. and R.M.:

(1)    That his company, Geneva Prestige Global Group, LLC, owned the 180 barrels of concentrate;

(2)    That the concentrate was insured by a $20 million insurance policy with Lloyds of London that guaranteed the value of the solution;

(3)    That the assays he provided to M.H. and R.M. were true and correct and showed that the barrels were valuable;

(4)    That he would retain the money from M.H. and R.M. as a refundable deposit pending their testing of the viability of the concentrate;

c.    Based on the foregoing representations, M.H. and R.M. gave $25,000 and $75,000 respectively to Geneva Prestige Global Group, LLC, an entity controlled by defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

14.    The Dairy Financing Fraud

a.    In or about October 2009, defendant CHARTRAW fraudulently obtained $200,000 from W.V.B., an owner and operator of dairies who was in the process of raising financing for the development of new dairy properties to be sold to citizens of the Netherlands. Defendant

4

1  CHARTRAW offered to fund W.V.B. with $250 million from a bank that defendant CHARTRAW

2  claimed he controlled, but required that W.V.B. first wire him $200,000 as an advanced fee.

3          b.     In connection with this transaction, defendant CHARTRAW made the

4  following material false and fraudulent statements of material fact to W.V.B.:

5             (1)     That he owned a licensed and operational offshore bank;

6             (2)     That he had a genuine 1.5 billion Euro Certificate of Deposit from Cascabel

7                    Bank that would allow him to finance W.V.B.'s investment;

8             (3)     That the Certificate of Deposit could be placed with a bank in order to back a

9                    "trading program" that would generate sizable returns;

10          c.     Based on the foregoing representations, W.V.B. gave defendant CHARTRAW

11  $200,000, which defendant CHARTRAW then proceeded to use for his own personal expenses.

12      15.    <u>The Gold Refinery Financing Fraud</u>

13          a.     In on or about November 2009, defendant CHARTRAW fraudulently

14  obtained $100,000 from D.G. as an advanced fee for defendant CHARTRAW's promise that he

15  would secure up to $10 million in funding from Cascabel Bank for D.G. to build a gold refinery.

16          b.     In connection with this transaction, defendant CHARTRAW made the

17  following material false and fraudulent statements of material fact to D.G.:

18             (1)     That he owned an interest in Cascabel Bank, a licensed and operational

19                    offshore bank;

20             (2)     That he would use the $100,000 provided by D.G.to obtain funding for D.G;

21             (3)     That he owned a 50% interest in the AZ Rock Mine in Arizona;

22          c.     Based on the foregoing representations, D.G. gave defendant CHARTRAW

23  $100,000, which defendant CHARTRAW then proceeded to use for his own personal expenses.

24      16.    <u>The Dore Bar Fraud</u>

25          a.     In or about November 2010 through in or about March 2011, defendant

26  CHARTRAW and L.G., fraudulently obtained $1 million from J.F.C., in exchange for the purchase

27  of "dore bars" from AZ Rock Holdings ("AZ Rock"), which defendant CHARTRAW claimed

28  contained precious metals.

1             b.      In connection with this transaction, defendant CHARTRAW made the

2 following material false and fraudulent statements of material fact to J.F.C.:

3             (1)      That he and L.G. were officers of AZ Rock with authority to act on behalf of

4                         that company;

5             (2)      That the $1 million provided by J.F.C. would be placed in an escrow account

6                         in the name of L.G., omitting to tell J.F.C. that that account was actually

7                         controlled by defendant CHARTRAW and L.G.;

8             (3)      That the $1 million provided by J.F.C. would be used to purchase "dore bars"

9                         from AZ Rock;

10             c.      To further induce J.F.C. to go forward with this investment, defendant

11 CHARTRAW represented to J.F.C. that his money would be safely held in an escrow account at J.P.

12 Morgan Chase Bank in the name of 1st National Title Insurance Agency (1st National).  However,

13 after the transfer of the J.F.C.'s funds to that account defendant CHARTRAW and L.G. provided, or

14 caused to be provided, to 1st National a materially false and forged "Letter of Introduction and

15 Mandate Authority" purporting to be from AZ Rock.  This letter fraudulently listed defendant

16 CHARTRAW as a "Principle/Partner" in AZ Rock and contained the defendant's signature and the

17 forged signature of L.N., the true owner of AZ Rock.  The letter also falsely purported to give L.G.

18 authority to act on behalf of AZ Rock.  In reliance on this letter, between on or about November 22,

19 2010, and on or about March 16, 2011, 1st National disbursed the funds from the escrow account to

20 personal accounts controlled by defendant CHARTRAW and L.G., and to an attorney client trust

21 account maintained by attorney J.H. on behalf of defendant CHARTRAW.  Thereafter, defendant

22 CHARTRAW and L.G. used these funds for their own personal expenses.

23           17.    The "Trading Platform" Fraud

24             a.      In or about February 2010, defendant CHARTRAW fraudulently obtained

25 $113,258.30 from G.A. by fraudulently telling G.A. that he would invest the money on G.A.'s behalf

26 in a "trading platform" at a bank where it would generate 15% interest every 30 days before being

27 returned after 90 days.

28

1            b.      In connection with this transaction, defendant CHARTRAW made the

2 following material false and fraudulent statements of material fact to G.A.:

3                (1)      That such "trading platforms" exist when in truth and in fact as defendant

4                            knew such investments do not exist;

5                (2)      That G.A.'s money would be added to a pool of money that defendant

6                            CHARTRAW already had invested in this "trading platform";

7                (3)      That G.A.'s money would remain available to him to withdraw at any time;

8            c.      Based on the foregoing representations, G.A. gave defendant CHARTRAW

9 $113,258.30, which defendant CHARTRAW then proceeded to use for his own personal expenses.

10       18.     <u>The Gold Refining Equipment Loan Fraud</u>

11            a.      Between in or about April 2011 and in or about June 2011, defendant

12 CHARTRAW, fraudulently obtained loans of $50,000 from J.K., $25,000 from J.C., and $75,000

13 from H.G.

14            b.      In connection with these loans, defendant CHARTRAW made the

15 following material false and fraudulent statements of material fact to J.K., J.C., and H.G.:

16                (1)      That he was a wealthy individual who was asset rich, but cash poor;

17                (2)      That he owned a gold mine;

18                (3)      That he had a lease on a piece of gold refining equipment;

19                (4)      That he intended to use the borrowed money to make a lease payment on a

20                            piece of gold refining equipment:

21                (5)      That in return for the loans defendant CHARTRAW would transfer a quantity

22                            of gold to J.C. as collateral and repay the loan plus six percent interest within

23                            five days;

24                (6)      That he had actually shipped a quantity of gold to J.C. to act as collateral for

25                            J.C. and H.G.'s loans;

26            c.      In furtherance of the scheme to defraud, defendant CHARTRAW provided

27 H.G. with a document purporting to be a Bill of Lading fraudulently representing that the defendant

28 had shipped a quantity of gold to J.C. via Hellman Worldwide logistics.

1            d.      Based on the foregoing representations, J.K., J.C., and H.G. provided money

2 to defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own

3 personal expenses.

4        19.    <u>The Movie Production Fraud</u>

5            a.      In or about January 2010, defendant CHARTRAW fraudulently obtained

6 $100,000 from S.F., a movie producer who was seeking financing for a movie.  Defendant

7 CHARTRAW offered to fund S.F.'s movie production in the initial amount of $500,000 with a

8 further agreement to provide $350 million in funds; however, defendant CHARTRAW stated that he

9 would need a $100,000 fee from S.F. in order to allow the use of a $100 million certificate of deposit

10 in order to generate revenue for the financing.

11            b.      In connection with this transaction, defendant CHARTRAW made the

12 following material false and fraudulent statements of material fact to S.F.:

13            (1)     That he had a genuine $100 million certificate of deposit with Cascabel Bank;

14            (2)     That he would use the $100,000 from S.F. for fees associated with the $100

15                        million certificate of deposit;

16            (3)     That the certificate of deposit could be used in a "trading program" between

17                        banks;

18            (4)     That defendant CHARTRAW intended to return S.F.'s $100,000 on or about

19                        January 11, 2010

20            c.      Based on the foregoing representations, S.F. provided $100,000 to defendant

21 CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

22                      <u>III.  USE OF INTERSTATE WIRES</u>

23        20.    On or about the dates listed below, in the State and Eastern District of California, for

24 the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so,

25 the defendant, as more specifically set forth below, knowingly transmitted and caused to be

26 transmitted by means of wire communication in interstate commerce certain writings, signs, signals,

27 pictures and sounds.

28

8

| COUNT | DATE OF WIRE | WIRE AMOUNT | VICTIM | SENDER ACCOUNT ENDING | RECEIVER ACCOUNT ENDING |
|---|---|---|---|---|---|
| 1 | December 20, 2007 | $50,000 | T.F. | Wells Fargo Bank -3907 | El Dorado Savings Bank -1110 |
| 2 | January 24, 2008 | $25,000 | T.F. | Wells Fargo Bank -3907 | El Dorado Savings Bank -1110 |
| 3 | March 3, 2009 | $25,000 | A.R. | CitiBank, NA -0593 | Wells Fargo Bank -5565 |
| 4 | March 3, 2009 | $25,000 | P.W. | RaboBank -6201 | Wells Fargo Bank -5565 |
| 5 | March 20, 2009 | $25,000 | M.H. | Ensign Federal Credit Union -2334 | Wells Fargo Bank -5565 |
| 6 | March 27, 2009 | $75,000 | R.M. | JP Morgan Chase Bank -7316 | Well Fargo Bank -5565 |
| 7 | November 6, 2009 | $200,000 | W.V.B | Rabobank -7242 | City National Bank -2036 |
| 8. | November 20, 2009 | $100,000 | D.G. | JP Morgan Chase Bank -1241 | JP Morgan Chase Bank -9335 |
| 9 | November 22, 2010 | $400,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9731 |
| 10 | December 23, 2010 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 11 | December 31, 2010 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 12 | January 14, 2011 | $10,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 13 | January 26, 2011 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 14 | March 16, 2011 | $8,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 15 | February 1, 2010 | $113,800 | G.A. | Wachovia Bank NA -5092 | JP Morgan Chase Bank -9335 |
| 16 | November 4, 2009 | $30,000 | S.F. | Wells Fargo Bank -2849 | Wells Fargo Bank -1519 |
| 17 | April 11, 2011 | $50,000 | J.K. | HSBC Bank -1220 | JP Morgan Chase Bank -9731 |
| 18 | June 7, 2011 | $75,000 | H.G. | TD Ameritrade -8855 | JP Morgan Chase Bank -9731 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL.

/s/ Signature on file w/AUSA

FOREPERSON

BENJAMIN B. WAGNER
United States Attorney

9

No.

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA
*vs.*

### DANIEL CHARTRAW

### I N D I C T M E N T

**VIOLATION:** 18 U.S.C. § 1343 - Wire Fraud (18 Counts)

*A true bill,*

_____ /S/ _____

*Foreman.*

*Filed in open court this* ____ 17ᵀʰ _____ *day*

*of* __ May _____ , *A.D. 20* 12 __

_____ M. Caspu _____

*Clerk.*

*Bail, $* __ **NO PROCESS NECESSARY**

GPO 863 525

2 1 2 - CR ᴸ 0 1 8 4 WBS

PENALTY SLIP
**DANIEL CHARTRAW**

COUNTS 1-18:

VIOLATION: 18 U.S.C. § 1343 - Wire Fraud

PENALTY:   Not more than 20 Years Imprisonment,
           $250,000 Fine or both;
           3 Years TSR

PENALTY
ASSESSMENT:       $100 each count

2 1 2 - CR   0 1 8 4 WBS

AO 245B-CAED (Rev. 09/2011)  Sheet 1 - Judgment in a Criminal Case

# United States District Court

## Eastern District of California

UNITED STATES OF AMERICA
v.
**DANIEL CHARTRAW**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)
Case Number: **2:12CR00184-01**

Benjamin Galloway, Assistant Federal Defender
Defendant's Attorney

## THE DEFENDANT:

[✔]    pleaded guilty to count: 9 of the Indictment.
[ ]    pleaded nolo contendere to counts(s) ___ which was accepted by the court.
[ ]    was found guilty on count(s) ___ after a plea of not guilty.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offense:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number |
|---|---|---|---|
| 18 USC section 1343 | Wire Fraud (CLASS C FELONY) | 11/22/2010 | 9 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]    The defendant has been found not guilty on counts(s) ___ and is discharged as to such count(s).

[✔]    Counts 1-8 and 10-18 of the Indictment are dismissed on the motion of the United States.

[ ]    Indictment is to be dismissed by District Court on motion of the United States.

[✔]    Appeal rights given.        [ ]    Appeal rights waived.

     IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/29/2013
Date of Imposition of Judgment

Signature of Judicial Officer

**MORRISON C. ENGLAND, JR.**, United States District Judge
Name & Title of Judicial Officer

9/12/2013
Date

AO 245B-CAED (Rev. 09/2011)  Sheet 2 - Imprisonment

| | | |
|---|---|---|
| CASE NUMBER: | 2:12CR00184-01 | Judgment - Page 2  of  7 |
| DEFENDANT: | DANIEL CHARTRAW | |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of <u>57 months</u>.

[]  No TSR: Defendant shall cooperate in the collection of DNA.

[✔]  The court makes the following recommendations to the Bureau of Prisons:
    The court recommends that the defendant be incarcerated in the Sheridan, Oregon, facility, but only insofar as this accords with security classification and space availability.  The court recommends the defendant participate in the 500-Hour Bureau of Prisons Substance Abuse Treatment Program.

[✔]  The defendant is remanded to the custody of the United States Marshal.

[ ]  The defendant shall surrender to the United States Marshal for this district.
    [ ]  at ____ on ____.
    [ ] as notified by the United States Marshal.

[ ]  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
    [ ] before _ on ____.
    [ ] as notified by the United States Marshal.
    [ ] as notified by the Probation or Pretrial Services Officer.
    If no such institution has been designated, to the United States Marshal for this district.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

  Defendant delivered on_____  to  _____

at _____ , with a certified copy of this judgment.


             _____
                UNITED STATES MARSHAL


         By  _____
             Deputy U.S.  Marshal

AO 245B-CAED (Rev. 09/2011)  Sheet 3 - Supervised Release

CASE NUMBER:    2:12CR00184-01                          Judgment - Page 3  of  7
DEFENDANT:       DANIEL CHARTRAW

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>36 months</u>.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four (4) drug tests per month.

[ ]      The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.  (Check, if applicable.)

[✔]     The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  (Check, if applicable.)

[✔]     The defendant shall cooperate in the collection of DNA as directed by the probation officer.  (Check, if applicable.)

[ ]      The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.), as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  (Check, if applicable.)

[ ]      The defendant shall participate in an approved program for domestic violence.  (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without permission of the court or probation officer;
2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3)   the defendant shall answer truthfully all inquiries by the probation officer and follow instructions of the probation officer;
4)   the defendant shall support his or her dependants and meet other family responsibilities;
5)   the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6)   the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7)   the defendant shall refrain from excessive use of alcohol;
8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)   the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere, and shall permit confiscation of any contraband observed in plain view by the probation officer;
11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B-CAED (Rev. 09/2011)  Sheet 3 - Supervised Release

| | |
|---|---|
| CASE NUMBER:      2:12CR00184-01 | Judgment - Page 4  of  7 |
| DEFENDANT:      DANIEL CHARTRAW | |

# SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant shall submit to the search of his person, property, home, and vehicle by a United States probation officer, or any other authorized person under the immediate and personal supervision of the probation officer, based upon reasonable suspicion, without a search warrant.  Failure to submit to a search may be grounds for revocation.  The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2.  The defendant shall not dispose of or otherwise dissipate any of his assets until the fine and/or restitution order by this Judgment is paid in full, unless the defendant obtains approval of the Court or the probation officer.

3.  The defendant shall provide the probation officer with access to any requested financial information.

4.  The defendant shall not open additional lines of credit without the approval of the probation officer.

5.  As directed by the probation officer, the defendant shall participate in an outpatient correctional treatment program to obtain assistance for drug or alcohol abuse.

6.  As directed by the probation officer, the defendant shall participate in a program of testing (i.e. breath, urine, sweat patch, etc.) to determine if he has reverted to the use of drugs or alcohol.

7.  The defendant shall abstain from the use of alcoholic beverages and shall not frequent those places where alcohol is the chief item of sale.

8.  The defendant shall not work in a position of fiduciary responsibility without the prior approval of the court or the probation officer.

AO 245B-CAED (Rev. 09/2011) Sheet 5 - Criminal Monetary Penalties

| | |
|---|---|
| CASE NUMBER:      2:12CR00184-01 | Judgment - Page 5 of 7 |
| DEFENDANT:      DANIEL CHARTRAW | |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 100.00 | $ 0.00 | $ 2,830,698.53 |

[ ]   The determination of restitution is deferred until ___ .  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[✔]   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| REDACTED | $113,800.00 | $113,800.00 | |
| REDACTED | $200,000.00 | $200,000.00 | |
| REDACTED | $25,000.00 | $25,000.00 | |
| REDACTED | $1,000,000.00 | $1,000,000.00 | |
| REDACTED | $70,000.00 | $70,000.00 | |
| REDACTED | $100,000.00 | $100,000.00 | |
| REDACTED | $100,000.00 | $100,000.00 | |
| REDACTED | $99,999.00 | $99,999.00 | |
| REDACTED | $100,000.00 | $100,000.00 | |
| REDACTED | $100,000.00 | $100,000.00 | |
| REDACTED | $75,000.00 | $75,000.00 | |
| REDACTED | $75,000.00 | $75,000.00 | |
| REDACTED | $25,000.00 | $25,000.00 | |
| REDACTED | $2,747.63 | $2,747.63 | |
| REDACTED | $50,000.00 | $50,000.00 | |
| REDACTED | $45,000.00 | $45,000.00 | |
| REDACTED | $41,250.00 | $41,250.00 | |
| REDACTED | $2,450.90 | $2,450.90 | |
| REDACTED | $125,000.00 | $125,000.00 | |
| REDACTED | $75,000.00 | $75,000.00 | |
| REDACTED | $35,000.00 | $35,000.00 | |
| REDACTED | $80,000.00 | $80,000.00 | |
| REDACTED | $55,000.00 | $55,000.00 | |
| REDACTED | $80,000.00 | $80,000.00 | |
| REDACTED | $25,000.00 | $25,000.00 | |
| REDACTED | $35,451.00 | $35,451.00 | |
| REDACTED | $70,000.00 | $70,000.00 | |
| REDACTED | $25,000.00 | $25,000.00 | |
| **TOTAL RESTITUTION** | **$2,830,698.53** | **$2,830,698.53** | |

    ** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2011) Sheet 5 - Criminal Monetary Penalties

| | | |
|---|---|---|
| CASE NUMBER: | 2:12CR00184-01 | Judgment - Page 6 of 7 |
| DEFENDANT: | DANIEL CHARTRAW | |

[]      Restitution amount ordered pursuant to plea agreement $ ___

[ ]    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ✔ ]     The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    [✔]   The interest requirement is waived for the   [ ]  fine          [✔] restitution

    [ ]   The interest requirement for the        [ ] fine  [ ] restitution is modified as follows:

[ ]   If incarcerated, payment of the fine is due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

[✔]   If incarcerated, payment of restitution is due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

   ** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2011) Sheet 6 - Schedule of Payments

| | |
|---|---|
| CASE NUMBER:     2:12CR00184-01 | Judgment - Page 7  of  7 |
| DEFENDANT:       DANIEL CHARTRAW | |

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

**A**   [ ] Lump sum payment of $ ___ due immediately, balance due

        [ ]      not later than ___ , or
        [ ]      in accordance with     [ ] C,   [ ] D,   [ ] E, or         [ ] F below; or

**B**   [✔]          Payment to begin immediately (may be combined with   [ ] C,          [ ] D, or   [ ] F below); or

**C**   [ ] Payment in equal ___ (e.g., weekly, monthly, quarterly) installments of $ ___ over a period of ___ (e.g., months or years), to commence ___ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   [ ] Payment in equal ___ (e.g., weekly, monthly, quarterly) installments of $ ___ over a period of ___ (e.g., months or years), to commence ___ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**   [ ] Payment during the term of supervised release will commence within ___ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   [ ] Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[ ]   Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate:

[ ]   The defendant shall pay the cost of prosecution.

[ ]   The defendant shall pay the following court cost(s):

[ ]   The defendant shall forfeit the defendant's interest in the following property to the United States:

# EXHIBIT D

**PG** Asia Investment Bank Ltd
A Pied Piper Group Global Company

Licensed Labuan Investment Bank
Registration No. LL08568 / License No. 120111BI

*11/16/2022 BCC*
*#8 ET-22-404109 (UC-0519-17)*
*#9 ET-22-400110 (UC-0568-14)*

November 15, 2022

**Dribble Dunk, LLC/All Net, LLC**
Attn: Jackie Robinson
3770 Howard Hughes Pkwy,
Suite 100
Las Vegas, NV 89169

Sir,

The undersigned bank officer, at your request, hereby confirms that we, PG Asia Investment Bank, LTD, located at 10, Jalan P. Ramlee, Kuala Lumpur, 50250 Kuala Lumpur, Wilayah Persekutuan Kuala Lumpur, Malaysia, are Ready, Willing, and Able to issue a Letter of Credit to the order of **Clearwater Premiere Perpetual Master, LLC** for the total amount of Five Billion United States Dollars ($5,000,000,000.00) as required for the Dribble Dunk Project funding expectations. The term of such guarantee(s) will be for a minimum of one calendar year plus one calendar month. A new Letter of Credit containing the same or similar terms will be issued to replace each expiring Letter of Credit for an additional two (2) consecutive periods of one year and one month each. We also confirm that the the underlying capital assets supporting this Letter of Credit is free of any liens, encumbrances and/or restrictions and consists of clean, clear funds of non-criminal origin.

Upon receipt of your written request, we will verify the approved Letter of Credit via SWIFT MT760, sent to your indicated bank and corresponding account coordinates, communicated by the undersigned banking officer, Mr. William Murphy. We acknowledge that the approved Letter of Credit satisfies contractual terms and conditions for your mutual engagement with our client, functioning primarily as security and/or to satisfy periodic payments according to the projects requirements. A signed facsimile and/or email copy of this confirmation is deemed legally binding, with such delivery classified as an original correspondence.

For and on behalf of PG Asia Investment Bank, LTD of 10, Jalan P. Ramlee, Kuala Lumpur, 50250 Kuala Lumpur, Wilayah Persekutuan Kuala Lumpur, Malaysia, executed Tuesday, November 01, 2022.

William Murphy (Nov 15, 2022 08:59 EST)

**William Murphy**
*Financial Director and CFO*
**PG Asia Investment Bank, LTD**
Email: wmurphy@pgaib.com
US Ph: +1 631 375 0701
URL: http://www.pgaib.com

| | |
|---|---|
| **Principal Office** | : Level 7(E)-2, Main Office Tower, 87000 Federal Territory of Labuan, Malaysia |
| **Marketing Office** | : Level 22(E), UBN Tower, 10, Jalan P Ramlee 50250 Kuala Lumpur, Malaysia |
| **U.S. Office** | : 233 S. Wacker Dr. 67th Floor, Chicago, IL 60606 |
| **DMCC Office** | : Bin Haidar Bldg, Ste. 217: Port Saeed Deira, Dubai UAE |
| **Zurich Office** | : Freischutzgasse 3, 8004 Zurich, Switzerland |

✉ trade@piedpipergroup.com
📞 +6 087 416160
🖨 +6 087 417160



# EXHIBIT E



**Ameri Metro, Inc.**

*"Changing The Way You Move"*

*American Spirit American Dream*
*Ameri Metro*

*Affiliated Companies:*
HSR PASSENGER SERVICES, INC.
HSR LOGISTICS, INC.
HSR TECHNOLOGIES, INC.
HSR FREIGHT LINE, INC.

February 13, 2023

TDA Global Systems, LLC
Clearwater Premiere Perpetual Master Trust
Clearwater Premiere Perpetual Master, LCC
30 N Gould St
Ste 22728
Sheridan, WY 82801

Att: Mr. Daniel L. Chartraw

Re: Letter of Notice

Dear Dan:

Please accept this formal Letter of Notice in direct response to your call to me of February 1, 2022, in which you and I specifically and expressly discussed the current state of bond monetization as per the efforts of Clearwater for well over a year now.

This Letter shall confirm that in this call, you expressly admitted that Clearwater would be unable to get the bonds monetized as agreed and that Clearwater could not and would not be able to procure an insurance wrap sufficient in size to be able to secure or assure any such monetization.

Further in this call, you expressly stated that the best that could be done, would be the possibility of Clearwater being able to secure up to a One Billion Dollar loan annually, against the first, Forty Billion Dollar Bond, which we both agreed would be insufficient to be able to fund those projects directly tied to the bond.

These frank and honest admissions on your part were and are well appreciated by me on behalf of all affected companies as follows:

HSR logistics, Inc.
HSR Freight Line Inc.
HSR Passenger Services, Inc.
HSR Technologies, Inc.
Global Infrastructure Finance & Development Authority, Inc.
Cape Horn Abstract Inc.
Cape Horn Abstracting
Susquehanna Mortgage Bankers Corp
Susquehanna Mortgage Bank Susquehanna mortgage, co.
Zurich Financial Guarantee and Security Company
Penn Venture Capital, Co.
Penn Insurance Services LLC
Atlantic Energy and Utilities, Inc.
Atlantic Energy & Utility Products, Inc.
KSJM International Airport, Inc.
Malibu Homes, Inc.
Ameri Cement, Inc.
Lord Chauffeurs LTD.
Eastern Development & Design, Inc.
Slater & West, Inc.
Platinum Media Inc.
Natural Resources LLC
Dutch East India Logistics Co.
Ann Charles International Airport, Inc.,
Hi Speed Rail Facilities, Inc.
Hi Speed Rail Facilities Provider, Inc
Ameri Metro Infrastructure Cryptocurrency, Inc.
Decentralized Autonomous Organization, LLC
Ledger Autonomous Organization Crypto Asset and Natural Resources
Commodities Exchange, LLC
Crypto Asset and Natural Resources Commodities Exchange
Crypto Asset and Natural Resources Commodities Exchange DAO LLC
Global Infrastructure Stock Exchange LLC
Global Consumptive Use Token Exchange DAO LLC
Digital Asset Management and Clearinghouse LAO LLC
Digital Asset Depository Statutory Trust
Digital Asset Depository and Asset's custodian DAO LLC
Port of Ostia, Inc.
Port of De Claudius, Inc.

Additionally, the fact that you fully acknowledged, understood and agreed that, while a billion dollars is a lot of money, it was not even remotely close to sufficient funds necessary toward the goals of project funding that brought the bonds into existence in the first place, was and is also appreciated.

It was in the spirit of this conversation that I was required to go to the Board of each above-mentioned, affected company and to which I attended a Board meeting for each above mentioned, affected.

company thereto.

A formal Board vote for each above-mentioned, affected company was taken, considering the realities of Clearwater's inability to properly monetize the bonds, with the following results.

Due to the express and admitted inability to perform as agreed by TDA and Clearwater, through perhaps no fault of their own, but nonetheless, the Board of each affected company voted, as relevant to each, as follows:

1. The various Collaboration Agreements by and between TDA Global Systems, LLC and Ameri Metro Infrastructure Cryptocurrency, Inc., including all Addendums, are hereby irrevocably terminated.

2. Any and all Agreements by and between any and all of the above mentioned, affected companies and Clearwater Premiere Perpetual Master Trust and/or Clearwater Premiere Perpetual Master, LCC are hereby irrevocably terminated.

3. All bond assignments for bonds from Malibu Homes Inc., Atlantic Energy and Utility Products Inc., and HSR Freight Line Inc. / HSR Passenger Services Inc., are hereby irrevocably terminated.

4. TDA Global Systems, LLC, Clearwater Premiere Perpetual Master Trust and Clearwater Premiere Perpetual Master, LCC are all hereby expressly and irrevocably decommissioned from having any further authority on any and all of the bonds from Malibu Homes Inc., Atlantic Energy and Utility Products Inc., and HSR Freight Line Inc. / HSR Passenger Services Inc.

**Ameri Metro, Inc.**

PHONE: 717-434-0668                                2575 EASTERN BLVD., YORK, PA 17402

5. Any and all bond title page and appurtenant bond paperwork earlier forwarded to TDA Global Systems, LLC, Clearwater Premiere Perpetual Master Trust and Clearwater Premiere Perpetual Master, LCC, are hereby expressly rendered null and void, with no legal authority whatsoever.

6. Any and all transfer agents, book runners, broker dealers and/or law firms appointed by TDA and/or Clearwater to act on their behalf with respect to any and all bonds from the above mentioned, affected companies hereto, are hereby expressly and irrevocably decommissioned from acting in any such capacity and have no legally recognized authority with respect to the bonds or the abovementioned, affected companies as a matter of law.

7. Mr. Todd Owen has been formally removed as a shareholder by majority Board vote and approval, from each company Mr. Owen had received shares into, as per the officially filed 8K Filings, as filed in 2022 thereto. As these shares were rendered to Mr. Owen in express consideration for his pending, represented ability to get each such company's bonds successfully monetized, which has not and cannot be done, the shares have been taken back and redistributed in accordance with previous ownership.

In conclusion, we wish you and Todd well in your other business endeavors, but once again, we reiterate that you both have been legally and irrevocably decommissioned from acting with any authority on any of the bonds, as any such authority has been permanently and irrevocably revoked.

Thank you for your time and attention to this matter.

Very sincerely yours,

Shah Mathias, CEO
Ameri Metro, Inc. &
Signing for all the entities
listed in paragraph four
above

**Ameri Metro, Inc.**

PHONE: 717-434-0668

2575 EASTERN BLVD., YORK, PA 17402

# EXHIBIT F

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

U.S. DISTRICT COURT - N.D. of N.Y.
**FILED**
MAY 2 8 2024
AT_____ O'CLOCK
John M. Domurad, Clerk - Albany

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Case No.   1:24-MJ-261   (CFH) |
| | ) |
| KRIS ROGLIERI, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about December 12, 2023 through December 29, 2023, in the counties of Albany and Warren in the

Northern District of New York, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud |

This criminal complaint is based on these facts:
Please see attached affidavit.

☒   Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Jonathon Vick
_____
*Printed name and title*

Attested to by the affiant in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Date:   May 28, 2024
_____

_____
*Judge's signature*

City and State:   Albany, New York

Hon. Christian F. Hummel, U.S. Magistrate Judge
_____
*Printed name and title*

## Affidavit in Support of a Criminal Complaint

Special Agent Jonathon Vick, of the Federal Bureau of Investigation (FBI), being duly sworn, deposes and states:

### Introduction

1.      I respectfully make this affidavit in support of a criminal complaint charging Kris Roglieri, of Queensbury, New York, with wire fraud committed in violation of 18 U.S.C. § 1343.

2.      I have been employed since August 2022 as an FBI Special Agent. I am presently assigned to the Albany Field Office investigating public corruption and financial crimes.

3.      The facts in this affidavit come from my personal observations, my training and experience, my and others' analysis of various categories of records and information, and information obtained from other law enforcement officers and witnesses. The information contained in this affidavit is not an exhaustive account of everything I know about Roglieri or everything I have learned in this investigation. Rather, it contains only the facts that I believe are necessary to establish probable cause in support of a criminal complaint. Where statements of others are related in this affidavit, they are related in substance and in part. Also, if a specific date is given for a financial transaction, it is approximate.

### Background

4.      This request for a criminal complaint arises from an ongoing investigation into a fraud and money laundering scheme perpetrated by Roglieri and others via Prime Capital Ventures, LLC ("Prime Capital"), a purported commercial lending business.

5.      Prime Capital was formed in December 2021; Roglieri is its sole member.

1

6.      At all relevant times, Roglieri operated Prime Capital as well as affiliated entities including Prime Commercial Lending, LLC ("Prime Commercial"), from offices in Albany. Prime Capital and Prime Commercial had bank accounts at KeyBank in Albany.

7.      At all relevant times, Individual A was Executive Vice President of Prime Capital.

8.      Prime Capital held itself out as a commercial lending business. As part of contractual arrangements with its borrower clients situated across the country, Prime Capital obtained upfront interest payments from prospective borrowers while it sought to secure loans for those borrowers; these upfront interest payments were characterized by Prime Capital as the "Interest Credit Account Payment," or "ICA" payment for short. ICA payments did not represent fees to Prime Capital. Instead, each borrower's upfront ICA payment would be debited over time as the loan was funded and accrued more interest. An ICA payment would also be refundable if Prime Capital failed to secure a loan for the borrower client.

9.      Prime Capital was the subject of an involuntary Chapter 7 bankruptcy proceeding in this District begun on December 19, 2023, in the case captioned *In re Prime Capital Ventures, LLC*, No. 1:23-bk-11302 (Bankr. N.D.N.Y.) (the "Involuntary Bankruptcy Proceeding"). In that proceeding, three Prime Capital creditors filed a petition to put Prime Capital into bankruptcy based on allegations that Prime Capital had fraudulently taken and refused to return $43 million from numerous entities, including more than $20 million from the petitioning creditors.

10.     In the Involuntary Bankruptcy Proceeding, the petitioning creditors alleged that Prime Capital defrauded its borrower clients by using the ICA funds that those clients paid to Prime Capital – as pre-payment of interest on yet-to-be issued loans – for Prime Capital's own purposes and then failed to return the ICA funds when the loans did not materialize.

2

11.    United States Bankruptcy Judge Robert E. Littlefield Jr. dismissed the Involuntary Bankruptcy Proceeding on January 9, 2024, at the request of both the petitioning creditors and Prime Capital. Roglieri personally filed for bankruptcy on February 15, 2024 ("the Personal Bankruptcy Proceeding"). No. 1:24-bk-10151 (Bankr. N.D.N.Y.).

12.    On March 14, 2024, as part of his Personal Bankruptcy Proceeding, Roglieri gave sworn testimony at a creditors meeting, which was audio-recorded. Roglieri stated that he was the only person with access to Prime Capital's bank accounts and Prime Commercial's bank accounts. Roglieri stated that he was the only person with online access to the accounts, and the only person with the ability or authority to make wire transfers from those accounts.

**Basis for a Probable Cause Finding that Roglieri Has Committed Wire Fraud**

13.    1800 Park Avenue LLC ("1800 Park") is a Minnesota company that sought a loan from Prime Capital in order to build a commercial egg production facility. On or about December 12, 2023, Prime Capital provided to 1800 Park a "Commitment to Fund Letter" by which Prime Capital committed to fund a line of credit in the amount of $98,905,467. Roglieri signed the letter on Prime Capital's behalf. Roglieri and Prime Capital made this commitment to fund a nearly $100 million project even though, as of December 12, 2023, Prime Capital had failed to fund numerous loans promised to earlier clients; failed to return tens of millions of dollars in ICA payments to earlier clients once those loans did not materialize; and had been sued multiple times by clients alleging fraud and seeking the return of ICA payments.

14.    In emails sent to 1800 Park on December 11, December 15, December 18 and December 19, representatives of Prime Capital and Prime Commercial informed representatives of 1800 Park that 1800 Park needed to conduct a "soft close" on the deal as soon as possible, if 1800 Park wanted to keep the loan terms that were being offered; a soft close would include an

3

ICA payment made by 1800 Park. For instance, in the email sent to 1800 Park representatives on December 19, a Prime Capital/Prime Commercial representative stated:

> Per Kris, [1800 Park needs] to come to the soft close with at least $10M, preferably $12- or total requested of $15M.
>
> …
>
> Please get with your clients, and explain the urgency of the situation.  We all have worked too hard for this one.

A draft of this email was sent to Roglieri on December 19, prior to its being sent to a representative for 1800 Park.

15.    On or about December 19, a representative of 1800 Park emailed Individual A, and others, stating that 1800 Park could make an ICA payment in the amount of $5 million and "it would help us feel comfortable depositing the $5mm if you could point us to the place in the loan documents or send us the deposit agreement where it outlines that the funds sent to establish the ICA are fully refundable if we cannot consummate the deal on the back." Individual A forwarded this email to Roglieri on December 20.

16.    On December 21, Individual A emailed to 1800 Park a draft Deposit Agreement between 1800 Park and Prime Commercial[1]; this agreement specified that the ICA payment would be refundable if 1800 Park and Prime Commercial did not enter into a loan agreement.

17.    On or about December 22, Roglieri signed the Deposit Agreement on behalf of Prime Commercial; that agreement, as revised by 1800 Park from its initial draft, stated:

> The Lender hereby acknowledges receipt of such funds and agrees to hold the [ICA

---

[1] No explanation was given as to why the contracting party would be Prime Commercial, as opposed to Prime Capital. During his testimony at the creditors meeting on March 14, 2024, Roglieri stated that Prime Commercial was a lender for smaller transactions (what he called "small-balance commercial mortgages" and "loan brokering"), whereas Prime Capital was a lender for larger transactions (*e.g.*, commercial real estate and construction loans).

4

payment] in a separate and distinct account for Borrower, subject to the terms and conditions of this Agreement. The Deposit Amount should be held as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party hereto.

By this agreement, Roglieri and Prime Commercial agreed to hold 1800 Park's ICA payment in a "separate and distinct account," and to hold the payment as a "trust fund"; they also agreed that the ICA payment would be refunded if the parties did not enter into a loan agreement.

18.     On December 22, 1800 Park wire transferred, from an account at Home State Bank[2], a $5 million ICA payment to the KeyBank account in Prime Capital's name, pursuant to wire transfer instructions attached to the Deposit Agreement (these instructions erroneously identified the account holder as Prime Commercial).

19.     Based on the FBI's financial analysis, there is probable cause to conclude that the ICA payment was not held as a "trust fund" in a "separate and distinct account." 1800 Park was instructed to transfer the ICA payment to Prime Capital's account at KeyBank, for which Roglieri was the only signatory. When 1800 Park's ICA payment entered this account, its balance was $1,923.66.

20.     Also on December 22, Roglieri transferred the entire ICA payment, $5 million, from Prime Capital's account to Prime Commercial's account at KeyBank, for which Roglieri was the only signatory. At the time of this $5 million transfer, this Prime Commercial account's balance stood at $57,045.90. After the account balance increased to $5,057,045.90[3], Roglieri made the following transfers and payments from the Prime Commercial account, among others:

---

[2] According to the Federal Deposit Insurance Corporation, Home State Bank is based in Minnesota and has branches only in Minnesota.

[3] Between December 22 and 29, the Prime Commercial account received a total of $27,809.93 from a title company; these were the only other transfers into the account during that time period.

5

- December 22: $2 million was transferred to a credit union account standing in the name of a Virginia company owned by an associate of Individual A. Asked, at a creditors meeting held on April 4, 2024, about the company that received this transfer, Roglieri stated, "it could have been a borrower or a creditor. I'm not sure without looking at the records."

- December 22: $950,000 was transferred to a Prime Capital client, as partial loan funding for that client's real estate project in Saratoga County.[4] Roglieri thus used part of 1800 Park's ICA payment to meet a financial obligation that Prime Capital had made to another client. Also on December 22, Roglieri and this client's owner exchanged numerous text messages about this $950,000 transfer, with Roglieri texting the owner, on December 22 at about 2:11 p.m., that he had transferred the funds.

- December 22 to 29: a total of $34,000 was transferred to personal KeyBank accounts for which Roglieri was a signatory.

- December 26: $84,000 was paid to Wrist Aficionado, a high-end watch company, for Roglieri's purchase of a Rolex day-date 36 mm yellow gold diamond bezel watch.

- December 26: $101,000 was paid to XO Global, which provides private jet services. This payment was for round-trip, private air travel between Albany International Airport and Anguilla, for a family vacation that Roglieri took from about December 29, 2023 to January 5, 2024.

- December 26: $50,000 was paid to a law firm that had represented Prime Capital in the Involuntary Bankruptcy Proceeding.

---

[4] On January 29, 2024, this client filed a lawsuit against Prime Capital in Saratoga County Court, alleging that Prime Capital had failed to fully fund the real estate project.

- December 29: $400,000 was paid to another law firm that had represented Prime Capital in the Involuntary Bankruptcy Proceeding as well as in another case in the United States District Court for the Northern District of New York.

21.     On January 3, 2024, after learning of the Involuntary Bankruptcy Proceeding, 1800 Park demanded back its ICA payment, and sent a letter to Prime Commercial pursuant to the notice provisions of the Deposit Agreement; a Prime Commercial representative acknowledged receipt of the letter that same day. To date, 1800 Park has not received back any part of its $5 million ICA payment and has brought an adversarial action against Roglieri, and others, in Roglieri's Personal Bankruptcy Proceeding.

### Conclusion

22.     Based on the foregoing, I respectfully submit that this affidavit establishes probable cause for a criminal complaint charging Kris Roglieri with wire fraud committed in violation of 18 U.S.C. § 1343.

Attested to by the affiant:

_____
Jonathon Vick
Special Agent
Federal Bureau of Investigation

I, the Honorable Christian F. Hummel, United States Magistrate Judge, hereby acknowledge that this affidavit was attested by the affiant by telephone on May 28, 2024 in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

_____
Hon. Christian F. Hummel
United States Magistrate Judge

7